*Original*

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
AT DENVER

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUN -5 2020

JEFFREY P. COLWELL
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 1:17-cr-168-CMA-1 |
| | ) | Civil No. |
| Plaintiff-Respondent, | ) | |
| | ) | HON. CHRISTINE M. ARGUELLO |
| vs. | ) | MAG. |
| | ) | |
| KAREN LYNN MCCLAFLIN, | ) | MOTION FOR COMPASSIONATE |
| | ) | RELEASE OR HOME CONFINEMENT |
| Defendant-Movant. | ) | PER THE CARE & FIRST STEP ACTS |

\* \* \* \* \* \* \* \* \* \*

COMES NOW DEFENDANT-MOVANT Karen Lynn McClaflin and respectfully moves this Honorable Court to for an **EMERGENCY ORDER** for her compassionate release or home confinement pursuant to 18 U.S.C. § 3624(c)(2) (Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement) 18 U.S.C. § 3582(c)(1)(A)(i) and the Cares Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) and the Barr Memorandums of March 26, 2020 and April 3, 2020 and 18 U.S.C. § 3553(a).

### *ISSUES PRESENTED*

Issue:                                                                          Page:

1.)    **This Court Should Grant Immediate Compassionate Release For Ms
       McClaflin Pursuant 18 U.S.C. § 3582(c)(1)(A)(i) As Amended By The
       CARES Act, And The Barr Memo And Consistent With 18 U.S.C. §
       3553(a)** ............................................................................................................ 5

2.)    **Given The Life And Death Consequences To Karen Lynn McClaflin,
       This Court Can And Should Reach And Rule On The Merits Of Her
       Motion Without Requiring Further Exhaustion Of Administrative
       Remedies** ......................................................................................................... 18

**Conclusion** .................................................................................................................. 20

iii

**Certificate of Filing and Service**........................................................................**21**

**Appendix of Exhibits** .............................................................................**End**

Administrative Remedies...........................................................A

## Statement Of Facts And Procedural History

On 5-10-18 Ms McClaflin was sentenced to 96 months incarceration plus 3 years supervised release, $200.00 special assessment and $14,528,206.39 restitution for violation of 18 U.S.C. § 1343 (Wire Fraud) (Count 1); 18 U.S.C. § 1957 (Monetary Transaction in Property Derived from Wire Fraud) (Count 2).

With good time, Ms McClaflin has served 12 months months of her sentence. This is 15% of her sentence.

For at least the last year, Ms McClaflin prison record has been exemplary.

Ms McClaflin is 61 years old.

Ms McClaflin is currently housed in FMC Carswell. While Ms McClaflin is currently housed in other than a low or minimum security facility, her actual security level is minimum.

Ms McClaflin has a minimal PATTERN score.

Ms McClaflin suffers from the following medical conditions which cause her to be especially vulnerable to the coronavirus in accordance with the Centers for Disease Control and Prevention (CDC) guidelines[1]:

> 1. Autoimmune disorder due to massive amounts of broad-spectrum antibiotics used to treat infections following 18 hip surgeries. (Documentation available through my medical records). I am exceptionally susceptible to any & all virus' to which I am exposed. I actually got an infection in my hip from a routine teeth cleaning even though I took 4 amoxicillin as recommended by my doctor.

---

[1] Based on what we know now, those at high-risk for severe illness from COVID-19 are: People of all ages with underlying medical conditions, particularly if not well controlled, including: People 65 years and older;  People with chronic lung disease or moderate to severe asthma; People who have serious heart conditions;  People who are immunocompromised;   Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications;  People with severe obesity (body mass index [BMI] of 40 or higher);  People with diabetes;  People with chronic kidney disease undergoing dialysis;   People with liver disease.   See: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

2. I suffered through one episode of Clostridium difficile due to the antibiotic treatments. Clostridium difficile is a highly contagious, deadly condition if not immediately treated. See: https://www.mayoclinic.org/diseases-conditions/c-difficile/symptoms-causes/syc-20351691
3. Thyroid disease - have taken thyroid medications for 20+ years. Thyroid disease runs in my family.
4. Former smoker - lungs are borderline to needing oxygen during the day.
5. I have been recommended the use of a C-PAP at night, but have not gotten one here at Carswell yet.

(See attachments)

These multiple and severe comorbidities increase her likelihood of death exponentially when she inevitably contracts COVID-19 if she continues to be held at FMC Carswell.[2]

Ms McClaflin also suffers from the following serious medical condition which was not known to the Sentencing Court:

I was assigned to FMC Carswell as the Judge in my case, Hon. Christine Arguello, was under the impression that this facility was a medical facility and that my medical issues would be addressed here. such is not the case as Carswell has not passed their inspection for many years to receive accreditation as a Medical Facility. Carswell is a Nursing Facility, Behavioral Modification Unit & Ambulatory Care Unit. As such, I self-surrendered here on 6/11/20 with the expectation that I could receive appropriate medical care for my medical issues. I was originally sentenced to the AZ (Phoenix) Satellite Camp as I am a low-level offender. After meeting with the BOP Contractor, Dr. Santos - (Orthopedic Surgeon), it was determined that I should wait at least 6-12 months before considering any 'reimplantation' surgery. A 'Girdlestone Procedure' was performed in December, 2018. As that date approached, Dr. Santos on his second meeting with me expressed his concerns about his unfamiliarity with my condition as well as the Doctors at the Hospital where he worked. I asked Dr. Jowdy, (my BOP assigned physician), whether or not I should even contemplate having the surgery done while at Carswell and what he would do if he was me. He stated that under no circumstances would he have the surgery done here. He would go to The Hospital for Special Surgery in New York or the Mayo Clinic. He was so adamant about it that he looked it up on his computer while I was in his consultation room and had me scoot around to see the screen. He typed in the HSS in NY and we picked out 2 physicians that only specialized in hip replacements. *It is to be noted that my right leg is now over 6 inches shorter than my left leg*.

(See attachments)

2

Ms McClaflin's re-entry plan will prevent recidivism and maximize public safety as hereinafter more fully appears. She will be picked up at the prison by private vehicle and carried directly to her available Probation Approved housing at 1630 drive, Colorado Springs, Colorado, 80921. At this location she will have a private room and bath segregated from anyone else. She will contact the local Federal Probation Office at Colorado Springs to coordinate her supervision. She is disabled and will apply for supplemental Social Security but will still be able to assist the "receiver" in her underlying case to continue returning funds to the victims of the case. She will have medical care available thru her ex-husband's insurance where he works.. Under these verifiable conditions, Ms McClaflin would maximize public safety and present a vastly lower risk of contracting COVID-19 than if allowed to continue incarceration at FMC Carswell.

Due to Ms McClaflin's minimal PATTERN score, she is *by definition* NOT a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).

Ms McClaflin has filed 3 (three) BP-9 administrative remedy requests with the warden of the facility in which she is incarcerated. The dates of filing the first two of the  requests are 11-18-19 and 1-27-20. The third request was filed shortly before the filing of this motion. The BP-10 request was denied on 3-12-20 as untimely. It was untimely because she was in quarantine when the second BP-9 was answered and so she was unable to file the BP-10 on time. (See attachments) The institution where Ms McClaflin is incarcerated has explicitly advised that she is NOT eligible for release under the CARES Act. As much as Ms McClaflin has tried to exhaust administrative remedies, she has been unable to because the BOP simply runs her around in a circle.

---

[2] *Id.*

Ms McClaflin argues below that this Court can and should grant emergency release to home confinement pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and the Cares Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) and the Barr Memorandums of March 26, 2020 and April 3, 2020 and 18 U.S.C. § 3553(a).

### Argument

1.) **This Court Should Grant Immediate Compassionate Release For Ms McClaflin Pursuant 18 U.S.C. § 3582(c)(1)(A)(i) As Amended By The CARES Act, And The Barr Memo And Consistent With 18 U.S.C. § 3553(a).**

18 U.S.C. § 3582(c)(1) provides in relevant part:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that--
> (1) in any case--
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) [18 USCS § 3553(a)] to the extent that they are applicable, if it finds that-
> (i) *extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*;

*Id.* 18 U.S.C. § 3582(c)(1) (As Amended Dec. 21, 2018,P.L. 115-391, Title VI, § 603(b), 132 Stat. 5239) (emphasis added). See *United States v. Maumau*, 2020 U.S. Dist. LEXIS 28392 *; 2020 WL 806121 (D UT 2-18-20).

18 U.S.C. § 3553(a) provides that the Court should consider the following in determining whether to grant compassionate release under 18 U.S.C. § 3582(c)(1):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the [*17] sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;

5

(4) the kinds of sentence[s] and the sentencing range established for—
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ... [;]
(5) any pertinent policy statement ... [;]
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). See *United States v. Cantu*, No. 1:05-CR-458-1, 2019 U.S. Dist. LEXIS

100923, at *16-17 (SD TX 6-17-19).

Sec. 12003 of the CARES Act, Congressional Record Vol. 166, No. 59, Section 12003

(Senate - March 25, 2020) provides:

(a) Definitions.--In this section--
(1) the term ``Bureau'' means the Bureau of Prisons;
(2) *the term ``covered emergency period'' means the period beginning on the date on which the President declared a national emergency under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID-19) and ending on the date that is 30 days after the date on which the national emergency declaration terminates;* and
(3) the term ``Secretary'' means the Secretary of Health and Human Services.
(b) Supply of Personal Protective Equipment and Test Kits to Bureau of Prisons; Home Confinement Authority.--
(1) Personal protective equipment and test kits.--
(A) Findings.--Congress finds the following:
(i) There is an urgent need for personal protective equipment and test kits to the Bureau based on the density of the inmate population, the high traffic, the high volume of inmates, the high rate of turnover of inmates and personnel, and the number of high-security areas, within the facilities of the Bureau.
(ii) The inability of the Bureau to secure the purchase of infectious disease personal protective equipment and related supplies now and in the future is a vulnerability.
(iii) The Bureau is currently competing in and engaging the same landscape of vendors as all other Federal agencies and private entities.
(iv) The ability of the Bureau to purchase needed equipment and supplies is currently subject to an individual manufacturer's specific recognition of the

6

Bureau as a priority and subsequent allocation of the inventory of the manufacturer to the Bureau.

(B) Consideration.--The Secretary shall appropriately consider, relative to other priorities of the Department of Health and Human Services for high-risk and high-need populations, the distribution of infectious disease personal protective equipment and COVID-19 test kits to the Bureau for use by inmates and personnel of the Bureau.

*(2) Home confinement authority.--During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.*

c) Video Visitation.--

(1) In general.--During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau shall promulgate rules regarding the ability of inmates to conduct visitation through video teleconferencing and telephonically, free of charge to inmates, during the covered emergency period.

(2) Exemption from notice-and-comment rulemaking requirements.--Section 553 of title 5, United States Code, shall not apply to the promulgation of rules under paragraph

(1) of this subsection.

(d) Emergency Requirement.--The amount provided by this section is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

*Id*. CARES Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) (emphasis added).

The so-called "Barr Memo" of March 26, 2020 by the Attorney General states as follows:

Office of the Attorney General
Washington, DC 20530
March 26, 2020

**MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS FROM: THE ATTORNEY GENERAL**

SUBJECT: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic

7

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

## I. TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

> • The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;
>
> • The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;
>
> • The inmate's conduct in prison, with inmates who have engaged in violent or gang related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;
>
> • The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

• Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

• The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

II. PROTECTING THE PUBLIC

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

*Id.* Memorandum from Attorney General Barr dated 3-26-20.

On 4-3-20, the Attorney General has subsequently issued an updated memorandum as hereinafter more fully appears:

9

**MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS**
**FROM:** THE ATTORNEY GENERAL
**SUBJECT:** Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

**I. IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

10

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

*Id.* Memorandum from Attorney General Barr dated 4-3-20.

While old policy statements provide helpful guidance, they do not constrain the Court's independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i). An interpretation of the old policy statements as binding on the new compassionate release procedure is likely inconsistent with the Commission's statutory role. . . . It is also inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BOP finds they are not appropriate. . . . Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement. *United States v. Maumau*, 2020 U.S. Dist. LEXIS 28392 *; 2020 WL 806121

11

(D UT 2-18-20) (citing and quoting *United States v. Beck*, 2019 U.S. Dist. LEXIS 108542, 2019 WL 2716505 at \*5-6 (M.D.N.C. June 28, 2019) and collecting cases.)[3].

    In Ms McClaflin's case, as set forth in the Statement of Facts, supra, on 5-10-18 she was sentenced to 96 months incarceration plus 3 years supervised release, $200.00 special assessment and $14,528,206.39 restitution for violation of 18 U.S.C. § 1343 (Wire Fraud) (Count 1); 18 U.S.C. § 1957 (Monetary Transaction in Property Derived from Wire Fraud) (Count 2). With good time, Ms McClaflin has served 12 months months of her sentence. This is 15% of her sentence. For at least the last year, Ms McClaflin prison record has been exemplary. Ms McClaflin is 61 years old. She is currently housed in FMC Carswell. While Ms McClaflin is currently housed in other than a low or minimum security facility, her actual security level is minimum. Ms McClaflin has a minimal PATTERN score. Ms McClaflin suffers from the

---

[3] see also *United States v. Cantu*, No. 1:05-CR-458-1, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923 at \*5 (S.D. Tex. June 17, 2019) ("[T]he correct interpretation of § 3582(c)(1)(A)—based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statements at any time . . . —is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief."). [\*6] Accord *United States v. Cantu-Rivera*, No. H-89-204, 2019 U.S. Dist. LEXIS 105271, 2019 WL 2578272 at \*2 n.1 (S.D. Tex. June 24, 2019); *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, 2019 WL 3046086 at \*3 (D. Me. July 11, 2019); *United States v. Rivernider*, No. 3:10-cr-222(RNC), 2019 U.S. Dist. LEXIS 137134, 2019 WL 3816671 at \*2 (D. Conn. Aug. 14, 2019); *United States v. Bucci*, 409 F. Supp. 3d 1, 2019 WL 5075964 at \*1 (D. Mass., 2019); *United States v. Brown*, No. 4:05-CR-00227-1, 2019 U.S. Dist. LEXIS 175424, 2019 WL 4942051 at \*4 (S.D. Iowa Oct. 8, 2019); *United States v. Urkevich*, No. 8:03CR37, 2019 U.S. Dist. LEXIS 197408, 2019 WL 6037391 at \*3 (D. Neb. Nov. 14, 2019); *United States v. Dusenbery*, No. 5:91-cr-291, 2019 U.S. Dist. LEXIS 199502, 2019 WL 6111418 at \*3 n.3 (N.D. Ohio Nov. 18, 2019); *United States v. Valdez*, No. 3:98-cr-0133-01-HRH, 2019 U.S. Dist. LEXIS 223651, 2019 WL 7373023 at \*2-3 (D. Alaska Dec. 31, 2019); *United States v. Schmitt*, No. CR12- 4076-LTS, 2020 U.S. Dist. LEXIS 2832, 2020 WL 96904 at \*3 (N.D. Iowa Jan. 8, 2020).

following medical conditions which cause her to be especially vulnerable to the coronavirus in

accordance with the Centers for Disease Control and Prevention (CDC) guidelines[4]:

> 1. Autoimmune disorder due to massive amounts of broad-spectrum antibiotics used to treat infections following 18 hip surgeries. (Documentation available through my medical records). I am exceptionally susceptible to any & all virus' to which I am exposed. I actually got an infection in my hip from a routine teeth cleaning even though I took 4 amoxicillin as recommended by my doctor.
> 2. I suffered through one episode of Clostridium difficile due to the antibiotic treatments. Clostridium difficile is a highly contagious, deadly condition if not immediately treated. See: https://www.mayoclinic.org/diseases-conditions/c-difficile/symptoms-causes/syc-20351691
> 3. Thyroid disease - have taken thyroid medications for 20+ years. Thyroid disease runs in my family.
> 4. Former smoker - lungs are borderline to needing oxygen during the day.
> 5. I have been recommended the use of a C-PAP at night, but have not gotten one here at Carswell yet.

(See attachments)

These multiple and severe comorbidities increase her likelihood of death exponentially

when she inevitably contracts COVID-19 if she continues to be held at FMC Carswell.[5]

Ms McClaflin also suffers from the following serious medical condition which was not

known to the Sentencing Court:

> I was assigned to FMC Carswell as the Judge in my case, Hon. Christine Arguello, was under the impression that this facility was a medical facility and that my medical issues would be addressed here. such is not the case as Carswell has not passed their inspection for many years to receive accreditation as a Medical Facility. Carswell is a Nursing Facility, Behavioral Modification Unit &

---

[4] Based on what we know now, those at high-risk for severe illness from COVID-19 are: People of all ages with underlying medical conditions, particularly if not well controlled, including: People 65 years and older;  People with chronic lung disease or moderate to severe asthma;  People who have serious heart conditions;  People who are immunocompromised;  Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications;  People with severe obesity (body mass index [BMI] of 40 or higher);  People with diabetes;  People with chronic kidney disease undergoing dialysis;  People with liver disease.  See: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html
[5] *Id.*

Ambulatory Care Unit. As such, I self-surrendered here on 6/11/20 with the expectation that I could receive appropriate medical care for my medical issues. I was originally sentenced to the AZ (Phoenix) Satellite Camp as I am a low-level offender. After meeting with the BOP Contractor, Dr. Santos - (Orthopedic Surgeon), it was determined that I should wait at least 6-12 months before considering any 'reimplantation' surgery. A 'Girdlestone Procedure' was performed in December, 2018. As that date approached, Dr. Santos on his second meeting with me expressed his concerns about his unfamiliarity with my condition as well as the Doctors at the Hospital where he worked. I asked Dr. Jowdy, (my BOP assigned physician), whether or not I should even contemplate having the surgery done while at Carswell and what he would do if he was me. He stated that under no circumstances would he have the surgery done here. He would go to The Hospital for Special Surgery in New York or the Mayo Clinic. He was so adamant about it that he looked it up on his computer while I was in his consultation room and had me scoot around to see the screen. He typed in the HSS in NY and we picked out 2 physicians that only specialized in hip replacements. *It is to be noted that my right leg is now over 6 inches shorter than my left leg*.

(See attachments)

Ms McClaflin's re-entry plan will prevent recidivism and maximize public safety as hereinafter more fully appears. She will be picked up at the prison by private vehicle and carried directly to her available Probation Approved housing at 1630 drive, Colorado Springs, Colorado, 80921. At this location she will have a private room and bath segregated from anyone else. She will contact the local Federal Probation Office at Colorado Springs to coordinate her supervision. She is disabled and will apply for supplemental Social Security but will still be able to assist the "receiver" in her underlying case to continue returning funds to the victims of the case. She will have medical care available thru her ex-husband's insurance where he works.. Under these verifiable conditions, Ms McClaflin would maximize public safety and present a vastly lower risk of contracting COVID-19 than if allowed to continue incarceration at FMC Carswell.

Due to Ms McClaflin's minimal PATTERN score, she is *by definition* NOT a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).

14

Extraordinary events that could not have been foreseen at the time of sentencing have made Ms McClaflin's current state of confinement at FMC Carswell extremely dangerous for her. In recent months, COVID-19 has spread across the globe and throughout the United States. As of 5-18-20 COVID-19 has sickened over 4,789,376 people, leading to at least 316,049 deaths worldwide[6]. As of 5-18-20 COVID-19 has sickened over 1,524,215 people, leading to at least 90,897 deaths in the United States[7]. On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic. President Trump has declared a national emergency. The Centers for Disease Control and Prevention ("CDC") have issued guidance related to the deadly effects of COVID-19 on certain high-risk patients of the population. The CDC identified the population most at risk of death from the disease to include adults of any age with underlying medical conditions, including people with diabetes and other chronic illnesses. For these individuals, the CDC warned to take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[8]

As of 5-18-20 there have been 1 positive case of coronavirus in FMC Carswell and 1 death from coronavirus in FMC Carswell. Notably, the "number of cases" is predicated on the policy of FMC Carswell which ONLY tests symptomatic individuals -- at most. *Cf. Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 **5 (ND OH 4-22-20); *Martinez-Brooks v. Easter*, No. 3:20-cv-00569; 2020 U.S. Dist. LEXIS 83300 * (D CT 5-12-20).

Moreover, a sentence reduction for Ms McClaflin is consistent with and supported by the factors in 18 U.S.C. § 3553(a), whose consideration is mandated by 18 U.S.C. § 3582(c)(1)(A) "to the extent they are applicable." Two of those factors now carry more weight than at the time

---

[6] See JOHNS HOPKINS Coronavirus Resource Center,  https://coronavirus.jhu.edu/map.html
[7] See JOHNS HOPKINS Coronavirus Resource Center,  https://coronavirus.jhu.edu/map.html

of sentencing: (1) "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); and

(2) "the need for the sentence imposed . . . to provide the defendant with . . . medical care . . . in

the most effective manner," 18 U.S.C. § 3553(a)(2)(D).[9] First, Ms McClaflin's vulnerability to

COVID-19 weigh in favor of reducing her sentence. Second, she is a non-violent offender with a

minimal "Pattern Score" which, by the BOP's own definition indicates she is NOT in need of

continued incarceration and should be released to be able to obtain medical care even if it is just

"social distancing" which is *NOT* even *alleged* by the strongest prison advocates as being

available in prison. *Id.* Any other course is simply playing Russian Roulette with Ms McClaflin's

life. She did NOT receive a sentence of "Russian Roulette" with her life.

Given (1) the highly infectious nature of COVID-19, (2) the limitations in a prison

environment (even a prison medical center) on practicing the hygienic and social distancing

techniques that the Center for Disease Control has put in place to prevent rapid transmission, and

(3) the fact that Ms McClaflin suffers from ailments that have already been identified as "high

risk," it is clear that Ms McClaflin's legitimate medical risk is a sufficiently extraordinary and

compelling basis for granting compassionate release. See Note 1(A), U.S.S.G. § 1B1.13

(expressly recognizing that "other reasons" may exist for granting compassionate release), see

Note 1(D), U.S.S.G. § 1B1.13 (recognizing that extraordinary and compelling reasons exists

"other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Ms

McClaflin's high susceptibility to COVID-19 falls within the purview of this catchall. See *Wilson*

*v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 (ND OH 4-22-20), affirmed,

---

[8]    See:    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html
[9] See *United States v. Kirk Brannan*, No. 4:15-CR-80-01 (SD TX 4-2-20) (ordering emergency release of vulnerable prisoner due to COVID-19 with a finding that these two sections of 18 U.S.C. § 3553(a) "now carry more weight than at the time of sentencing")

16

*Wilson v. Williams*, No. 20-3447; 2020 U.S. App. LEXIS 14291 * (6th Cir. 5-4-20); *Martinez-Brooks v. Easter*, No. 3:20-cv-00569; 2020 U.S. Dist. LEXIS 83300 * (D CT 5-12-20).

Based on the foregoing facts, continued incarceration of Ms McClaflin at FMC Carswell is subjecting her to denial of her Eighth Amendment constitutional right to be free of cruel and unusual punishment by deliberate indifference to her serious medical needs. *Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 (ND OH 4-22-20), affirmed, *Wilson v. Williams*, No. 20-3447; 2020 U.S. App. LEXIS 14291 * (6th Cir. 5-4-20); *Martinez-Brooks v. Easter*, No. 3:20-cv-00569; 2020 U.S. Dist. LEXIS 83300 * (D CT 5-12-20).

Based on the foregoing, a sentence reduction for Ms McClaflin is consistent with and supported by the factors in 18 U.S.C. § 3582(c)(1)(A)(i) and the Cares Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) as well as the Barr Memorandums and *Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 (ND OH 4-22-20), affirmed, *Wilson v. Williams*, No. 20-3447; 2020 U.S. App. LEXIS 14291 * (6th Cir. 5-4-20); *Martinez-Brooks v. Easter*, No. 3:20-cv-00569; 2020 U.S. Dist. LEXIS 83300 * (D CT 5-12-20).[10]

---

[10] Judges around the country have released defendants in light of the extraordinary risk posed by the COVD-19 pandemic. See, e.g., *United States v. Grobman*, No. 18-cr-20989 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Powell*, No. 1:94-cr- 316-ESH (D.D.C. Mar. 28, 2020) (granting motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Stephens,* 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic") (Nathan, J.); see also *United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (sua sponte

17

**2.)    Given The Life And Death Consequences To Karen Lynn McClaflin, This Court Can And Should Reach And Rule On The Merits Of Her Motion Without Requiring Further Exhaustion Of Administrative Remedies.**

It is well settled law that a Court can dispense with administrative remedies in appropriate cases and go directly to the merits. Indeed, courts throughout the country have waived the administrative exhaustion requirements under the First Step Act where circumstances warrant. See *Washington v. Bur. of Prisons*, No. 1:19-CV-01066, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (in addressing motion for recalculation of good time credit under the First Step Act, the court explained that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile."). Moreover, "[e]ven where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019). There are generally three bases for waiver of an exhaustion requirement. See *United States v. Perez*, No. 17cr513-3(AT), ECF No. 98 at 3-4 (S.D.N.Y. Apr. 1, 2020) (discussing exceptions to statutory exhaustion in context of motion for compassionate release during COVID-19 pandemic). "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Washington*, 925 F.3d at 118. "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile." *Id.* at 120. Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief," including situations where "the relief the agency might provide could,

---

inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Kirk Brannan*, No. 4:15-CR-80-01 (SD TX 4-2-20) (ordering emergency release of vulnerable prisoner due to COVID-19 with a finding that these two sections of 18 U.S.C. § 3553(a) "now carry more weight than at the time of sentencing"); *United States v. Colvin*, Case No. 3:19-cr-00179-JBA (D CT 4-2-20); *United States v. Resnick*, Case No. 1:12-cr-00152-CM (SD NY 4-2-20).

because of undue delay, become inadequate." *Id.* at 119-20. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." Id. at 119.[11]

In Ms McClaflin's case, as set forth above, she has filed 3 (three) BP-9 administrative remedy requests with the warden of the facility in which she is incarcerated. The dates of filing the first two of the requests are 11-18-19 and 1-27-20. The third request was filed shortly before the filing of this motion. The BP-10 request was denied on 3-12-20 as untimely. It was untimely because she was in quarantine when the second BP-9 was answered and so she was unable to file the BP-10 on time. (See attachments) The institution where Ms McClaflin is incarcerated has explicitly advised that she is NOT eligible for release under the CARES Act. As much as Ms McClaflin has tried to exhaust administrative remedies, she has been unable to because the BOP simply runs her around in a circle. (See attachments)

Based on the foregoing, given the life and death consequences to Karen Lynn McClaflin, this Court can and should reach and rule on the merits of her motion without requiring further exhaustion of Administrative Remedies.

---

[11] See also *United States v. Walker*, No. 3:10-cr- 00298-RRB-1, [Dkt. 110] (D. Or. Feb. 7, 2019) (finding that, although the defendant failed to exhaust administrative remedies, the Court had jurisdiction to order recalculation of defendant's good time Case 3:19-cr-00179-JBA Document 30 Filed 03/31/20 Page 6 of 8 7 credit under the First Step Act and to order defendant's release if his term of imprisonment had expired); see also *Gurzi v. Marques*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at *2 (D. Minn. Oct. 10, 2019) (despite prisoner's failure to exhaust administrative remedies, addressing the merits of prisoner's objections to his designation, in part under the First Step Act, as "the Court observes that it has the authority to proceed to the merits of the case rather than rely on a failure to exhaust when appropriate."); *United States v. Colvin*, Case No. 3:19-cr-00179-JBA (D CT 4-2-20); *United States v. Brannan*, Case No. 4:15-cr-00080 (SD TX 4-2-20) (verbal request to case manager constituted exhaustion).

## CONCLUSION

Based on the foregoing, a sentence reduction for Ms McClaflin is consistent with and supported by the factors in 18 U.S.C. § 3582(c)(1)(A)(i) and the CARES Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) and the Barr Memorandum of April 3, 2020.. *Id.* Ms McClaflin respectfully requests this Court to so **ORDER**.

Date: 6/01/20                                    Respectfully submitted,

                                                 Karen Lynn McClaflin
                                                 44166-013
                                                 P.O. Box 27137
                                                 Fort Worth, TX  76127

20

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### AT DENVER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 1:17-cr-168-CMA-1 |
| | ) | Civil No. |
| Plaintiff-Respondent, | ) | HON. CHRISTINE M. ARGUELLO |
| | ) | MAG. |
| vs. | ) | |
| | ) | CERTIFICATE OF FILING |
| KAREN LYNN MCCLAFLIN, | ) | AND SERVICE |
| | ) | |
| Defendant-Movant. | ) | |

\* \* \* \* \* \* \* \* \* \*

Pursuant to the principles of *Houston v. Lack,* 487 U.S. 266, 276 (1988), Ms McClaflin

has this day filed with the Court and served counsel for the opposing party with the required

original and copies of the enclosed documents by depositing same in the prison legal mail

collection box, in sealed envelopes, first class postage affixed and addressed to: **Clerk, U.S.**

**District Court, 901--19th Street, Denver, CO 80294-3589** and to **United States Attorney,**

**1801 California St #1600, Denver, CO 80202.**

Signed under penalty of perjury under
28 U.S.C. § 1746 this _1ST_ day
of _____JUNE_____, 2020.

**Karen Lynn McClaflin**
44166-013
P.O. Box 27137
Fort Worth, TX  76127

21

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
## AT DENVER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 1:17-cr-168-CMA-1 |
| | ) | Civil No. |
| Plaintiff-Respondent, | ) | HON. CHRISTINE M. ARGUELLO |
| | ) | MAG. |
| vs. | ) | |
| | ) | |
| KAREN LYNN MCCLAFLIN, | ) | **VERIFICATION OF EXHIBITS** |
| | ) | |
| Defendant-Movant. | ) | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**COMES NOW DEFENDANT-MOVANT Karen Lynn McClaflin** and deposes and states as follows:

1.)    I am the Defendant-Movant in the above entitled case and the instant proceedings pursuant to 18 U.S.C. § 3582(c)(1).

2.)    The attached documents are submitted as exhibits in support of my 18 U.S.C. § 3582(c)(1) motion. I have personal knowledge of the originals of the exhibits and state that the copies truly and accurately represent said originals.

3.)    I have read the foregoing and state that it is true and correct.

Signed under penalty of perjury under 28 U.S.C. § 1746 this __1st__ day of __June__, 2020.


Karen Lynn McClaflin
Defendant-Movant
44166-013
P.O. Box 27137
Fort Worth, TX 76127

1

**ATTACHMENT TO BP-9**

I am requesting compassionate release and/or transfer to home confinement pursuant to 28 U.S.C. § 2241 and 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 2201 and 2202 and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) as well as 18 U.S.C. § 3624(c)(2) (Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement) 18 U.S.C. § 3582(c)(1)(A)(i) and the *Cares Act*, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) and the *Barr Memorandums of March 26, 2020 and April 3, 2020* and 18 U.S.C. § 3553(a) and for the following reasons:

I currently suffer from the following medical conditions which cause me to be especially vulnerable to the coronavirus in accordance with the Centers for Disease Control and Prevention (CDC) guidelines[1]:

> 1. Autoimmune disorder due to massive amounts of broad-spectrum antibiotics used to treat infections following 18 hip surgeries. (Documentation available through my medical records). I am exceptionally susceptible to any & all virus' to which I am exposed. I actually got an infection in my hip from a routine teeth cleaning even though I took 4 amoxicillin as recommended by my doctor.
> 2. I suffered through one episode of Clostridium difficile due to the antibiotic treatments. Clostridium difficile is a highly contagious, deadly condition if not immediately treated. See: https://www.mayoclinic.org/diseases-conditions/c-difficile/symptoms-causes/syc-20351691
> 3. Thyroid disease - have taken thyroid medications for 20+ years. Thyroid disease runs in my family.
> 4. Former smoker - lungs are borderline to needing oxygen during the day.
> 5. I have been recommended the use of a C-PAP at night, but have not gotten one here at Carswell yet.

These multiple and severe comorbidities increase my likelihood of death exponentially when I inevitably contract COVID-19 if I continue to be held at FMC Carswell.

I also suffer from the following medical conditions which were NOT foreseen by the Sentencing Court:

---

[1] Based on what we know now, those at high-risk for severe illness from COVID-19 are: People of all ages with underlying medical conditions, particularly if not well controlled, including: People 65 years and older; People with chronic lung disease or moderate to severe asthma; People who have serious heart conditions; People who are immunocompromised; Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; People with severe obesity (body mass index [BMI] of 40 or higher); People with diabetes; People with chronic kidney disease undergoing dialysis; People with liver disease. See: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

I was assigned to FMC Carswell as the Judge in my case, Hon. Christine Arguello, was under the impression that this facility was a medical facility and that my medical issues would be addressed here. such is not the case as Carswell has not passed their inspection for many years to receive accreditation as a Medical Facility. Carswell is a Nursing Facility, Behavioral Modification Unit & Ambulatory Care Unit. As such, I self-surrendered here on 6/11/20 with the expectation that I could receive appropriate medical care for my medical issues. I was originally sentenced to the AZ (Phoenix) Satellite Camp as I am a low-level offender. After meeting with the BOP Contractor, Dr. Santos - (Orthopedic Surgeon), it was determined that I should wait at least 6-12 months before considering any 'reimplantation' surgery. A 'Girdlestone Procedure' was performed in December, 2018. As that date approached, Dr. Santos on his second meeting with me expressed his concerns about his unfamiliarity with my condition as well as the Doctors at the Hospital where he worked. I asked Dr. Jowdy, (my BOP assigned physician), whether or not I should even contemplate having the surgery done while at Carswell and what he would do if he was me. He stated that under no circumstances would he have the surgery done here. He would go to The Hospital for Special Surgery in New York or the Mayo Clinic. He was so adamant about it that he looked it up on his computer while I was in his consultation room and had me scoot around to see the screen. He typed in the HSS in NY and we picked out 2 physicians that only specialized in hip replacements. *It is to be noted that my right leg is now over 6 inches shorter than my left leg.*

The foregoing extraordinary and compelling circumstances demonstrate deprivation by the Bureau of Prisons of my Eigth Amendment right to be free of cruel and unusual punishment by deliberate indifference to my serious medical needs.

My proposed release plans, including where I will reside, how I will support myself, and, information on where I will receive medical treatment and how I will pay for such treatment: are as follows:

I will be picked up at the prison by private vehicle and carried directly to my available Probation Approved housing at 15954 Jackson Creek Pkwy #B602, Monument, CO 80132. At this location I will have a private room and bath segregated from anyone else. I will contact the local Federal Probation Office at Colorado Springs to coordinate my supervision. I am disabled and will apply for supplemental Social Security but will still be able to assist the "receiver" in my underlying case to continue returning funds to the victims of the case. I will have medical care available thru my husband's insurance where he works.. Under these verifiable conditions, I will maximize public safety and present a vastly lower risk of contracting COVID-19 than if allowed to continue incarceration at FMC Carswell.

Date: 6/01/20

Karen Lynn McClaflin
44166-013
P.O. Box 27137
Fort Worth, TX 76127

2

REJECTION NOTICE -- ADMINISTRATIVE REMEDY

DATE: MARCH 16, 2020

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      SOUTH CENTRAL REGIONAL OFFICE

TO  : KAREN LYNN MCCLAFLIN, 44166-013
      CARSWELL FMC    UNT: UNIT 6 CC    QTR: C02-103L
      P.O. BOX 27066
      FORT WORTH, TX 76127

FOR THE REASONS LISTED BELOW, THIS REGIONAL APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID        : 1004424-R1    REGIONAL APPEAL
DATE RECEIVED    : MARCH 12, 2020
SUBJECT 1        : REDUCTION-IN-SENTENCE REQUEST
SUBJECT 2        :
INCIDENT RPT NO:

REJECT REASON 1: YOUR APPEAL IS UNTIMELY. REGIONAL APPEALS (BP-10)
                 MUST BE RECEIVED WITHIN 20 DAYS OF THE WARDEN/CCM
                 RESPONSE OR RECEIPT OF THE DHO REPORT. THIS TIME
                 INCLUDES MAIL TIME.

REJECT REASON 2: YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN
                 15 DAYS OF THE DATE OF THIS REJECTION NOTICE.

REJECT REASON 3: SEE REMARKS.

REMARKS        : YOU HAD 20 DAYS FROM THE DAY YOU RECEIVED YOUR BP-9
                 RESPONSE 2-14-2020 TO APPEAL. PROVIDE STAFF DOCUMEN
                 TATION FOR REASON OF DELAY.



**For Institution
Delivery to Inmate**

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

FROM: MCCLAFLIN, KAREN L.    44166-013    CC-5    CARSWELL
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO    UNIT    INSTITUTION

**Part A - REASONS FOR APPEAL**

I AM SUBMITTING THIS APPEAL FOR RECONSIDERATION
BASED ON PROGRAM STATEMENT 5050.50 AMEND # 799

PLEASE SEE ATTACHED

3-9-20
DATE                    SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

MAR 12 2020

DATE
If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

**ORIGINAL: RETURN TO INMATE**    CASE NUMBER: 1004424-R1    REGIONAL DIRECTOR

**Part C - RECEIPT**

CASE NUMBER:

Return to:
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT:

DATE    SIGNATURE, RECIPIENT OF REGIONAL APPEAL    BP-230(13)
JUNE 2002

March 9, 2020

Bureau of Prisons
South Central Regional Office
344 Marine Forces Drive
Grand Prairie, TX  75051

To Whom it May Concern:

Pursuant to the attached denial letter of my request for Administrative Remedy # 1004424-F1, I am submitting this request for reconsideration.

As an inmate, I may request consideration for Reduction in Sentence or Compassionate Release when there are extraordinary or compelling circumstances which could not have been foreseen at the time of sentencing.  At the time of my sentencing, I was not suffering from any surgical complications; however, no one could have foreseen the fact that the BOP would NOT be able to provide a physician with the necessary skill set and experience to perform the reimplantation surgery that I desperately require.

Although I may not meet ALL the criteria according to USC 18 3582(d)(1).   Program Statement 5050.50 Amendment 799 clearly states that there may exist conditions that are in COMBINATION of those outlined within the Program Statement.  (SEE ATTACHED)

Amendment 799 provides an option to reduce a sentence to qualify for the 60+ pilot program so that an inmate over 60 years of age can spend the remainder of their sentence on home confinement.

If an inmate doesn't qualify EXACTLY under a section of Program Statement 5050.50, it doesn't mean that they don't qualify for a COMBINATION of issues within any given section.

Dr. Jowdy, (my BOP assigned physician), as well as Dr. Miner, (my Orthopedic Specialist from Denver, CO), concur that due to the complexity of the Denver, CO surgery and the trauma suffered, I have ONE more opportunity for a successful surgery. reimplantation.

To-date, the costs of surgeries, prescriptions, rehab etc. is approximately $3M for 18 surgeries performed.  Because I cannot bear any weight on my right leg, (due to the missing skeletal structure), I am confined to a wheelchair (or walker) 15-16 hours a day.

I am 61 years old and am suffering from a debilitative condition- (my right leg continues to atrophy due to the delay in surgery and is now over 6" shorter than my left leg), and am deeply concerned that I may not be able to get the critical surgery I need before the tendons & muscles in my right leg atrophy to the point where a reimplantation surgery will be less than successful.

Given the totality of circumstances, I kindly ask that you carefully review and reconsider my case.

Respectfully,

Karen McClanin
44166-013

Delivered to inmate
2-13-2020

KAREN LYNN MCCLAFLIN, 44166-013
CARSWELL FMC    UNT: UNIT 5 CC    QTR: G02-193L
P.O. BOX 27066
FORT WORTH, TX 76127

**PART B – RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY # 1004424-F1**

| McClaflin, Karen | 44166-013 | CC5 |
|---|---|---|
| **INMATE NAME** | **REGISTER NUMBER** | **UNIT** |

This is in response to your Request for Administrative Remedy # 1004424-F1, received in the Warden's Office on January 28, 2020, wherein you requested reconsideration for Reduction In Sentence/ Compassionate Release based on Medical Circumstances – Debilitated Medical Condition.

An inmate may request consideration for Reduction In Sentence/Compassionate Release when there are particularly extraordinary or compelling circumstances which could not have been foreseen by the court at the time of sentencing. To meet criteria for Reduction In Sentence/Compassionate Release based on Medical Circumstances – Debilitated Medical Condition, one must be completely disabled, meaning the inmate cannot carry on any self-care and is confined to a bed or chair more than 50% of waking hours under the United States Code 18 3582(d)(1). According to your attending physician and your treating physical therapist, you do not meet these criteria as you are able to complete all self-care activities independently, which is well documented in your medical records.

In addition you suffered from your medical conditions at the time of sentencing, and your Presentence Investigation Report (PSR) mentions these medical conditions and required medical care at length.

In addition, per Program Statement 5050.50, *Reduction In Sentence/Compassionate Release*, additional factors should be considered when reviewing this type of request. Some of these factors include; length of sentence and amount of time served, supervised release violations, and criminal history. While you may have serious medical conditions, currently, you do not meet the medical criteria for Reduction In Sentence- Terminal Medical Condition. While you may have serious medical conditions, currently you do not meet the criteria for Reduction in Sentence-Debilitated Medical Condition.

Based on the above information, your Request for Administrative Remedy is denied.

If you are not satisfied with this decision, you may appeal to the Regional Director at: Bureau of Prisons, South Central Regional Office, 344 Marine Forces Drive, Grand Prairie, Texas 75051. Your appeal must be received in the South Central Regional Office within 20 days of the date of this response.

_____
M. Carr, Warden

2-11-2020
Date

RECEIPT - ADMINISTRATIVE REMEDY

DATE: MARCH 26, 2020

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CARSWELL FMC

TO  : KAREN LYNN MCCLAFLIN, 44166-013
      CARSWELL FMC     UNT: UNIT 5 CC     QTR: G02-193L

THIS ACKNOWLEDGES THE RECEIPT OF THE ADMINISTRATIVE REMEDY REQUEST
IDENTIFIED BELOW:

REMEDY ID       : 1004424-F1
DATE RECEIVED   : JANUARY 28, 2020
RESPONSE DUE    : FEBRUARY 17, 2020
SUBJECT 1       : REDUCTION-IN-SENTENCE REQUEST
SUBJECT 2       :

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: McCLAFLIN KAREN L. 44166-013 CC-5 CARSWELL FMC
LAST NAME, FIRST, MIDDLE INITIAL     REG.NO.     UNIT     INSTITUTION

**Part A- INMATE REQUEST** ON 11/18/19 I SUBMITTED A REQUEST FOR CONSIDERATION FOR COMPASSIONATE RELEASE TO WARDEN CARR. I RESPONDED TO A "CALL-OUT" APPOINTMENT TO SOCIAL WORKER WHEELER WHERE SHE PRESENTED ME WITH A "DENIAL" LETTER DATED 12/13/19 SIGNED BY ACTING WARDEN POLLARD. (THIS WAS A MERE FEW WEEKS PRIOR TO LEAVING CARSWELL). I'M NOT SURE WHETHER WARDEN CARR EVER SAW MY REQUEST. THE DENIAL WAS BASED ON THE PREMISE THAT I WAS ABLE TO COMPLETE ALL SELF-CARE INDEPENDENTLY. I QUESTION WHO MADE THIS ASSUMPTION AS TO MY EFFICIENCY IN PERFORMING ADL's (ACTIVITIES OF DAILY LIVING) BECAUSE CARSWELL DOES NOT HAVE AN OCCUPATIONAL THERAPIST SINCE MY SELF-SCREENER ON 6/11/19.
I AM THEREFORE APPEALING THIS DENIAL AND RESPECTFULLY REQUEST A RECONSIDERATION THROUGH THE ADMINISTRATIVE REMEDY PROGRAM.

1/27/20
DATE

Karen L McClaflin
SIGNATURE OF REQUESTER

**Part B- RESPONSE**

JAN 28 2020

DATE     WARDEN OR REGIONAL DIRECTOR
If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in this Regional Office within 20 calendar days of the date of this response.
**ORIGINAL: RETURN TO INMATE**     CASE NUMBER: 1004424-F1

**Part C- RECEIPT**     CASE NUMBER:
Return to: ___
LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION
SUBJECT: ___

DATE     RECIPIENT'S SIGNATURE (STAFF MEMBER)     BP-229(13)
APRIL 1982



**U. S. Department of Justice**

Federal Bureau of Prisons

Federal Medical Center, Carswell

---

*P.O. Box 27066, J Street, Bldg 3000*
*Fort Worth, Texas 76127*

December 13, 2019

MEMORANDUM FOR MCCLAFLIN, KAREN
                Reg. No. 44166-013

FROM:           M. Carr, Warden

SUBJECT:         Compassionate Release/Reduction In Sentence (RIS)

Consideration for your release, under the provisions of Title 18, United States Code, Section 3582 (c)(1)(A), and Bureau of Prisons' Program Statement 5050.50, has been given careful review, which included case summary information and length of time served. Based upon this information, your request for a Compassionate Release/Reduction In Sentence (RIS) has been denied.

Currently, you do not meet the criteria for a Reduction In Sentence based on medical circumstances – Debilitated Medical Condition. A review of your current medical status indicates that, although you may require a wheelchair at times for mobility, you are able to complete all self-care activities independently. After careful review of this information, consideration for Compassionate Release/RIS is denied. In compliance with Bureau of Prisons' Program Statement 5050.50, you may appeal this denial through the Administrative Remedy Program.

Medical staff will continue to monitor your conditions as clinically indicated. I suggest you continue to work with your unit team, your designated medical team, and your assigned social worker to address your needs, as they may arise.

TO: WARDEN MICHAEL CARR
FM: KAREN McCLAFLIN 44166-013
DT: 11/18/2019
RE: FORMAL CONSIDERATION FOR COMPASSIONATE RELEASE

Please accept this as my Formal Consideration for Compassionate Release and/or Reduction in Sentence (Ref: Program Statement 5050.5) as allowed by 18 U.S.C. 3582(c)(1)(A) and Amended by the First Step Act of 2018 as well as the 50-Year Old Pilot Program. Please reference US Sentencing Guideline Amendment 799 (A) (1v) and US v Cantu, No. 1:05-CR-458-1, 2019 U.S. Dist. LEXUS 100923 (S.D. Tex. June 17, 2019).

My request is based on extraordinary or compelling circumstances that I believe warrant consideration (Para: 571.61). These issues could not reasonably have been foreseen by the Court at the time of sentencing.

On June 21, 2017, I entered into a Plea Agreement with the Government containing one Count of Wire Fraud and one Count of Money Laundering. I was sentenced on May 10, 2018, at the age of 60. The Government suggested a sentence of 65 months, (due to super-cooperation), but the Judge imposed a sentence of 96 months.

During the period of time between the Plea Agreement and Sentencing, (approximately 11 months), I was released on a PR Bond, (with no stipulation of Home Confinement). Thirteen unsuccessful hip surgeries were performed, (between January, 2017, and May 10, 2018), due to repeated infections. I experienced pain and trauma as a result of the multiple failed surgeries and endured tremendous grief due to the deaths of both my mother and father, (to whom I was the Primary Caregiver), within six months of each other.

At the time of sentencing, my infections had temporarily abated, however, the 17th surgery, (called a Girdlestone), was performed in December, 2018 - followed by yet another infection at the site, necessitating an 18th surgery in March, 2019. This last surgery was performed just shy of 3 months prior to my self-surrender to Carswell FMC on June 11, 2019.

The Girdlestone procedure removed all hip replacement components. Because there is no longer a hip structure, my right leg is attached to my torso only by muscles and tendons. My condition is steadily declining as the leg is atrophying and my overall health has declined since arriving at Carswell, FMC. My weight hovers around 100 pounds because I am experiencing major issues with the diet provided by the BOP. Also, the Ensure Nutritional Supplements I was receiving upon my arrival at Carswell FMC have been discontinued.

It is the prognosis of my Orthopedic Specialist, (Dr. Miner) in Denver, Colorado along with my Infectious Disease Doctor, (Dr. Brookmeyer), that it would be best to allow the hip to heal for a period of 6-12 months from the date of the last surgery before reimplantation would be considered. Meanwhile, I am confined to a wheelchair (full time) because I am unable to bear any weight on my right leg whatsoever. I am a high fall risk due to this condition, and my femur has fractured to the point where metal super clamps have been installed to prevent further breakage of the bone. There is now over a 5" length leg discrepancy which may or may not ever be fully correctable with reimplantation; but the sooner the surgery is performed, the better, since almost a year has passed since the Girdlestone surgery. The length discrepancy will continue to increase the longer the surgery is delayed, and lessens the chance of a successful outcome.

My immune system is compromised due to the serious nature of my numerous surgeries as well as IV antibiotic treatment following each surgery. I have already experienced C-Diff (Colustrium Difficile Diarrhea) that is highly contagious & life-threatening and caught an infection in my eyes during my first few weeks at Carswell, FMC. Initially I was categorized as a Care Level 4 due to my multiple health issues and my overall frailty.

The opinion of my orthopedic specialist is that I have one more opportunity for a successful surgery reimplantation due to the trauma experienced and the complexity of reimplantation following a Girdlestone procedure. Since my arrival at Carswell, FMC, I met with Commander Stevens, (in the PT Department), and Dr. Sanchez, (an Orthopedic doctor contracted by the BOP), twice to discuss a forward plan regarding my hip. Dr. Sanchez recognized the complexity of the Girdlestone procedure and concurred that I needed to wait at least a year, (infection free), before contemplating reimplantation and that he was not overly familiar or experienced with the condition. PT also discharged me as there were no further treatments that could improve my situation. As there was nothing more that could be done for me, I was transferred to Unit CC-5 on October 9, 2019, as a Care Level 2. I understand that if I was able-bodied I would qualify for Camp Status, as my original designation was to the BOP Satellite Camp in Phoenix, Arizona.

I met with Dr. Jowdy, (my BOP designated Physician), on November 8, 2019, to discuss my healthcare situation. He stated that due to the complexity of the reimplantation he would NOT elect to have the surgery done while at Carswell, FMC. He said that I

should research Orthopedic Specialists in NEW YORK and the MAYO CLINIC for the best chance of finding a qualified & experienced surgeon.

I am, therefore, requesting that I be granted Compassionate Release/Reduction in Sentence, or Commutation to Home Confinement so that I may be allowed to procure my own orthopedic specialist, through my own health insurance before my condition deteriorates further.

The following Factors and Evaluation of Circumstances are:

The Company I founded and operated, (and where my charges originated), is being managed by a Court Appointed Receiver that I procured. During the period between the Plea Agreement and self-surrender, I cooperated fully with the Receiver, FBI, SEC and all Governmental Agencies involved in my case. I worked alongside a Forensic Accountant, (employed by the Receiver), on a regular basis (for 2 1/2 years), to reconstruct files allowing the Receiver to disburse funds to the victims.

The Probation Department previously visited and approved my designated release residence in December, 2017. It is the home that my husband and I have shared since 1997, and where he currently resides. It is my intent to file for Social Security Disability due to my debilitated condition upon release, therefore providing an income to address healthcare and any FRP.

Nature & Circumstances of the inmate's offense: 1 Count of Money Laundering & 1 Count of Wire Fraud
Criminal History: 1
Comments from Victims: Mixed, but predominantly favorable
Unresolved Detainers: None
Supervised Release Violations: None
Institutional Adjustment: Significant Depression and overall declining health
Disciplinary Infractions: None
Personal history derived from PSR: Excellent
Length of Sentence and amount of time served: 96 months/ 5 months
Inmate's Release plans (Employment, Medical & Financial): Husband employed full-time, Social Security Disability Income enabling me access to good health insurance. Able to address any FRP better from being released
Inmate's current age: 61
Inmate's age at the time of offense and sentencing: 58/60
Whether release would minimize the severity of the offense: No. There is no amount of prison time, (whether in a BOP Facility or Home Detention), that will ever lessen the remorse, guilt and responsibility I feel for what transpired. Release from Custody would better enable me to pay any FRP and receive Social Security benefits, (income), as well as health insurance.

I know that being released from incarceration @ Carswell, FMC would be in the best interest of all involved.   Untreated, my health and the condition of my right leg will continue to decline. The ongoing costs born by the BOP for my medical care will continue to escalate, and payments toward any FRP would be further delayed. The average cost of each hip surgery ranges between $135K & $150K (just for the operating room). Additional costs for hospitalization, doctor fees, aftercare, Physical Therapy and medications exceed $25K per surgery. To-date, the cost of my 18 surgeries has exceeded $3 Million.

Dr. Jowdy made it clear that the BOP is not able to provide the caliber of Orthopedic Specialist required to perform the reimplantation of my hip. I am terrified by the thought that after 18 surgeries I could lose my leg or my life due to an inexperienced surgeon. I also know that there is no chance that I would ever reoffend. I am not a danger or threat to anyone.

In summation, my time in prison @ FMC Carswell has been the most difficult experience in my life. I need to be released as soon as possible so that I may pursue a specialist that will be able to perform my much needed surgery. Once that is completed, I will be able to concentrate my efforts to address any shortfalls to the victims that may exist. The efforts of the receiver have continued while I have been at Carswell FMC, but they would definitely be expedited if I could assist the Forensic Accountant as I did previous to my incarceration.

I will be happy to provide any and all documentation, (letters, medical records, etc), requested that support my claims. Thank you for your kind consideration of my request.

Sincerely,

Karen McClaflin
44166-013

KAREN McCLAFLIN
44166-013
FEDERAL MEDICAL CENTER
CARSWELL
PO BOX 27137
FT. WORTH, TX 76127

CLERK, U.S. DISTRICT COURT
901-19ᵀᴴ STREET
DENVER, CO 80294-3589






FMC Carswell
P.O. Box 27066
Fort Worth, TX 76127
Mailed ____6-2-19____
The enclosed letter was processed through special
mailing procedures for forwarding to you. The letter
has neither been opened nor inspected. If the writer
raises a question or problem over which this facility
has jurisdiction, you may wish to return the material
for further information or clarification.    (4)