APPEAL,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: <u>1:17–cr–00168–CMA</u>–1

Case title: USA v. McClaflin

Date Filed: 05/17/2017
Date Terminated: 05/14/2018

Assigned to: Judge Christine M. Arguello

Appeals court case numbers:
18–1217 USCA, 20–1268
USCA 10th Circuit

**Defendant (1)**

**Karen Lynn McClaflin**
*TERMINATED: 05/14/2018*

represented by **Karen Lynn McClaflin**
44166–013
CARSWELL
FEDERAL MEDICAL CENTER
Inmate Mail/Parcels
P.O. BOX 27137
FORT WORTH, TX 76127
PRO SE

**Ann Marie Taliaferro**
Brown Bradshaw & Moffat
10 West Broadway
Suite 210
Salt Lake City, UT 84101
801–532–5297
Fax: 801–532–5298
Email: ann@brownbradshaw.com
*ATTORNEY TO BE NOTICED*
*Designation: 10th Circuit Special Designation*

**Nathan Dale Chambers**
Nathan D. Chambers LLC
303 16th Street
Suite 200
Denver, CO 80202
303–825–2222
Fax: 303–825–4010
Email: nchambers@nathanchamberslaw.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Thomas James Hammond**
Thomas J. Hammond, P.C.

1544 Race Street
Denver, CO 80206
303–321–7902
Fax: 303–329–5871
Email: hammondlaw@solucian.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of NINETY–SIX (96) MONTHS to run concurrently to Count 2. Supervised Release of THREE (3) YEARS to run concurrently to Count 2. Special Assessment of $100.00. Restitution of $14,528,206.39. |
| 18 U.S.C. § 1343 Wire Fraud (1) | |
| 18 U.S.C. § 1957 Monetary Transaction in property derived from wire fraud (2) | Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of NINETY–SIX (96) MONTHS to run concurrently to Count 1. Supervised Release of THREE (3) YEARS to run concurrently to Count 1. Special Assessment of $100.00. Restitution of $14,528,206.39. |

**Highest Offense Level
(Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level
(Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| USA | represented by | **Pegeen Denise Rhyne** |
|---|---|---|
| | | U.S. Attorney's Office–Denver |
| | | 1801 California Street |
| | | Suite 1600 |
| | | Denver, CO 80202 |
| | | 303–454–0323 |
| | | Fax: 303–454–0409 |
| | | Email: pegeen.rhyne@usdoj.gov |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Laura Beth Hurd**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0135
Fax: 303–454–0402
Email: laura.hurd@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 05/17/2017 | 1 | 5 | INFORMATION as to Karen Lynn McClaflin (1) count(s) 1, 2. (Attachments: # 1 Penalty Sheet) (athom, ) (Entered: 05/17/2017) |
| 05/24/2018 | 47 | 12 | TRANSCRIPT of Sentencing Hearing as to Karen Lynn McClaflin held on 5/10/18 before Judge Arguello. Pages: 1–112. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (dmart, ) (Entered: 05/24/2018) |
| 06/11/2018 | 52 | 124 | AMENDED JUDGMENT as to defendant Karen Lynn McClaflin (1): Defendant committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of NINETY–SIX (96) MONTHS as to each Count, to run concurrently. Supervised Release of THREE (3) YEARS, as to each Count, to run concurrently. Total Special Assessment of $200.00. Restitution of $14,528,206.39. SO ORDERED by Judge Christine M. Arguello on 6/11/2018. (cmasec) (Entered: 06/11/2018) |
| 09/20/2019 | 112 | 133 | USCA Opinion as to Karen Lynn McClaflin re 42 Notice of Appeal : We AFFIRM the judgment of the district court. (USCA Case No. 18–1217) (This document is not the Mandate) (Attachments: # 1 Cover Letter to Opinion)(evana, ) (Entered: 09/20/2019) |
| 06/05/2020 | 117 | 147 | MOTION for Compassionate Release or Home Confinement per the Care & First Step Acts by Karen Lynn McClaflin. (evana, ) (Entered: 06/05/2020) |
| 06/08/2020 | 119 | 185 | ORDER: The Government and the Probation Office are DIRECTED to file a Response to 117 Defendants Motion on or before 6/15/2020. The Government's Response shall specifically address: what steps the warden at this facility is taking/has taken to protect especially vulnerable people like Defendant from the COVID–19 virus, what the status of Defendant's |

| | | | administrative request is, and whether the warden has put in place any process to expedite the determination of these types of compassionate release requests. Probation's Response shall specifically address: what steps would need to be taken by their office to put in place adequate supervision if the Court were to find that release is appropriate, what the time frame would be, and what particular risks if any the relief Defendant requests may create for the community. SO ORDERED by Judge Christine M. Arguello on 6/8/2020. Text Only Entry (cmasec) (Entered: 06/08/2020) |
|---|---|---|---|
| 07/03/2020 | 128 | 187 | REPLY TO RESPONSE to Motion by Karen Lynn McClaflin re 117 MOTION to Reduce Sentence pursuant to First Step Act of 2018 (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Chambers, Nathan) (Entered: 07/03/2020) |
| 07/20/2020 | 129 | 225 | ORDER Denying 117 Defendant Karen McClaflin's Motion for Compassionate Relief, by Judge Christine M. Arguello on 7/20/2020. (evana, ) (Entered: 07/20/2020) |
| 07/24/2020 | 130 | 229 | NOTICE OF APPEAL as to 129 Order On Motion to Reduce Sentence Pursuant to First Step Act of 2018 by Karen Lynn McClaflin. (Chambers, Nathan) (Entered: 07/24/2020) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 17-cr-168-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. KAREN LYNN MCCLAFLIN,
      Defendant.

---

### INFORMATION
18 U.S.C. §1343
18 U.S.C. § 1957

---

The ACTING UNITED STATES ATTORNEY charges that:

### COUNT ONE
### 18 U.S.C. § 1343

**The Scheme**

    1.     Beginning in or about March 2011 and continuing until in or about February 2017, in the State and District of Colorado and elsewhere, defendant KAREN LYNN MCCLAFLIN ("MCCLAFLIN") devised a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises (herein after referred to as the "Scheme"). The Scheme was executed in connection with offering investors the opportunity to invest in Homesource Partner Inc.'s ("Homesource") business of purchasing distressed houses and then reselling the houses at a profit. It was part of the Scheme that:

1

a. From early 2011 through March 2017, McClaflin owned and operated Homesource Partners Inc. (Homesource") in Colorado Springs, Colorado. Homesource's business model was to use investor money to purchase distressed houses in order to resell those houses at a profit by: (1) selling the house within 30 days for an immediate profit; (2) "fixing and flipping" the house for resale within 31-90 days; or (3) fixing the house and renting it if the house failed to sell within 90 days.

b. Between March 2011 and early 2017, in seeking investors for Homesource, McClaflin told investors, potential investors, and intermediaries representing investors that Homesource was seeking loans from investors to finance Homesource's business because Homesource was not able to use traditional bank loans because such loans took too long and some of the distressed homes might not qualify as collateral for such loans.

c. Between 2011 and early 2017, through Homesource marketing materials and verbal statements, McClaflin represented to investors, potential investors and intermediaries representing investors that:

    i.  Homesource had access to distressed houses that were deeply discounted and had a team of contractors who would upgrade the properties so Homesource could resell the properties for more than market price;

    ii. each property would be financed by an individual investor whose investment would be secured by a Deed of Trust in first

position, or occasionally second position, on that property,
which McClaflin would record for the investor;

   iii.  the investor's principal investment would be returned to the
investor upon the sale of the property unless the investor
decided to reinvest in another property;

   iv.  investors would receive an interest rate of 6% to 15%; and

   v.  the properties would normally be sold in 3 months.

d.  However, starting in at least late March 2011, McClaflin knowingly and
intentionally began having multiple investors "invest" in the same
property and placed multiple Deeds of Trust on the same properties
such that the amount of the investments purporting to be secured by
the Deeds of Trust exceeded the value of the property.

e.  Starting in at March or April 2011, McClaflin intentionally did not record
all of the Deeds of Trust as promised.

f.  Starting in at least January 2013, Homesource's debt had grown too
high and the interest payments owed to investors far exceeded the
gross profits earned by Homesource.

g.  Despite her knowledge as of January 2013 that Homesource's
business was failing and that McClaflin was using new investor money
to pay interest to prior investors, McClaflin continued to seek and
accept investor money for Homesource as described above through at
least January 2017.

**Execution of the Scheme**

2.      For the purpose of executing the Scheme described in paragraphs 1a.
through 1g. above, on or about September 1, 2016, defendant MCCLAFLIN caused to
be transmitted the following wire communication in interstate commerce:  Homesource
investors T.B. and L.B. wired $100,000 from their joint Charles Schwab brokerage
account in California to Homesource Partners Inc.'s ENT Credit Union account #
xx3200 located in Colorado Springs, Colorado.

In violation of Title 18, United States Code, Section 1343.

**COUNT 2**
**18 U.S.C. §§ 1957**

3.      On or about September 2, 2016, in the State and District of Colorado,
defendant KAREN LYNN MCCLAFLIN ("MCCLAFLIN") knowingly engaged in the
following monetary transaction, which was by, through, and to a financial institution and
affecting interstate commerce, in criminally derived property of a value greater than
$10,000, such property having been derived from a specified unlawful activity, namely,
wire fraud in violation of 18 U.S.C.  § 1343: on September 2, 2016, defendant
MCCLAFLIN transferred $40,857.12 from Homesource Partners Inc.'s ENT Credit
Union account # xx3200 to ENT Credit Union account # xx2662 held in defendant
MCCLAFLIN's name.

**Forfeiture Allegation**

4.      The allegations contained in Counts One and Two of this Information are
hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture

4

pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(1).

5.      Upon conviction of the violation alleged in Count One of this Information involving a scheme to commit violations of 18 U.S.C. § 1343, defendant MCCLAFLIN shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c) any and all of the defendant's right, title and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense, including, but not limited to the entry of a money judgment in the amount of proceeds obtained by the scheme and by the defendant.

6.      Upon conviction of the violation alleged in Count Two of this Information involving a violation of 18 U.S.C. § 1957, defendant MCCLAFLIN shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all of the defendant's right, title and interest in all property, real or personal, involved in such offense, or all property traceable to such property, including, but not limited to the entry of a money judgment in the amount of proceeds obtained by the scheme and by the defendant.

7.      If any of the property described above, as a result of any act or omission of the defendant:

        a)    cannot be located upon the exercise of due diligence;
        b)    has been transferred or sold to, or deposited with, a third party;
        c)    has been placed beyond the jurisdiction of the Court;
        d)    has been substantially diminished in value; or
        e)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

ROBERT C. TROYER
ACTING UNITED STATES ATTORNEY

s/
By: Pegeen D. Rhyne
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Phone: (303) 454-0100
Fax: (303) 454-0402
pegeen.rhyne@usdoj.gov

PENALTY SHEET

DEFENDANT 1:  Karen Lynn McClaflin
YEAR OF BIRTH:  1958

ADDRESS: Colorado Springs, Colorado

COMPLAINT FILED? _____YES ___x____NO
   IF YES, PROIVDE MAGISTRATE CASE NUMBER_____

HAS DEFENDANT BEEN ARRESTED ON COMPLAINT? _____YES ___x___NO

OFFENSE:    COUNT 1: 18 U.S.C. § 1343: Wire Fraud
            COUNT 2: 18 U.S.C. § 1957: Monetary Transaction in property derived from
            wire fraud

            Notice of Forfeiture

LOCATION OF OFFENSE:  El Paso County, Colorado and elsewhere

PENALTY:  COUNT 1:  NMT 20 years imprisonment, NMT 3 years supervised release, a
                  $250,000 fine, and a $100 special assessment.
         COUNT 2: NMT 10 years imprisonment, NMT 3 years supervised release, a
                  $250,000 fine, and a $100 special assessment.

AGENTS:     FBI Jonathon Cronan
           IRS Melissa Tweet

AUTHORIZED BY:  Pegeen D. Rhyne
               Assistant U.S. Attorney

ESTIMATED TIME OF TRIAL:  N/A resolved by pre-indictment disposition

_____five days or less

_____ over five days

_____ other

THE GOVERNMENT will no90 seek detention in this case.
OCDETF case:  _____ Yes __X___ No

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-00168-CMA


**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**KAREN LYNNE MCCLAFLIN,**

**Defendant.**

_____

## REPORTER'S TRANSCRIPT
## (Sentencing Hearing)
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 11:04 a.m. on the 10th
day of May, 2018, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

## A P P E A R A N C E S

**FOR THE PLAINTIFF:**
PEGEEN D. RHYNE and LAURA B. HURD, U.S. Attorney's Office
- Denver, 1801 California St., Suite 1600, Denver, CO
80202

**FOR THE DEFENDANT:**
THOMAS J. HAMMOND, Attorney at Law, 1544 Race St., Denver,
CO 80206

## **I N D E X**

**WITNESSES**:                                                          **PAGE**

### **MELISSA TWEET**
DIRECT EXAMINATION BY MS. RHYNE                              40
CROSS-EXAMINATION BY MR. HAMMOND                             44
REDIRECT EXAMINATION BY MS. RHYNE                            47

### **JAMES BARASH**
DIRECT EXAMINATION BY MR. HAMMOND                            50
CROSS-EXAMINATION BY MS. RHYNE                               64

## **E X H I B I T S**

**NO.**                                                      **ADMITTED**

    1, 2    .........................................    44


**No.**                                                      **REFUSED**

            .........................................

```
 1                        MAY 10, 2018
 2           (Proceedings commence at 11:04 a.m.)
 3           THE COURT:  You may be seated.
 4           Court calls Criminal Case No. 17-cr-00168-CMA,
 5  encaptioned the United States of America v. Karen Lynne
 6  McClaflin.
 7           Counsel, would you please enter your appearances.
 8           MS. RHYNE:  Good morning, Your Honor, Pegeen Rhyne
 9  and Laura Hurd for the United States.  With us at counsel
10  table is Special Agent Melissa Tweet, of the IRS.
11           THE COURT:  Good morning.
12           MR. HAMMOND:  Good morning, Your Honor, I am Tom
13  Hammond.  With me at counsel table is Matthew Werner.  He
14  represents Ms. McClaflin in the civil collections suit, as
15  well.  Ms. McClaflin is present.  She is seated to my
16  right.  She is on, I believe, a summons, or it is a
17  personal recognizance bond.
18           THE COURT:  Okay.  All right.  For the record, the
19  Court also notes that Officer Michelle Means, representing
20  the United States Probation Office, is also in attendance
21  at this hearing.  Good morning.
22           PROBATION OFFICER:  Good morning, Your Honor.
23           THE COURT:  Mr. Hammond, would you and
24  Ms. McClaflin please approach the podium.  The record
25  shows that on June 21, 2017, pursuant to a plea agreement,
```

4

1    Ms. McClaflin entered a plea of guilty to and was

2    convicted of two counts in an Information, the first

3    charged violation of 18 United States Code Section 1343;

4    wire fraud, and a second charged violation of 18 United

5    States Code Section 1957; money laundering.

6          We are here today for sentencing.  I have received

7    and reviewed the full presentence investigation report,

8    including on -- dated February 5, 2018, as revised on

9    March 5, 2018, including all addenda thereto, especially

10   the victim impact statements.

11         I also reviewed Document No. 18, the defendant's

12   objections to the presentence report.

13         26, the defendant's doctor's letter.

14         17, the Government's objection to the presentence

15   report.

16         19, the Government's motion for a 3-level decrease

17   in offense level for acceptance of responsibility.

18         15, the stipulation of loss and restitution.

19         And, 20, the Government's motion for a variant

20   sentence of 65 months.

21         Are there any documents that I failed to identify

22   that I should have reviewed in preparation for this

23   hearing?

24         MS. RHYNE:  No, Your Honor.

25         MR. HAMMOND:  Yes, but I haven't been able to

5

1    provide them to the Court.

2              THE COURT:  If you don't provide them to me before

3    the hearing, I don't get to review them, do I?

4              MR. HAMMOND:  That's correct, Your Honor.  That may

5    be an issue for another hearing that I'm the subject of,

6    and that is something that I will shoulder.

7              I think that there are a couple things that the

8    Court -- a couple documents that the Court should have.  I

9    have been late in getting some of those.  I have been late

10   in putting some of that together.  Some of it I have had

11   for awhile, some of it not so long.

12             The -- and I just need to put this into

13   perspective.  May I have just a second?  I think you know

14   me well enough after all of these years, I tend to get

15   choked up on certain occasions, and this is certainly one

16   of the biggest.

17             The course of this case seems to be prolonged, but

18   I submit to the Court that it is not.  Ms. McClaflin was

19   operating her business in, I believe it was March of 2017.

20   She was confronted.  She admitted.  We -- the Government

21   contacted me and Mr. Werner, and what happened was we

22   pretty much came to a very quick resolution by virtue of

23   an Information, not an Indictment.

24             There was a plea, I believe, in a week, and we all

25   agreed that it was necessary to continue the case for an

```
 1    extended period of time for sentencing because of the role
 2    that Ms. McClaflin was playing, and continues to play,
 3    with the Receiver in this case, who is -- has, as I
 4    understand it, I believe it is around $6.5 million in a
 5    trust account that should be going to the named victims in
 6    this case.
 7            There is more than that.  And I can't -- I want to
 8    show the Court, and I would have liked to have provided
 9    the Receiver's plan of distribution.  It does not -- I am
10    going to go through this, if we have to go to the
11    sentencing, with one of the witnesses today; why there is
12    no date set certain that the current amount, the current
13    pot of money cannot be distributed at this point in time.
14            I wanted to also provide the Court with some
15    additional information, and I will do that as well as I
16    can.  Ms. McClaflin did two separate interviews, maybe
17    three, within investigators from the Securities and
18    Exchange Commission.  That was for an investigation that
19    I'm not sure I can talk about, and I didn't get ahold of
20    those agents yesterday.  I would be happy to approach the
21    bench about that and explain that further.
22            There is, as of this morning -- let me put it this
23    way.  I think it was 6.4 million yesterday.  And as of
24    today, it appears to be 6.5 million in the pot currently.
25    That pot could grow, too, because there are a couple other
```

```
 1    properties, which we can get into if we have to, and we're
 2    going to get into them at some point, and that could take
 3    it up to 7-and-a-half to $8 million.
 4          There is also a -- I will call it a suit, and that
 5    is a procedure that I am not aware of, because I am a
 6    criminal defense lawyer, and that is called claw back.
 7    And that is for people who made a lot of money, and claw
 8    back -- because the receivership is an equitable
 9    proceeding and everybody should be made whole, those folks
10    who haven't been made whole -- those people who made more
11    money than the other people who haven't been made whole
12    may have to give money back.
13          Then there is another step, and that is a civil
14    suit that has been brought by the Receiver, as I
15    understand it, to sue the bank, Integrity Bank and Trust,
16    for their role in this, which, if it is resolved in the
17    plaintiff's favor, could result in as much as a $10
18    million verdict, which would take us somewhere over $4
19    million above and beyond the restitution that is set out
20    in the probation office's report.
21          That is -- it is still unresolved.  And I
22    understand that the Court has concerns about moving this
23    case along.  We have been kind of stalled on the financial
24    end, in terms of restitution, since about November 29th of
25    2017.  That doesn't mean that Ms. McClaflin hasn't been
```

1    working with the Receiver every single day that she isn't

2    getting medical care or in the hospital, because she has,

3    in my understanding.  And if we have to, we will get into

4    that.

5            But, aside from that, the Court knows that I filed

6    a motion to continue.  I filed two.  The first one was

7    unopposed, because around -- somewhere right around the

8    beginning of March of this year, I had information from

9    Ms. McClaflin's doctor, from the hip ---the hip

10   replacement doctor, I will call him.  He is basically the

11   hip doctor, and the physician's assistant, regarding the

12   nature of the infection that Ms. McClaflin was

13   experiencing and what would be, we anticipated, a surgical

14   procedure that we would know about some time after May

15   10th, today, -- sometime after May 10th, to determine

16   which procedure that would be.

17           As the Court is aware, I got information a few days

18   ago, I think it was around the middle of last week, very

19   frankly, right before I filed the motion.  The

20   information -- the first information was it appears that

21   the infection is as low as it can be right now.  But there

22   is an additional thing that the doctors are saying; they

23   don't think they want to do a procedure, but they're still

24   looking into the nature of the infection.

25           I think this is critically important, as critically

       1   important as the potential to realize monetary gain and

       2   get people paid in the amount in which they invested.  The

       3   reason I think the medical situation is that important is

       4   because I have not yet been able to determine if there is

       5   a facility in the Bureau of Prisons that is fully capable

       6   of dealing with Ms. McClaflin's medical issues.

       7        She has been fortunate in the last several years to

       8   have good insurance that has covered, I believe it is 300-

       9   to $500,000 in medical expenses, and it hasn't stopped.

      10   In addition, there are medications she has been taking,

      11   some of which I don't know how they resolve that in the

      12   Bureau of Prisons.

      13        I have some very teeny tiny amount of information

      14   that that might be accomplished or accommodated if the

      15   sentence was to a federal medical center, and that is what

      16   happened.  But I would like -- that is one of the reasons

      17   I wanted to have some additional time to find that out.  I

      18   am still asking for that.

      19        THE COURT:  Denied.

      20        MR. HAMMOND:  I expected that.

      21        This is a case in which I have never seen like

      22   facts in the entire time I have been practicing in the

      23   United States District Court.  I would suggest that no one

      24   has seen the facts in a case like this.  And, by that,

      25   what I mean is, and I would like to know --

                1        THE COURT:  All right.  I want to go through with

                2   my sentencing.  Are you making your argument for

                3   sentencing?

                4        MR. HAMMOND:  That is what I am trying to find out.

                5        THE COURT:  I would like to go through my normal

                6   colloquy, and then we can get to your argument on her

                7   behalf.

                8        MR. HAMMOND:  And there are a couple witnesses I

                9   would like to call on behalf of Ms. McClaflin.

               10        THE COURT:  Let's move through, and then when we

               11   get to that point, you can call those witnesses.  Who are

               12   they, and what are they going to address?  I normally

               13   don't have witnesses at a sentencing hearing unless there

               14   is a dispute as to the presentence report.

               15        MR. HAMMOND:  I spoke to a bunch of people over the

               16   last evening.  The people who I would really like to call

               17   the most, Your Honor, are Mr. James Barash, who is the

               18   Receiver.  There is also a woman named Donna Klimas.  She

               19   is -- she is someone who the Court has heard from, in

               20   terms of the fact that there is a letter in the materials,

               21   in the presentence report.

               22        I also received, either yesterday or the day

               23   before, an email from her, and spent a fair amount of time

               24   talking to her last night.  And I think that she presents

               25   a complete perspective, if the Court allows her to speak.

```
 1          THE COURT:  As her friend?

 2          MR. HAMMOND:  I believe she is a friend.  She is

 3   somebody that --

 4          THE COURT:  I see there is a Klimas on here; Doug

 5   Klimas, who is a victim.

 6          MR. HAMMOND:  As well as Donna Klimas.

 7          MS. RHYNE:  Your Honor, if I may, as a victim, she

 8   has a statutory right to speak here today at the

 9   sentencing, not necessarily to testify.

10          THE COURT:  I agree.  I am going to hear from the

11   victims.  So if they want to come forward, they can make

12   their statement.  But, what is the relevance of

13   Mr. Barash's testimony?

14          MR. HAMMOND:  I think it is critical that the Court

15   understand the nature of what I had discussed earlier, and

16   that would be in the form of testimony.

17          THE COURT:  You should have let this Court know you

18   wanted this scheduled for more than an hour because you

19   wanted testimony.  You are set for an hour.  I have read

20   what has been submitted by the Government, in terms of its

21   motion for a variant sentence.  I have read what the

22   probation officer put in its report.  I am aware of the

23   fact that the Receiver has been able to recover a

24   significant amount of funds, much more so than I have ever

25   seen in one of these cases, and that that is in part due
```

```
 1    to the assistance of Ms. McClaflin.

 2            I don't know if we need to put on -- take any more

 3    time, unless you have something more he is going to offer.

 4            MR. HAMMOND:  I tried to give you an outline of

 5    what you have not heard.

 6            THE COURT:  What have I not heard?

 7            MR. HAMMOND:  About the state of the case on the

 8    receivership.

 9            THE COURT:  What impact does that have on my

10    sentence?  Yes, the victims will be made somewhat whole,

11    not entirely.  I understand, based on the report, there is

12    about another million 4 or something still out there in

13    assets that he is trying to liquidate, which would bring

14    the total up to, maybe, 7.  But he has to take into

15    account his fees, which are currently in excess, as I

16    understand, 500,000; half a million.  So I understand all

17    of that.

18            What else is he going to give me?

19            MR. HAMMOND:  I think you would need to hear from

20    him about the plan of distribution, what has and hasn't

21    happened in El Paso County District Court with respect to

22    the receivership and where that stands, and get more exact

23    details regarding what else can be done.  I think that is

24    very important for the Court to hear.

25            It is also important for the Court to hear from
```

```
1    Mr. Barash.  And I expect him to say that Ms. McClaflin's

2    help has not only been critical, it still is.  It is

3    ongoing.  And I think the Court needs to understand and

4    put that in perspective as a factor in sentencing.

5            THE COURT:  Ms. Rhyne?

6            MS. RHYNE:  Your Honor, we don't believe the

7    outcome of the Receiver's litigation should cut for or

8    against Ms. McClaflin.  Mr. Hammond presents a very

9    optimistic view.  I hope he is right.  There is also a

10   chance they will not prevail in the litigation, and the

11   victims will recover nothing.  She will not be punished

12   for a negative outcome, nor should she be rewarded for a

13   positive outcome.

14           At this point, the litigation is in the Receiver's

15   hands, and she does not get credit for that.  She has been

16   awarded, through the Government's motion -- excuse me, I

17   should take that back.  A recommendation that she be

18   rewarded through the Government's motion of a 25 percent

19   downward variance from her bottom-of-the-guideline range

20   for her effort.  She does not need additional testimony to

21   support the facts that are attributed to her at this

22   point.

23           THE COURT:  All right.  I agree with the

24   Government.  I don't think I need any testimony from the

25   Receiver.  I have received considerable information on
```

14

```
 1   that, and it will not impact the statement -- the sentence
 2   I impose.
 3           Do you have other witnesses you wish to present?
 4           MR. HAMMOND:  I did mention Ms. Klimas.
 5           THE COURT:  She is a victim.  She can make
 6   statement.  She will not be a witness.
 7           MR. HAMMOND:  Another potential person I spoke to,
 8   I don't know exactly what his position is about, whether
 9   or not he wants to say something.
10           THE COURT:  What is his name?
11           MR. HAMMOND:  Can I have a -- I would rather not
12   say right now.  I understand --
13           THE COURT:  Well, we are either going to have
14   testimony, Mr. Hammond, or we are not.  And I have to move
15   this hearing along.  So, if you want to come to the bench
16   and give me his name, we can go through that.  If he is a
17   victim, he can make his statement as a victim.  But,
18   otherwise, I am not taking testimony.
19           MR. HAMMOND:  He is a victim.
20           THE COURT:  He can make his victim statement if he
21   wishes to when I ask for them to make their statements.
22           MR. HAMMOND:  I would ask for a brief break to be
23   able to ask him about that.
24           THE COURT:  Overruled.  We are going to move
25   forward.
```

1          MR. HAMMOND:  I am not asking for the moon here,

2     Your Honor, I am asking for 5 minutes.

3          THE COURT:  If he wants to make a statement,

4     Mr. Hammond, he can make a statement when I ask them to do

5     that.  I will not take a break.

6          All right.  Getting back to the sentencing hearing,

7     have you had enough time, Mr. Hammond, to review the

8     presentence report with Ms. McClaflin?

9          MR. HAMMOND:  Yes.

10         THE COURT:  Did you explain the contents of that

11    report to her?

12         MR. HAMMOND:  Yes.

13         THE COURT:  Do you have any concerns about her

14    ability to understand the contents of that report?

15         MR. HAMMOND:  No.

16         THE COURT:  Ms. McClaflin, did you get a copy of

17    the presentence report?

18         THE DEFENDANT:  I did.

19         THE COURT:  Did you read it?

20         THE DEFENDANT:  Yes, ma'am.

21         THE COURT:  Did Mr. Hammond explain its contents to

22    you?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Do you understand the contents of the

25    report?

```
 1          THE DEFENDANT:  I do.

 2          THE COURT:  All right.  Mr. Hammond, Ms. Rhyne,

 3     both of you filed objections to the presentence report.

 4     So the Government and the defendant object to paragraphs

 5     32 and 43 of the report, which asserts that the instant

 6     offense resulted in substantial financial hardship to 25

 7     or more victims, and thus applied the corresponding

 8     6-level enhancement pursuant to United States Sentencing

 9     Guideline Section 2B1.1(b)(2)(C).

10          The Government notes that at the time the plea

11     agreement was entered into with Ms. McClaflin, the

12     Government did not have the evidence to support this

13     enhancement, and the plea agreement only included a

14     2-level enhancement.

15          The Government also indicates that the enhancement

16     requires a victim-by-victim analysis, and the Government

17     bears the burden of proving to the Court by a

18     preponderance of the evidence that this enhancement should

19     apply.  And the Government requests that the Court accept

20     the calculation in the plea agreement.

21          As such, Ms. Rhyne, am I to take your pleading as

22     indicating that you are not going to meet the burden that

23     the Government has to prove that the enhancement applies?

24          MS. RHYNE:  Correct, Your Honor.

25          THE COURT:  All right.  The Government is correct
```

```
 1    that the -- there is a burden on the Government to prove
 2    that the enhancement applies.  The failure of the
 3    Government to protect the interest of the public by
 4    shirking its responsibilities to meet this burden,
 5    especially in a case as egregious of this, cannot tie this
 6    Court's hands in calculating the appropriate guideline
 7    sentence.
 8            In circumstances like this, where a massive fraud
 9    has been perpetrated, to the tune of 14 million, which
10    is -- 14 million plus, which is admitted by the defendant,
11    loss to the victims in that amount, proof of application
12    of enhancement can be established by the victim impact
13    statements.
14            Both the Court and the probation office have
15    conducted the victim-by-victim analysis that the
16    Government fails to do.  This Court has reviewed all of
17    the victim statements and declarations of loss that are
18    attached to the presentence report.
19            Ms. McClaflin, as I indicated, admits that the
20    total loss to the victims in this case exceeds $14
21    million.  Applying the test set forth in Note 4(F) to the
22    United States Sentencing Guideline 2B1.1, the Court's
23    review confirms that there were more than 90 investors who
24    were defrauded.
25            And in reaching this number, this Court did not
```

```
 1    count separately the husband and wives who invested
 2    together; in other words, the Court counted them as one.
 3    Approximately 63 of these victims filed victim impact
 4    statements.  And, again, this Court is not counting the
 5    individually the victims who were husband and wife
 6    couples.
 7         All 63 indicated that they suffered significant
 8    financial loss from their retirements or other savings or
 9    investment funds.  In addition, 28 victims indicated that
10    they had to make substantial changes to their employment,
11    including postponing retirement or going back to work
12    after having retired, or made substantial changes to their
13    living arrangements, such as having to sell their homes
14    and relocate to a smaller, less expensive home; selling
15    their home and moving in with someone else; or selling the
16    family farm or home to just make ends meet.
17         Again, in reaching this number of 28 victims
18    reporting substantial changes to employment and living
19    arrangements, this Court did not count as separate those
20    victims who were husband and wife, otherwise the number of
21    victims reporting substantial hardship based on these
22    factors would have been much higher.
23         A number of victims indicate that they now have to
24    support their elderly parents because they invested both
25    their retirement savings, as well as their parents'
```

```
 1    savings, in Ms. McClaflin's fraudulent scheme.

 2          The defendant's fraud resulted in substantial

 3    hardship to both parents, whose funds were invested, and

 4    their children, who thought they were making sound

 5    investments for the parents and themselves.

 6          Thus, the Court finds that the 6-level enhancement

 7    of 2B1.1(b)(2)(C) for an offense that resulted in

 8    substantial financial hardship to 25 or more victims was

 9    properly assessed.  The defendant's objection is

10    overruled.

11          Mr. Hammond, you may make any statement for the

12    record that you wish to make.

13          MR. HAMMOND:  It is the Government's objection,

14    Your Honor, not the defendant's.

15          THE COURT:  I am sorry?

16          MR. HAMMOND:  It is the Government's objection.

17          THE COURT:  You objected, as well.

18          MR. HAMMOND:  I did.

19          THE COURT:  Do you wish to make any statement for

20    purposes of your record on appeal?

21          MR. HAMMOND:  I do not.

22          THE COURT:  All right.  Does the Government wish to

23    make any statements for purposes of the record on appeal?

24          MS. RHYNE:  No, Your Honor.  Thank you.

25          THE COURT:  All right.  The defendant's objection
```

1   to paragraph 57 was resolved by removal of that conviction

2   from the presentence report.

3           Mr. Hammond, are there any additional objections

4   that the defendant would like to make at this time?

5           MR. HAMMOND:  No.

6           THE COURT:  Ms. Rhyne, does the Government wish to

7   make any objections at this time?

8           MS. RHYNE:  No, Your Honor.

9           THE COURT:  All right.  The Government has filed a

10  motion pursuant to United States Sentencing Guideline

11  Section 3E1.1(b) requesting that this Court grant the

12  defendant a full 3-level decrease in offense level for

13  acceptance of responsibility.  That motion, Document No.

14  19, is granted.

15          At this time, Mr. Hammond, you and Ms. McClaflin

16  can have a seat.  I am going to hear from any victims who

17  wish to come forward.

18          MS. RHYNE:  Mr. Tinkle.

19          THE COURT:  If you could just state your full name,

20  and then spell it for the record.

21          VICTIM TINKLE:  Yes, ma'am.  Good morning.  My full

22  name is David Wayne Tinkle, Jr., T-I-N-K-L-E.

23          THE COURT:  All right.

24          VICTIM TINKLE:  And I think I am almost reading off

25  of your script there, because I represent my father.  I am

```
 1    the power of attorney over him.  He is brain injured and
 2    disabled.  He didn't make it here today; it wouldn't be
 3    practical.  My wife, also, Robin and I, we all three
 4    invested into the scheme.  And my father became brain
 5    injured when I was an infant, so I have only know him like
 6    that.
 7            And that is something that I conveyed to Karen when
 8    meeting with her about investing, in going forward with
 9    this deal.  She commiserated with me, because she admitted
10    that she is also taking care of elderly father, as well.
11    So we had a common bond there.
12            And so all of my life growing up -- and, again, I
13    am 50 years old.  My father had his accident in June of
14    '68.  He has lived below the poverty line.  I was raised
15    in poverty.  He has not filed taxes any year since then.
16            And so it happened to be that he and his siblings
17    had investments in some property that sold, and in late
18    2016, his windfall was put into this.  He received one
19    interest payment before this all blew up.  I received
20    three.  My wife, zero.  She got in probably within a few
21    hours of this coming to a head.
22            So we were the latest ones to the game.  And,
23    again, I believe I had full faith.  I was being the good
24    son.  I brought him this investment opportunity that
25    turned out to go sour.
```

1          Yeah, and so meeting with Karen across the table,

2     she had no problem, once knowing his financial and

3     physical condition, taking the $100,000 in exchange for

4     what I believed to be was known as an invalid or useless

5     deed of trust and promissory note.

6          Because of the fraud portrayed upon my father, not

7     only would he fail to receive the agreed upon monthly

8     payments, and to raise his standard of living at the

9     poverty line, but his last bit of treasure was now

10    completely erased.

11         The stress he incurred lead to various

12    stress-related illnesses, landing him in the ER and then a

13    rehab facility for 20 days.  Medicaid only paid for 20

14    days, so he was discharged back home, where once again he

15    relapsed and had to go into ER, and now I am scrambling to

16    find him a Medicaid or VA facility for him to be re-homed

17    in.  He is in his 70s, and moving.  Here, is impractical,

18    because of the altitude and stairs in our home, and all of

19    that.

20         And his options for relocation are limited due to a

21    lien on his home.  He has a reverse mortgage.  And, of

22    course, he has been borrow as much to survive.  He

23    receives about $330 a month on Social Security, and that

24    is his only income.  And, of course, I chip in a bunch.

25         I am not looking for anything out of that, but it

         1    has been about $20,000 from my family that has been help

         2    to pay for him to live.  So that is my father.

         3         For my wife, Robin, she and I both separately

         4    invested $50,000.  For us, it has been a re-defined

         5    future, and our injured relationship.  Not only is there a

         6    very understandable and palpable air of disappointment my

         7    father has in me from my lack of wisdom, my wife also has

         8    this, and, of course, it causes stress on our marriage.

         9         And, of course, we've talked about her returning to

        10    the workforce, but she also has a mother with dementia.

        11    And we are both only children, so we have to take care of

        12    our folks.  So Robin returning to the workforce is not

        13    practical at this time.

        14         We also have a daughter who has learning to drive,

        15    and she wants to go to college.  How we are going to pay

        16    for that, of course, it is an ongoing conversation due to

        17    our reduced funds and resources.

        18         And our daughter has been on a life-long asthma

        19    plan, and house we moved into has pets, so we have to get

        20    rid of all of the carpet, that has been delayed.  And so

        21    she keeps a rescue inhaler on hand.  And so we are having

        22    to deal with that.

        23         Oh, I don't know why I mention this, but any

        24    vacation plans, they are deferred, completely dashed for

        25    the time being.

1          My wife, Robin, requires medication to fall and

2    remain asleep due to the anxiety and stress, and that has

3    been ongoing.

4          And, of course, I have a security clearance for my

5    job.  Of course, I come up for review every few years to

6    make sure I can keep that job.  And any time that there is

7    a financial hiccup, they look at that as potential for,

8    well, maybe we don't give this clearance to this guy, and

9    that limits my employment opportunities.  I hope it

10   doesn't happen but, certainly, if it does, I can see how.

11         And so our past, present, and future have all been

12   permanently altered due to this event.  And for all of

13   this, we don't seek revenge, but we do insist on judgment,

14   and a full measure of it.  Thank you.

15         THE COURT:  All right.  Thank you, Mr. Tinkle.

16         MS. RHYNE:  Mr. Sims.

17         THE COURT:  Spell your name.  First spell it for

18   the record.

19         VICTIM SIMS:  I'm Cecil Dean Sims S-I-M-S.

20         Your Honor, we request that you deliver the maximum

21   penalty.  If Ms. McClaflin was sentenced to 1 year for

22   every year that she stole from the lives of her victims,

23   we believe it would be -- would exceed the maximum

24   penalty.

25         Personally, she caused us financial loss, marital

1      stress, unnecessary worry, loss of sleep, loss of

2      appetite, hundreds and hundreds of wasted hours.

3            Jointly, her schemes have cost the victims' health,

4      security, and the ability to care for ailing parents, like

5      we just heard.

6            We lost savings, which forced us to change our

7      retirement plans.  If not reimbursed, we will be required

8      to work years to rebuild our hard-earned savings.  Our

9      futures have been altered by Ms. McClaflin's crime.

10           Karen lived a lavish lifestyle at the expense of

11     her victims.  She flaunted diamond-studded jewelry,

12     expense cars, houses, land, and exotic vacations in front

13     of us and others.

14           I would categorize her as a master con artist that

15     operates without remorse or regret.  Karen preys on

16     trusting members of society that are vulnerable or in need

17     of assistance.  The ruthlessness of her chosen con is that

18     she feigns support, offers a helping hand in need, or puts

19     on a good samaritan act, while she openly deceives and

20     steals from the people she is pretending to help.

21           Specifically, she lied to us about the value of the

22     properties; HomeSource's ownership of the property; the

23     number of lenders allowed to invest in the properties.

24     She told us that our investment funds would be used to

25     improve properties; instead to pay other investors.

```
 1            She lied about HomeSource's profitability and
 2    filing our deeds of trust with the county.  We invested in
 3    properties, two specifically.  The ones that are involved
 4    in this case were never upgraded or never refurbished and
 5    sold at a discount.
 6            To further characterize Karen's heartlessness, I
 7    wanted to share one personal account.  On November 16th, I
 8    was hospitalized for 37 days, requiring two emergency
 9    surgeries.  And I almost died.  Hospital bills amounted,
10    exceeding a quarter of a million dollars.
11            Karen McClaflin was made aware of my condition in
12    early December, while I was still in the hospital, and
13    both loans mentioned came due.  With full knowledge of my
14    condition and her fraudulent activities and the collapsing
15    state of the HomeSource Partners, Karen encouraged us to
16    extend the fraudulent loans, promulgating her lies, and
17    acting, in my opinion, without conscience.
18            And this is a what if, Your Honor.  If I had died,
19    my wife would have been forced to sell our home and become
20    the financial provider while being cheated by
21    Ms. McClaflin.
22            Your Honor, please do not be deceived by Karen
23    McClaflin's support and cooperation in this case.  We
24    request that the Court disregard Karen's self-serving
25    cooperation and research of the case.  Karen is providing
```

```
 1    help, however, she does this with self-serving, dishonest,
 2    and fraudulent motives.
 3            She acts without conscience, shame, or forethought
 4    to the impact of others.  We request that the Court
 5    deliver the maximum sentence to Karen McClaflin, including
 6    mandatory restorative therapy; a punishment that is
 7    commensurate with her crimes; and we request that the
 8    Court order a full restitution be made to us and other
 9    injured parties.
10            And to Karen, not be confused that consequences and
11    forgiveness are two different things.
12            Thank you, Your Honor, for the opportunity to share
13    this information in person.
14            THE COURT:  Thank you, Mr. Sims.
15            MS. RHYNE:  Rick Jackson.
16            THE COURT:  Good morning.
17            VICTIM JACKSON:  Richard Jackson, J-A-C-K-S-O-N.
18            I am speaking today on behalf of my wife, myself,
19    and my mom.  We had just retired, and we thought, "we made
20    it."  We were free from schedules and from the demands of
21    work, and had begun to live out our retirement dreams, but
22    this crime dramatically changed them.
23            Our trust was broken; still is broken.  We now look
24    at life through a different lens.  We are suspicious.  We
25    are anxious.  We have an insecure future.  And the joy of
```

```
 1   our life is vanished, and we feel like our future is gone.
 2        Our retirement has just plain disappeared.  The
 3   stress of this Ponzi scheme has challenged our 44-year
 4   marriage.  It has caused us to -- sorry.  It has been the
 5   most difficult thing we have faced in our marriage.
 6        We have lots of nights where we stress at the
 7   bills.  We stress over the future.  We stress over how we
 8   are going to be able to help our parents.  Pearl's mom and
 9   dad are 89 and 88.  My mom is 96 and in assisted living.
10   And we don't see how we are going to have the resources to
11   help.
12        We worry about the increasing costs of living and
13   about the devaluation of the possessions we have.  Our
14   home used to be filled with joy and laughter and music and
15   dancing and entertaining friends and family, and it is now
16   closed in.  It is a quiet place.  Our conversations used
17   to flow easily, but they have become very quiet.
18        Before we invested with Karen, we did the best
19   research we could.  She came recommended highly from a
20   neighbor.  And he invested with her for over 10 years
21   without problems.
22        We talked about the safety -- we talked with Karen
23   about the safety of our investment opportunity, and she
24   said that in all of the years she had been investing for
25   people, she had never lost anybody's principal.
```

```
 1           When we expressed concern about, what would happen
 2     if you didn't show up one day?  What if you were to die?
 3     And she explained that she had a business continuation
 4     plan that was funded by a keyman insurance policy, and
 5     that she had an advisory board that included an attorney
 6     and an accountant.  And she had been cross training her
 7     employees so that they could provide a smooth transition
 8     for the investors if that were to happen.
 9           We also read in the Colorado Business Journal of
10     what a great job she was doing for investors.  They just
11     sang her praises.  We researched with the Better Business
12     Bureau and found that she had an A+ rating.  We couldn't
13     find anything negative on the internet.
14           Like Dave and like Dean, we don't come from a
15     wealthy background.  I worked for 48 years, setting aside
16     money.  We both worked full-time and part-time jobs to set
17     it aside.  We were diligent in the way we saved.  We
18     didn't go on vacations.  We snuck Cokes and popcorn into
19     movies.  We tried the best we could.
20           But, we were able to put together $720,000.  And we
21     felt we had a pretty secure retirement.  But that $720,000
22     was taken away, and 250-additional-thousand dollars taken
23     from my mom at 96 years of age.  And she knew those were
24     her last dollars.
25           She stripped us of our dignity.  She destroyed our
```

1    ability to provide in old age.  No more plans of travel or

2    opportunities or hobbies or our ability to be generous

3    with our parents or our children or with this community.

4    We have had to reduce what we give the church.  And all of

5    this because of fraudulent activity.

6         Our monthly income was suddenly reduced to a single

7    Social Security income, a small public school pension, and

8    limited savings.  We got to the point where we now are

9    doing thing like postponing haircuts and trying to take on

10   -- we have a small home business we were about to shut

11   down.  We now have tried to revitalize that.  I have gone

12   back to work in order to pay for our house and for our

13   cars.  We are literally pinching everything we can.

14        My move still has $4,100 -- excuse me, we moved her

15   from a $4,100 a month facility to one that was more around

16   3,600, trying to save in that manner.

17        We just don't understand how knowing the impact

18   this could have on people, how someone could continue to

19   go on and promote this kind of activity.

20        So, like the others, we seek a fair and just

21   punishment.  And if she is able to restore, we would be

22   willing to consider a lesser punishment, but the

23   punishment she has given us is a long-term punishment.

24        THE COURT:  Thank you, Mr. Jackson.

25        MS. RHYNE:  Paula Greco.

```
 1            VICTIM GRECO:  Paula Greco.

 2            I will describe how Karen McClaflin gained my

 3     confidence in her mission to steal my money by pretending

 4     to be my friend.  She first started working with my

 5     ex-husband, and I met her through him.  She gave him 10

 6     percent on his investment to help support his Christian

 7     school.

 8            He and I divorced and sold our home.  Karen knew I

 9     had just divorced and sold the home and had some money.

10     That money took me 34 years to earn as a special education

11     teacher.  I worked for 21 years in a New York City inner

12     city school, where I taught minority young men to read,

13     and then continued to teach here in Colorado Springs for 8

14     more years at the time of my divorce.

15            I contacted Karen to help me find a house.  She

16     took me out a few times to look at homes, even though she

17     said she usually didn't do that.  She invited me to come

18     into office to obtain an LLC to protect my assets; how

19     ironic, and for $50 acquired in LLC for me.

20            It was then that she sat with me through tears and

21     anguish other my divorce, as we had many heartfelt talks

22     in her office.  Karen would stop whatever she was doing to

23     be kind, supportive, and caring.  She encouraged me that

24     life will be so much better.

25            She then offered to be the realtor for the purchase
```

```
 1    of my new home, and would not accept payment for that job.

 2    She offered me the same investment she offered my

 3    ex-husband, so that she could help me out.  Karen promised

 4    that my investment would be safe if anything ever happened

 5    to her or to HomeSource Realty, because I would own a

 6    piece of property, and that I had a deed of trust.

 7            After I bought my home and purchased furniture, I

 8    then reserved 60K, $60,000 to invest with Karen on April

 9    10, 2014.  A few weeks later, Karen called asked if I

10    would invest $15,000 more; she was waiting on a bank to

11    make a large transfer, and she was in a bind.  This time I

12    would get 12 percent, as I would get 10, and then two

13    points at the time of sale of property.

14            On my promissory note, she affixed a note, a

15    Post-It that said, "Thank you so much for doing this, but

16    more importantly, for your hand in friendship and love.

17    Hugs, Karen."

18            Karen promised me that I would receive monthly

19    interest payments until the homes were sold, whereby I

20    would get my principal investment returned to me.  I now

21    know that the first property I invested $60,000 in on

22    April 2014 was sold on May 16, 2015, and not only was I

23    never notified and interest payments kept coming, but on

24    the ONE report, my name was never filed.

25            The second report, the second property where I
```

1    invested 15,000 on May 21, 2014, the ONE report had a list
2    of five investor who invested from 146,000 to 200,000, and
3    I was not on that list.  That house was sold less than 2
4    months after my investment and, again, I was not notified,
5    and interest payments kept coming.
6          Karen knew how vulnerable I was, and believe that
7    therein lies the tragedy; to be so devoid of humanity to
8    prey upon me at my lowest point, to seize the opportunity
9    of my vulnerability of pain for her gain, speaks volumes
10   to the depravity of Karen McClaflin.
11         I have heard attorneys -- sorry.  I have heard
12   attorneys say in court, in reference to this case, and in
13   reference to those in first position, that their clients
14   should be reimbursed because they have done nothing wrong.
15   Well, I have no position thanks to the slippery dealings
16   of Karen McClaflin.  But I believe I have done nothing
17   wrong, and I have the right to restitution as well as
18   anyone else.  Thank you.
19         THE COURT:  Thank you.
20         MS. RHYNE:  Mr. Koch.
21         And, Your Honor, for the court reporter, Greco is
22   spelled, G-R-E-C-O.
23         VICTIM KOCH:  My name is Jeffrey Koch, K-O-C-H.  I
24   first learned of Karen through my brother, who had
25   invested with her about a year earlier, and he said, oh,

 1    she is a great Christian woman.  No problems.  And I was a

 2    little bit hesitant, but like some of the other victims, I

 3    did my homework, and everything seemed to be on the up and

 4    up.  And I am a very trusting person, or I was.

 5         Sorry.  I did have a few doubts, so I brought my

 6    most cynical friend that I know.  He, too, was a realtor,

 7    and we went to her office, and she was point on about

 8    everything.  We did -- after we got home, we did some

 9    number crunching for about a week, and he said, man, she

10    has got a gold mine.

11         If she buys and sells -- and even though we get

12    between 6 and 8 to 10 percent on investment, she is going

13    to make well over 1.5 to 2 million a year if she would

14    have done it.

15         Well, with the number crunches, I went there to

16    talk to Karen, and I am that "all in" type of guy.  Well,

17    we invested, and she told me that I would be the first

18    person on the deed of trust, and that they would go to --

19    after I put it in there, they would go down to the

20    courthouse and file it, which they never did, so a month

21    later I did it.

22         She just said it was an error on her secretary's

23    part, which, again, I am a trusting person.  Thank God I

24    didn't invest any more.

25         I was number, I believe, number four and number six

```
 1   on the properties once I did do the deed of trust.  And on

 2   one of them, one of my brothers, who could not be here

 3   today, she didn't even own -- or HomeSource did not even

 4   own the property that she had him invest in.  I said, wow.

 5        I agree with the victims that have come before me,

 6   especially Mr. Sims.  My wife has to continue to work

 7   because of this.  And thank God I am able to watch my

 8   granddaughter -- my daughter and son-in-law have full-time

 9   jobs -- which is the best job I have ever had.

10        I have become friends with another victim, who I

11   spoke with today.  She is a very nice lady.  But I have

12   waited, and I hope you get at least half to full maximum

13   sentence for what you have done.  Thank you, Your Honor.

14        THE COURT:  Thank you, Mr. Koch.

15        MS. RHYNE:  Donna Klimas.

16        VICTIM KLIMAS:  Donna Klimas.  Last name is

17   K-L-I-M-A-S.

18        Karen and I became personal friends after we

19   invested.  We originally started with Trademark

20   Properties, and then it transitioned over to Home

21   Partners.

22        Do I feel betrayed by what happened?  Absolutely,

23   yes.  How someone could lie to a friend.  Yet I know deep

24   down in my heart that Karen never intended to lose

25   people's money.  She started her business with high hopes
```

1    of success, like all business owners do.

2         I think we all need to acknowledge to ourselves

3    that we were being greedy by believing that Karen could

4    provide us with such a high rate of return on our money.

5    Do we need to take some responsibility for what happened

6    to us?  Yes, we do.

7         Does she need to take responsibility for her

8    actions?  Yes, she does.  Is what happened devastating to

9    all of us?  Yes.  We are in for well over a half a

10   million.

11        We did, however, choose to participate, and did not

12   do the due diligence we should have done.  Since the

13   failure of the business, she has done everything she

14   possibly can to help right the wrong.

15        I have forgiven her, just as God would ask all of

16   us to do.  Life is about people; caring for them and

17   loving them.  It is not all about money.

18        God said, "let he that is without sin be the first

19   to a cast stone."  Thank you.

20        MS. RHYNE:  Your Honor, at this time, there is just

21   the unknown person who will or will not speak.

22        THE COURT:  Is there anybody else who wishes to

23   come forward?  Please do.

24        And are you a victim?

25        VICTIM HENSON:  Yes, I was an investor of $110,000.

1          THE COURT:  State your name, and spell it for the

2     record.

3          VICTIM HENSON:  Cynthia Lynn Henson, H-E-N-S-O-N.

4          It is a terrible and terrifying experience to have

5     lost my investment.  But, to have Karen be incarcerated,

6     it is not going to get my money back or their money back.

7     Having Karen go to prison is not going to right this

8     wrong.

9          I think justice could be better served by keeping

10    her on the job, assisting in the recovery of our money

11    with Mr. Barash, no matter how long it takes.

12         Since there are many things in the works; Integrity

13    Bank lawsuits, selling more of HomeSource assets, I mean,

14    think about it.  It is her files, her system.  She knows

15    where to access these mounds of information to quickly

16    receive -- to quickly get the information for the Receiver

17    and the accountant, which saves our money in the long run,

18    from paying the salaries to the Receiver or the

19    accountants that would recoup our money.

20         The Bureau of Prisons is not set up for this

21    fragile woman.  From 2013 to this date, today, Karen has

22    endured 11 hip replacement surgeries, medications,

23    physical therapy, the Center of Disease Control, and she

24    is running HomeSource Partners in between all of this.

25    This infection is still growing right now.

```
 1          If she goes to prison or is incarcerated, there is
 2    our tax dollars again paying for that.  She is better
 3    served to be in her office to help recoup our money.
 4    Bottom line, this case is like no other.
 5          Whatever the legal term is, Your Honor, probation,
 6    extended sentence, house arrest, bracelets on her arms and
 7    legs, please let her right this.
 8          And, for the record, I feel she has had
 9    insufficient counsel.  Tom Hammond called me at 5:30 last
10    night to see if I would be speaking on Karen's behalf.  In
11    our conversation, I asked him, did he feel prepared.  He
12    laughed and said, "I'm not prepared.  She's going to
13    prison.  Don't even think about probation."
14          Somehow I brought up money, he said he was getting
15    pennies on the dollar.  So, is he prepared?  Did he put
16    all of the effort into Karen McClaflin's case because he
17    got paid up front?  Is it something that she -- this is
18    this woman's life.  This is this woman's life.  She needs
19    to be out of prison, out of incarceration to help
20    recuperate our money.
21          Thank you, Your Honor.
22          THE COURT:  All right.  Thank you.
23          Is there any other victim who would like to speak?
24          All right.  The total offense level in this case is
25    33.  The defendant's Criminal History Category -- I am
```

```
 1    sorry, Ms. Rhyne?

 2            MS. RHYNE:  I apologize, Your Honor, I will defer

 3    to the Court's judgment, but there were two enhancements

 4    that were left open to dispute in the plea agreement.  I

 5    know one was resolved by a stipulation.  I am concerned

 6    that the 2-level enhancement for the $1 million coming

 7    through a financial institution, while not objected to, is

 8    not factually supported in the plea agreement, and I would

 9    like a very brief opportunity to put that on the record.

10            THE COURT:  All right.  Yes, then you may.  Because

11    there was no objection, I didn't see there was anything

12    else.  Move forward.  Go ahead.

13            MS. RHYNE:  Thank you, Your Honor.  The Government

14    calls Melissa Tweet.

15            COURTROOM DEPUTY:  May I have your attention,

16    please.

17            Would you raise your right hand.

18                          MELISSA TWEET

19    having been first duly sworn, testified as follows:

20            THE WITNESS:  I do.

21            COURTROOM DEPUTY:  Please be seated.

22            Please state your name, and spell your first and

23    last names for the record.

24            THE WITNESS:  Melissa, M-E-L-I-S-S-A, Tweet,

25    T-W-E-E-T.
```

```
 1              MS. RHYNE:  Your Honor, before I proceed, I would
 2     like her to testify to restitution, which has not been
 3     stipulated to at this point.
 4              THE COURT:  All right.
 5              MS. RHYNE:  Thank you.
 6                         DIRECT EXAMINATION
 7     BY MS. RHYNE:
 8     Q.    Ms. Tweet, where do you work?
 9     A.    IRS Criminal Investigation.
10     Q.    What is your role there?
11     A.    I'm a criminal investigative special agent.
12     Q.    There should be exhibits in front of you.  Do you see
13     them?
14     A.    I do.
15     Q.    What is Exhibit 1?
16     A.    It is the chart I created for the loss per investor.
17     Q.    And what records did you review when you put together
18     this calculation for restitution and loss?
19     A.    Deeds filed with El Paso County.  Investor files
20     provided by Ms. McClaflin.  QuickBooks records.  Bank
21     records.  Settlement statements.
22     Q.    Did you also review victim impact statements?
23     A.    I did.
24     Q.    And the QuickBooks records that you referred to, do
25     those belong to HomeSource and Trademark?
```

1    A.    They did.

2    Q.    The investor files you referenced, were -- they were

3    from HomeSource and Trademark?

4    A.    They were.

5    Q.    To be clear, are the investments that you calculated

6    for purposes of loss and restitution, investments that

7    relate to investment that were made into HomeSource and

8    not Trademark?

9    A.    Correct.  I did include investments that were made to

10   Trademark that were transferred into HomeSource.

11   Q.    So if there was evidence of those specific

12   investments being rolled into the new company, you did

13   include them?

14   A.    I did.

15   Q.    But if there was an investment specifically into

16   trademark, the prior company, that was not rolled over,

17   did you include that?

18   A.    I did not.

19   Q.    Is that because the scope of the conduct charged here

20   was the fraud committed at HomeSource?

21   A.    Yes.

22   Q.    And did you also learn that in doing your

23   calculations, some victims had received interest and other

24   payments that exceeded the amount of the original

25   principal investment?

1    A.    Yes.

2    Q.    Where that occurred, did you include those victims in

3    your loss chart?

4    A.    I did not.

5    Q.    Where a victim was not yet made whole but received

6    credits against their principal, can you explain the

7    methodology you used?

8    A.    I looked at the properties that were still

9    outstanding and the amounts that were outstanding, and

10   then I subtracted out any interest or points payments.

11   Q.    And so what is left on this chart is the principal

12   investment minus any payment to that victim for interest

13   or fees?

14   A.    Correct.

15   Q.    And were there also evidence of loans that were made

16   personally to Ms. McClaflin that were not part of the

17   scheme that was charged?

18   A.    There were.

19   Q.    Did you include those loans in this chart?

20   A.    I did not.

21   Q.    What was the total amount of loss and restitution you

22   were able to calculate based on your analysis of those

23   records that you discussed?

24   A.    $14,528,206.39.

25   Q.    And approximately how many hours did you spend

```
 1    creating and reviewing this chart for accuracy?

 2    A.    Approximately a thousand hours.

 3    Q.    Around a thousand, or in excess of a thousand?

 4    A.    In excess.

 5    Q.    Do you have a specific number that you can tally?

 6    A.    I do not.

 7    Q.    Moving on to Exhibit 2 what is Exhibit 2?

 8    A.    It is a 302 prepared by FBI Special Agent Jonathan

 9    Wayne Cronan.

10    Q.    For those of us who aren't law enforcement, is a 302

11    shorthand for a report of interview created by the FBI?

12    A.    It is.

13    Q.    Who is the person interviewed?

14    A.    David Howell.

15    Q.    And who is he?

16    A.    He is one of the owners of Season Investments.

17    Q.    And how did Season Investments -- how is Season

18    Investments involved in this case?

19    A.    They found investors that invested with HomeSource.

20    Q.    Is there a chart in Exhibit 2?

21    A.    There is.

22    Q.    And what is that chart?

23    A.    That chart is the investors that invested in

24    HomeSource through Seasons.

25    Q.    Were those people identified by Mr. Howell during his
```

1   interview?

2   A.   They were.

3   Q.   And did you compare that list of investors to our

4   loss calculations that you just talked about?

5   A.   I did.

6   Q.   Were each of these investors included in your loss

7   calculation?

8   A.   They were.

9   Q.   And did you have evidence to show that the amount --

10  at least the amount indicated on this Exhibit 2 was, in

11  fact, invested by these investors?

12  A.   I did.

13       MS. RHYNE:  Your Honor, I have no further questions

14  for this -- I am sorry Your Honor, I would offer Exhibits

15  1 and 2.

16       THE COURT:  All right.  Any objection?

17       MR. HAMMOND:  No objection, Your Honor.

18       THE COURT:  Exhibits 1 and 2 are admitted.

19       (Exhibit Nos. 1, 2 are admitted.)

20       MS. RHYNE:  I have no further questions of the

21  witness.

22       THE COURT:  Mr. Hammond, you may cross.

23       MR. HAMMOND:  Thank you.

24                     **CROSS-EXAMINATION**

25  **BY MR. HAMMOND:**

```
 1    Q.    Good afternoon Ms. Tweet?

 2    A.    Good afternoon.

 3    Q.    Just now you were asked about how you -- the

 4    methodology that you used.  And you worked in excess of a

 5    thousand hours to come up with the most accurate figures

 6    that you came up with; is that fair to say?

 7    A.    Yes.

 8    Q.    How did you come about working on that?  I know this

 9    is awkwardly worded, so let me see if I can do a little

10    better job.  In the thousand hours you worked on it, did

11    you do that by yourself?

12    A.    I did not.

13    Q.    Who else did you work with?

14    A.    I worked with FBI agents special agents in my office.

15    I also worked with the Receiver's accountant.  And I also

16    worked with Ms. McClaflin.

17    Q.    Do you recall any the name of the Receiver's

18    accountant?

19    A.    Denise.

20    Q.    Okay.  To the best of your knowledge, was Denise also

21    doing a separate accounting as you were doing that?

22    A.    She was.

23    Q.    Did you and Denise also cross check each other's

24    figures?

25    A.    We did.
```

```
 1    Q.   At the ultimate end of the analysis that you
 2    conducted and that Denise conducted, was there a
 3    difference in the numbers?
 4    A.   There is.
 5    Q.   Do you know how much that difference is?
 6    A.   It is approximately $90,000.
 7    Q.   Basically, for all intents and purposes, the numbers
 8    are really, really close?
 9    A.   They are.
10    Q.   The numbers of hours in that thousand-plus hours, how
11    many hours, if you can guesstimate, did you spend with
12    Denise?
13    A.   Probably at least 500.
14    Q.   How many hours of that thousand hours plus did you
15    spend with Karen McClaflin?
16    A.   I would say probably about maybe like 80.  That might
17    be a little high.
18    Q.   Do you know where Denise got most of her information
19    from?
20    A.   From Ms. McClaflin.
21    Q.   Did you and/or Denise have any problems going through
22    the financial records, going through the books?
23    A.   We did.
24    Q.   Why did that -- what were the problems?
25    A.   One of the major problems was QuickBooks was not up
```

```
 1    to date.  So Denise had to work with Ms. McClaflin to get

 2    the QuickBooks up to date.

 3    Q.   Were they able to get it up to date?

 4    A.   I do not know if they totally got it up to date or

 5    not.

 6    Q.   Was -- when you were going through the books with

 7    Denise, was it sufficient that you felt comfortable with

 8    each other that your numbers were so close?

 9    A.   Yes.

10    Q.   Was that in large part due to the fact that

11    Ms. McClaflin had spent so much time with Denise and you

12    to get those numbers straight?

13    A.   Yes.

14         MR. HAMMOND:  I have no further questions, Your

15    Honor.

16         THE COURT:  All right.  Any redirect?

17         MS. RHYNE:  Just briefly, Your Honor.

18                    REDIRECT EXAMINATION

19    BY MS. RHYNE:

20    Q.   First, Special Agent Tweet, can you explain the

21    discrepancy between your number and Denise's number?

22    A.   Denise's number includes interest and points that

23    were paid through HomeSource's bank account for Trademark

24    and her personal loan.

25    Q.   So they included the interest?
```

```
 1    A.    They did.

 2    Q.    In their calculations, do they include as a loss the

 3    underlying investment that was used -- sorry, let me

 4    rephrase that.  Did they include the loss associated with

 5    the principal investment against which those interest

 6    payments were made?

 7    A.    They did not.

 8    Q.    So their analysis, at least as to those investments,

 9    were one sided; all benefit, no loss?

10    A.    Correct.

11    Q.    Is that an appropriate methodology, in your opinion?

12    A.    No.

13    Q.    Two, just to dispel any concerns that the victims may

14    have we let the fox watch the henhouse, did you confirm

15    any information you received from Ms. McClaflin with bank

16    records to confirm you were getting legitimate loss

17    numbers?

18    A.    I did.

19          MS. RHYNE:  No further questions.

20          THE COURT:  All right.  Thank you very much.  You

21    may step down.

22          Ms. Rhyne, do you have any other witnesses?

23          MS. RHYNE:  No, Your Honor.  Thank you.

24          THE COURT:  Mr. Hammond, do you have any witnesses?

25          MR. HAMMOND:  May I just ask generally the room, is
```

1    there anyone who has something positive to say about

2    Ms. McClaflin?

3            I think that answers that, Your Honor.

4            THE COURT:  Correct.  All right.  If you would

5    retake the podium.

6            MS. RHYNE:  There is one more that would like to

7    speak.

8            THE COURT:  A victim?  All right.

9            MR. HAMMOND:  Mr. Barash, Your Honor.

10           THE COURT:  This is the Receiver?

11           MS. RHYNE:  Yes.  He is not a victim, Your Honor.

12           THE COURT:  He is not a victim.  And I don't know

13   what his testimony would be that I would need for purposes

14   of the issue that was just raised by Ms. Rhyne.

15           MR. HAMMOND:  I gave the Court an idea of what I

16   expected his testimony to be.

17           THE COURT:  All right.  Mr. Barash, come forward.

18           MR. BARASH:  Good morning, Your Honor.  I didn't

19   intend -- when you said is there anybody who would say

20   something positive about Ms. McClaflin, I would, but I

21   don't know whether -- I didn't hear what Your Honor said

22   to --

23           THE COURT:  I will allow you to take the stand and

24   have Mr. Hammond question you.

25           Come forward and be sworn in.

1     COURTROOM DEPUTY:  May I have your attention,

2     please.

3                         **JAMES BARASH**

4     having been first duly sworn, testified as follows:

5          THE WITNESS:  I do.

6          COURTROOM DEPUTY:  Please be seated.

7          Please state your name and spell your first and

8     last names for the record.

9          THE WITNESS:  My name is James Barash, B-A-R-A-S-H.

10         THE COURT:  You may proceed.

11                     **DIRECT EXAMINATION**

12    **BY MR. HAMMOND:**

13    Q.   Good afternoon, Mr. Barash.

14    A.   Good afternoon.

15    Q.   What is your occupation?

16    A.   By training, I am an attorney, but I haven't actively

17    practiced for many years.  And I do business things and

18    sometimes serve as a court-appointed receiver, et cetera.

19    Q.   How long have you been a court-appointed receiver?

20    A.   Probably 10, 12 years.

21    Q.   How many cases have you worked on as a

22    court-appointed receiver?

23    A.   A dozen, 15, something like that.  I don't have those

24    numbers right in front of me.

25    Q.   Okay.  Do you recall how you came to be a

```
 1    court-appointed receiver in this case?

 2    A.   I do.

 3    Q.   How did you come to be appointed?

 4    A.   I was contacted by an attorney who works with

 5    Mr. Warner, and asked if -- he knew I served as a

 6    Receiver.  He has been involved in other cases I served as

 7    a Receiver, and he asked if I might serve as a Receiver in

 8    a real estate case.  That a client of his had a little

 9    problem.

10         Not knowing anything about it, I said, sure, I

11    could do that.  Then I learned a little bit more, and

12    learned about the allegations of fraud and et cetera.  And

13    I said to him, why do you want -- I have never heard --

14    when he used this term, and I would like to correct it

15    later, but what I said is I have never heard of the crook

16    asking for a Receiver.  What, have you lost your mind?

17         He said, no, no, my client made some mistakes, but

18    she really wants to make it right, and she wants to show

19    she is making it right.  So I said, let me talk to her,

20    because I wanted her to understand my attitude on these

21    things.  And I went in with an attitude that I just

22    assumed that this was horrible.  And it is horrible, that

23    hasn't changed.  But that she was a crook, that there was

24    a pot of gold somewhere, and all these bad things

25    happened.
```

1          I met with her and Mr. Werner for a couple of

2     hours.  She explained what had occurred.  And I said,

3     listen, I don't know why you want me as a Receiver.  I

4     said, it is crazy.  She said, I want to show that I really

5     want to help.  And I said, well, let me give you a

6     warning.  I said, I will only do it on one condition.  I

7     said, if you are helpful and you do what you say, I will

8     be sure to make that fact known.

9          And she did beyond what I thought, but I will get

10    to that in a minute.  I said, however, if you lie to me

11    once about anything, you're toast, this is the worst

12    mistake of your life, because I will make sure that this

13    is brought to light.

14         And then the odyssey began.  And this case is like

15    no other.  I heard victim impact statements.

16    Interestingly, two of them were the worst ones.  I cried

17    when I read them in my office.  These people, I totally

18    get it.  They are right.

19         On the other hand, my job, and what I feel very

20    strongly about as a Receiver, and I am proud of doing it,

21    and I have had some success in general.  I try and

22    maximize the value of the estate and try and make the

23    victims as whole as I possibly can.

24         And for all of the anger that these people have --

25    and if I were one of them, I would too.  I don't dispute

```
 1    any of it.  But, I can't stress enough, not only how
 2    helpful Karen has been in recreating this stuff -- and if
 3    the Court wanted, I was at the office yesterday just to
 4    see something, and I said, a picture is worth a thousand
 5    words.
 6         Karen was working with Denise Tinsley, our
 7    accountant, finalizing some stuff.  This accounting is
 8    incredibly complex.  What you heard Ms. Tweet testify to
 9    is all accurate, but we had to do a lot more than what she
10    did because of our other claims between claw backs and a
11    claim we have against the bank that is very complex.
12         And Ms. McClaflin's assistance has been invaluable,
13    not only in finding records and showing and explaining how
14    this connects to that, because the records weren't
15    complete.  The records that were there were accurate, but
16    a lot of the QuickBooks, for instance, the person who put
17    the date in, they classified things wrong.  All the
18    entries were there, the dollars were right, but they
19    called something this when it should have been that.
20         In addition to this, there are rooms full of files.
21    I can show you pictures of what they are going through.
22    There is only one person who knows their way through this
23    morass, and that is Ms. McClaflin.
24         So, from a purely economic, trying to get the best
25    for the investors, our biggest claim is out there, and it
```

1    is our claim against the bank.  The Court knows, you never

2    know what is going to happen in a case.  I am telling the

3    Court, in my opinion, we have a very good case.  And in a

4    lot of law enforcement authorities' opinions, they believe

5    we are right on the facts.

6         That doesn't mean we will win.  It doesn't mean we

7    will lose.  I can make no promises.  I also would love to

8    be able to tell the Court, and even more than the Court,

9    the victims, I have a check for you tomorrow because I

10   have all this money sitting in the bank.  But I can't

11   until the District Court Judge in El Paso County

12   authorizes it.

13        And there are claims of competing interests of the

14   various deeds of trust holders, some of whom are

15   sophisticated lenders, who made sure their deeds of trust

16   were recorded.  And they are saying, our deeds of trust

17   are sacrosanct, you can't use any of that money.  We get

18   it all, plus our fees, plus interest, plus our et cetera.

19        Then there are other people who, under various

20   cases and laws and the way Ponzi schemes are interpreted,

21   take the position, well now wait a minute, the Ponzi

22   scheme can be challenged, especially if you knew or should

23   have known.  And Court knows this far better than I.

24        The point I am getting to is, I do not have an

25   honest opinion as to when this money is going to be

```
 1   released.  And it is not in my control.  And the judge has
 2   been very good.  I think he gets the arguments.  He's been
 3   very responsive at setting hearings.
 4        But this big fraudulent transfer action and claim
 5   we have against the bank is going to take awhile.  And I
 6   don't know what "awhile" means.  I would be lying to you
 7   if I said anything else.  Now I will be quiet.
 8   Q.   I have a couple other questions for you.  I think it
 9   is obvious, but I have to ask it in this way.  Have you
10   recovered -- have you been able to recover an amount of
11   money for -- ostensibly for the victims in this case?
12   A.   Well, there is $6.4 million sitting in the HomeSource
13   trust account.  There is roughly another, I expect another
14   million plus for the goods from both marital properties.
15   One of the things, Karen and her husband had some marital
16   properties, some of which Karen put HomeSource deeds of
17   trust on and didn't mention to her husband.  He is a
18   victim too, in this thing.  And they are divorced now.
19        And we have agreed that we get Karen's half of the
20   marital equity, and the husband will get his half.  So
21   when that is all netted out, when I take that and when I
22   take the sale of the HomeSource office building, which we
23   have continued to use, because there are these thousands
24   and thousands of pages of files and documents, et cetera,
25   and when I sell those, I expect to recoup another million
```

```
 1    dollars.

 2            We have got claw back claims.  And, I apologize, I

 3    can't remember right off the top of my head what they

 4    amount to now.  My counsel is back there, and if you want

 5    me to ask him, I can ask him, if you care.  I am guessing

 6    between half a million and million-and-a-half dollars.  I

 7    just don't remember.  I don't know.

 8            So, and if we recover on the bank claim, the claim

 9    I honestly believe is worth $10 million on its face.  That

10    doesn't mean we will get $10 million.  And having Karen

11    there, I believe, will be very helpful to me.  That is a

12    purely selfish statement to the investors, to the victims.

13    Q.   In terms of the liquidation of the assets, is there

14    also a 5-acre property?

15    A.   Is there also what?

16    Q.   A 5-acre property that has been hasn't been

17    developed, are you aware?

18    A.   There is a lot, yes.

19    Q.   And do you have any idea of the value of that?

20    A.   It is in a hot area that I know very well, because it

21    is next to Glenn Eagle, that I developed.  It's -- I don't

22    know the current -- I know the market is very hot.  I am

23    not familiar with 5-acre parcels.  I am not familiar with

24    whether that is sub-dividable.  I have not focused on that

25    parcel yet.
```

1    Q.   Is there also an office building that has not been

2    sold -- I think you might have referred to that.

3    A.   That is what I just referred to.

4    Q.   At the end of everything, when this comes -- when you

5    are done doing all your work, when your folks move out of

6    that building -- and that is where Denise is; right?

7    A.   Yes.  She is in the back of the courtroom, but when

8    she is working.

9    Q.   She is working out of that building?

10   A.   Right.

11   Q.   When she moves out and there is no one else in that

12   building, do you intend to sell that building?

13   A.   I intend to sell that building and have an auction of

14   the personal property that is around.  It will raise a few

15   more dollars, but not significant in the grand scale of

16   things.

17   Q.   Fair to say the building is worth more than the

18   personal property?

19   A.   Oh, the building is worth probably a half million

20   dollars, using round number.  And the personal property --

21   I like auctions.  I have been to lots of them.  It could

22   go as low as $5,000 or as high as $50,000 for the personal

23   property, depending on the day and the weather and the

24   people.

25   Q.   If I am hearing you correctly, right now there is

```
 1   about $6.4 million that you have been able to obtain?

 2   A.   Sitting in the trust account, yes.

 3   Q.   Has that been increased, to your knowledge?

 4   A.   What do you mean, "been increased?"

 5   Q.   Did you hand me a document?

 6   A.   No.  The document I handed you was the latest update

 7   of the sales.  You called me last night.  You were telling

 8   me numbers.  I said I don't know if those are the latest

 9   numbers or not.  I stopped in my office this morning and

10   printed this out.  That document I gave you, that 6-point

11   -- the number you have there, that is everything that has

12   sold as of today.

13   Q.   That is what I am talking about, the number we were

14   referring to 6.4 million was about November 28th or 29th

15   of 2017?

16   A.   I don't know.  6.4 million is what is in the bank.

17   That may say 6.5 or something, but there are a few

18   legitimate sales loss that came out.

19   Q.   I understand that.  The old one goes back to the end

20   of November.  This one comes to today, and it is in the

21   amount of $6,515,766.06.

22   A.   And that was net sales proceeds out of which, what is

23   left in the bank, because we will have to take some taxes,

24   et cetera, is the 6.4 million something I told you.  I am

25   rounding it to 6.4 something.  I don't know to the penny
```

```
 1   what it is.
 2   Q.   If you were able to get the additional money from the
 3   marital property, from the claw backs, if I understand
 4   correctly from our discussions, that would be somewhere
 5   around 7-and-a-half to $8 million?
 6   A.   I think that is a reasonable guesstimate, yes.
 7   Q.   Okay.  Do you know if it could -- could it be more or
 8   less?
 9   A.   You are right, it could be.
10   Q.   Okay.  If you were successful -- if you are
11   successful in the civil suit against Integrity Bank and
12   Trust, would that add to the pot of money?
13   A.   Yes.
14   Q.   And I believe you said a minute ago that that could
15   be as much takes $10 million?
16   A.   It could be, or as little as zero.  I have to be
17   honest.  I believe we will prevail, but I don't know -- I
18   don't want to represent to anyone in the courtroom or the
19   Court any guarantees of what -- how the music is going to
20   end.
21   Q.   I understand.  I want to just talk to you briefly
22   about Ms. McClaflin's assistance to you and your
23   assistance to Denise.  What is Denise's last name?
24   A.   Tinsley, T-I-N-S-L-E-Y.
25   Q.   Denise Tinsley.  Have you observed, over the course
```

```
 1    of the last year or more, the work that Ms. Tinsley has

 2    done with Ms. McClaflin to get the books straight and get

 3    the accounts straight?

 4    A.   I have.

 5    Q.   Can you guesstimate the number of hours?

 6    A.   Well, Denise keeps records specifically of hours that

 7    she has worked with -- Karen's work with Denise.  And I

 8    smiled when I heard Ms. Tweet testifying to a thousand

 9    hours, because Karen alone, of the clocked hours she has

10    physically been present with Denise is 400 hours.  In

11    addition, to which Denise works at home, and et cetera for

12    more hours.  In addition to which Karen has come and met

13    with me on different things that our accountant -- she

14    knows the properties.  She knows the neighborhood, and she

15    was an excellent realtor.

16         So she was helpful in upping the value of the sales

17    and getting me some subs to fix things up, et cetera.  So

18    she spent a lot of time with me.  Any time I ever called

19    her for any assistance, if she doesn't answer the phone

20    immediately, I get a call back very rapidly, if not within

21    minutes, it is the next day.  And it starts with an

22    apology; I am sorry I couldn't call you yesterday, I was

23    in the hospital.

24         She has been -- I know the bad things that she did.

25    I am not minimizing them at all.  They are true.  But,
```

```
 1   these good things are true, too.
 2   Q.   You have heard from Agent Tweet, who testified
 3   earlier.  Are you aware of any other FBI or IRS agents who
 4   worked with you and/or Ms. McClaflin?
 5   A.   Well, I know that -- when I first got into this and I
 6   saw a few things that caused me concern, I went to the
 7   FBI.  And as I was explaining what had -- I had seen so
 8   far, plus what I had been told by Ms. McClaflin to the
 9   FBI.
10        They had some questions.  And I said, why don't I
11   get her to come in and talk to you.  And the response was,
12   well, we doubt that she would talk to us.  And I said,
13   well, I will talk to her and her lawyer.  The whole deal
14   she made was she was going to be helpful and do things.
15        So, I called Matt, who is sitting there, and I
16   said, Matt, the FBI wants to talk to Karen.  And if the
17   deal is she is going to show that she is helping, it makes
18   sense to me.  And Matt said okay.  So we went up to the
19   FBI office, and Ms. Tweet was there, and agent Cronan was
20   there.  There were a lot of other people from a lot of
21   other agencies all around this table.  And it was a
22   multi-hour, very interesting interview, that was much more
23   than I understood, at the end of which many law
24   enforcement people, like, afterwards, gave me this like,
25   wow, that was something.
```

```
 1        I have continued to stay in touch, primarily with
 2   Mr. Cronan, mostly because he is just a very nice guy, and
 3   we get along.  And he and I both share the common opinion;
 4   we have never seen a situation like this.  When there is
 5   this kind of theft in a situation, the money is usually in
 6   someone's pocket, and they have enriched themselves.
 7        This woman took a $40,000 a year salary, and every
 8   other penny is accounted for.  I heard stories of
 9   luxurious trips and all.  She was married to a husband who
10   was a professional at making money, and I don't think,
11   from what I've heard, that I have heard anything
12   extraordinary.
13        I am not minimizing any of the complaints.  They
14   are right.  But I think Karen did not, from what I can
15   tell, lead a high flying lifestyle, and she has given us
16   everything.
17   Q.  Have you filed a plan of distribution with the El
18   Paso County District Court?
19   A.  We have filed a proposed -- I have to emphasize that
20   word -- plan of distribution with the Court.  And until
21   and unless the Court approves it, that is not it.  There
22   are going to be objections.  There are going to be
23   hearings.  Counsel will get to talk.  But, in a nutshell,
24   Your Honor, what we are proposing -- and if you want to
25   hear it better than me, my counsel is here, and he can
```

         1   explain it better.

         2          We take winners and losers.  The winners are the

         3   people who got more than they put in.  We don't care

         4   called whether it was called points or interest or

         5   whatever.  If you put in a hundred dollars, and you got

         6   back 150, I want 50 back.  The losers, if they put in a

         7   hundred dollars and they got 35 back, I am going to try to

         8   get them 65.

         9          So, in the plan of distribution, we are saying,

        10   there are many deeds of trust that we're challenging.  And

        11   we think the Court should put them aside and throw that

        12   money into a pot for the other -- for the remaining

        13   unsecured creditors.  Treat some of those -- some of the

        14   deeds of trust just like the other investors who were

        15   unsecured.

        16          There are other deeds of trust that are seasoned

        17   and older and may have gone of record prior to the Ponzi

        18   being established.  That is one of the reasons this

        19   accountant took so long; we had to go through thousands of

        20   documents to figure out at what point did this stop being

        21   a legitimate business and turn into this Ponzi scheme;

        22   taking from Peter to pay Paul.

        23          And our senior accountant, Marvin Strait, has been

        24   directing Denise Tinsley.  And this took all of this time

        25   to do, but we will end up acknowledging that this pile of

1    deeds of trust gets the first money.

2           Now, let's say one of those deeds of trust is good,

3    and they have a deed of trust on a house for $75 and the

4    house sells for a hundred, then our position is they get

5    the 75, the 25 goes into the pot for everyone else.

6           And that is, in short, a summary -- we are

7    proposing that is what the Court does and how the Court

8    distributes the money amongst the victims.  It is up to

9    the Court.

10   Q.   Was that Receiver's plan of distribution filed in the

11   El Paso County District Court on April 17th of this year?

12   A.   You got a filing stamp, I believe you.  I have no

13   idea of the date.  I am terrible on dates.

14   Q.   Okay.  Is there anything I have missed in speaking

15   with you?

16   A.   No.  It's been -- I think everybody has the picture,

17   the good and the bad.  And I am glad I don't have your

18   job, but I hope I have Karen to help me.

19           THE COURT:  Nope, you can't leave yet.

20           THE WITNESS:  I am sorry, excuse me.

21           THE COURT:  Cross-examination.  Ms. Rhyne may have

22   cross-examination.

23                        **CROSS-EXAMINATION**

24   **BY MS. RHYNE:**

25   Q.   To be clear, you have this ongoing litigation with

```
 1    Integrity Bank and Trust; correct?
 2    A.   Yes, ma'am.
 3    Q.   And they have, I am not sure what it is styled as in
 4    the Court, but something that at least amounts to a
 5    counterclaim, where they are seeking to enforce any of the
 6    first deeds of trust their investors have, yes?
 7    A.   Their position -- I am glad you raised that.  Let me
 8    make it clear so everybody understands it.
 9    Q.   Sure.
10    A.   Their position is, listen, guys, we have deeds of
11    trust, they're good.  We are owed the hundred dollars we
12    put in, plus, per the deeds of trust, we want our attorney
13    fees, court costs, interest, et cetera.  That is the
14    dispute.
15    Q.   And if they prevail --
16    A.   If they prevail --
17    Q.   -- not only will you not get 10 million extra, they
18    will dip heavily into the 6.5 you have collected; yes.
19    A.   Absolutely.  It would be a disaster.
20    Q.   So maybe this goes very well for the victims, yes?
21    A.   Yes.
22    Q.   Maybe it goes poorly?
23    A.   Absolutely.
24    Q.   Today we don't know?
25    A.   That is correct.
```

```
1    Q.   I wish you all the luck in the world, but I wanted to
2    make that reality clear.
3         I want to make something else clear.  You and I
4    have discussed this case a number of times; correct?
5    A.   I think two.
6    Q.   At the very beginning of our discussions, I made it
7    perfectly clear to you that the criminal case was not
8    going to take second seat to the receivership, and we were
9    not agreeing to allow Ms. McClaflin to stay out of jail
10   for the term that it took you to resolve the estate.  I
11   made that perfectly clear, did I not?
12   A.   You were very clear that that was your position.  And
13   I never suggested that the receivership should run the
14   criminal case.  I want to make that clear, also.
15        MS. RHYNE:  Thank you.
16        THE COURT:  All right.  I have a few questions.
17        So, with respect to the -- when you testified that
18   there are claims of competing interest of various deed
19   holders, are you talking about the deeds of trust held by
20   Integrity Bank or its investors?
21        THE WITNESS:  Among others.  Integrity Bank put in
22   money from individual's self-directed IRAs.  So some of
23   them are in this mix I am talking about.  Some of them,
24   they are in first place.  And then there are other regular
25   investors, individuals who have got these claims, as well.
```

1           THE COURT:  All right.  So, have all of the

2    properties related to those deeds of trust been sold?  In

3    other words, is the 6.4 that is in the bank subject to

4    those deeds of trust, and there is not any other assets

5    out there that have those on them?

6           THE WITNESS:  No.  The money that is in the bank

7    includes all of the HomeSource properties and deeds of

8    trust, that would include Integrity.  But, in addition to

9    that there are marital properties that were titled in the

10   name of Karen and her husband, that I am also selling, and

11   I have not sold those yet.

12          And, off the top of my head, I cannot remember

13   whether or not there are some HomeSource deeds of trust on

14   those or not.  I don't think there are, but I could be

15   mistaken.

16          THE COURT:  All right.  Well, put those aside, and

17   looking only to the 6.4 million that is in the bank, if

18   the deed of trust holders who are contesting that theirs

19   should be set aside, prevail, what does that reduce that

20   pot of money to, ballpark?

21          THE WITNESS:  What does that what?

22          THE COURT:  Reduce the pot of money, 6.4 million

23   to, just ballpark?  What are we talking about of the 6.4

24   million?

25          THE WITNESS:  May I ask my counsel if he remembers

1    the number?

2         THE COURT:  You may.  And I will tell you, this is

3    not so much for sentencing as for letting the investors

4    know what they are looking at.

5         MR. LUCAS:  Your Honor, Peter Lucas, Appel, Lucas &

6    Christensen.  I don't know if I need to be sworn.  But, to

7    answer your question most directly, there is no

8    unencumbered property in the receivership estates.  If

9    those deeds of trust were all proved to be valid, with the

10   exception of the office building, which might have a very

11   small slice of equity, there would be nothing in the

12   receivership estate for investors.

13        So, unless we can get rid of some or all of the

14   deeds of trust, there will be nothing.

15        THE COURT:  All right.  And how long do you

16   anticipate that litigation is going to take?

17        MR. LUCAS:  If the litigation were to go to

18   fruition, we're a year or more before we even get to

19   trial.  We are in fairly serious discussions with some of

20   the investors, in terms of settlements.  So we think that

21   things could progress more quickly, and that is only

22   because of settlement.  If we are talking litigation, we

23   will not get to trial in a year.

24        THE COURT:  All right.  And so I assume, then,

25   Mr. Barash, that the investors will see none of their

1    money in pay back until these issues are all resolved,

2    which could be more than a year, then?

3         THE WITNESS:  I believe that is correct.  It is all

4    dependent on what happens with the Court in El Paso

5    County.

6         THE COURT:  All right.  That is all I have.

7         Mr. Hammond, do you have anything further?

8         MR. HAMMOND:  No, Your Honor.

9         THE COURT:  All right.  Thank you very much, sir,

10   you are excused.

11        THE WITNESS:  Thank you very much, Your Honor.

12        MS. WULF:  Your Honor, may I speak for a moment?

13        THE COURT:  Who are you?

14        MS. WULF:  My name is Jessica Wulf, and I am a

15   friend of Karen McClaflin.

16        THE COURT:  Are you a victim?

17        MS. WULF:  I am not.

18        THE COURT:  Then you may not.

19        MS. WULF:  But Mr. Hammond asked if any of us could

20   say anything positive.

21        THE COURT:  You may not speak.  You are not a

22   victim.  You are not a witness here.  We don't do

23   character witnesses.

24        All right.  Mr. Hammond, would you and

25   Ms. McClaflin please retake the podium.

```
 1        Court finds that the total offense level in this
 2   case is properly calculated in the presentence report;
 3   that is an offense level 33.  The defendant's Criminal
 4   History Category is a I.  That results in an advisory
 5   range of imprisonment of 135 to 168 months.  The
 6   supervised release range is not more than 3 years.  And
 7   the fine is in the range of 17,500 to 29 million plus,
 8   which is twice the gross gain or loss.
 9        The Court also finds, unless you have some evidence
10   to present otherwise, Mr. Hammond, that the restitution
11   amount, based on the evidence presented, would be
12   $14,528,206.39.
13        MR. HAMMOND:  Your Honor, I am assuming that comes
14   from --
15        THE COURT:  The testimony that was just put on.
16        MR. HAMMOND:  -- the final result in Government's
17   Exhibit 1.
18        THE COURT:  Yes.
19        MR. HAMMOND:  I do not -- is the Court going to
20   allow me to speak on Ms. McClaflin's behalf?
21        THE COURT:  Absolutely.  Yes, absolutely.  We are
22   just going through the preliminaries here.
23        My way of dealing with sentencing, because it has
24   been a long time since you have been before me, is I will
25   tell you where I am going, in terms of my inclinations, so
```

1    that you can target any arguments you have to what my

2    concerns are, and to persuade me otherwise, or to persuade

3    me to go the way I have indicated, if that is what you

4    want.

5          I will hear from you, then Ms. Rhyne, and finally,

6    if Ms. McClaflin wishes to make any statement to me on her

7    own behalf, I will hear from her.

8          All right.  As part of my protocol for determining

9    whether the advisory guideline range is a range that is

10    sufficient, but not greater than necessary, to achieve the

11    objectives of sentencing, I have reviewed the presentence

12    report, I have considered the sentencing guidelines, and

13    the factors set forth at 18 United States Code Section

14    3553.

15          Ms. McClaflin is 59 years old.  She stands before

16    this Court for sentencing on her third felony conviction.

17    Although her first two felony convictions occurred more

18    than 30 years ago, the Court notes that they involved

19    stealing from her employers.  She was convicted of

20    embezzlement.

21          In this offense, she ran a Ponzi scheme for several

22    years, where she made false promises to her investors and

23    manufactured documents intended to make it appear as

24    though those promises were being kept.

25          She was aware that she could not continue to meet

1    the promises she was making to these investors.  And

2    instead of declaring bankruptcy, as her original partner

3    did, and cutting her losses, she chose to continue to seek

4    out investors in order to continue her fraudulent scheme.

5         During the course of that scheme, Integrity Bank

6    and Trust began funneling investors to the defendant.  At

7    some point, apparently, Integrity Bank began pressuring

8    her to protect its investors.  This pressure resulted in

9    the defendant then forging documents to show Integrity

10   Bank that its investors were protected.

11        That is what this testimony was all about of the

12   litigation with the bank, to see -- they are claiming they

13   have the first position on those properties because of the

14   forged documents that were put forward by Ms. McClaflin.

15        Eventually, Ms. McClaflin was not able to make the

16   minimum payments that she was making to cover the interest

17   to show the investors that they were getting something

18   back, and her scheme was uncovered.

19        Ultimately, the defendant ended up defrauding many

20   of her investors of a substantial amount of their savings,

21   and as a result, the investors lost -- or her victims lost

22   more than $14 million.

23        Many of the victim investors, as I have indicated,

24   have submitted declarations of victim losses and victim

25   impact statements.  A review of those statements reveal

1    that the defendant's action has caused significant

2    financial hardship for her many investors.

3        Her investors were impacted in a variety of ways,

4    including loss of most or all of their savings, inability

5    to retire, having to return to work, inability to provide

6    their children with financial assistance or any

7    inheritance, selling or downsizing their homes, and a few

8    have even had to move in with friends or family.

9        Many of the investors also discussed how the

10   defendant's action made them feel betrayed or left them

11   questioning their ability to trust people.

12       It has caused marital difficulties from some

13   investors because of the stress they are experiencing as a

14   result of their losses.

15       I am going to read from those statements that I

16   found to be the most pertinent.  And some of you have

17   spoken.  I have chosen your statement, and to the extent

18   you have already indicated something that I was going to

19   read, I am going to skip over it.  But these are some of

20   the victim impact statements:

21       "I am 71 years old, and my wife is 63.  To have

22   someone wipe out the majority of our retirement income has

23   been emotionally difficult.  There is a wide range of

24   emotions, from anger to fear to sadness and resignation.

25   In fact, she stole my last remaining retirement dollars.

```
 1        Any possibility of slowing down at work and
 2   enjoying more time together or with family has been
 3   eliminated."
 4        Another one talks about his mother:  "Due to a
 5   brain tumor and the effect of surgery to remove it, my
 6   95-year old mother has lost the use of one eye and has
 7   advanced macular degeneration in her remaining eye.  She
 8   has no hearing in one ear because the auditory nerve was
 9   cut during surgery.  She requires a hearing aid in her
10   other ear.  My mother requires help with medication
11   management and balance issues, person hygiene, dressing,
12   and food preparation.
13        If her money, in fact, is lost, which was 250,000,
14   we will not be able to continue her care without depending
15   on governmental aid and assistance."
16        "Karen has totally changed our lives.  She has
17   taken our dignity, destroyed our retirement, robbed my
18   mom's security, and threatened her well-being.
19        Her greed has caused damages on all her investors
20   and possibly some employees and has displaced her
21   renters."
22        "My wife and I worked hard to set aside money for
23   retirement.  I worked for a small company that did not
24   participate in retirement programs, so I knew I had to
25   save.  We were successful at building what we thought was
```

```
 1    a comfortable retirement account of 720,000.
 2            Eventually we invested all retirement money and
 3    most of our personal savings with HomeSource Partners.
 4    Ms. McClaflin took it all; 720,000.
 5            Our hopes for an independent future, the pride of
 6    knowing our children would not have to provide for us as
 7    we age, our dreams of travel, and our ability to be
 8    generous with family, friends, church, and our community,
 9    have been lost.
10            Now that our retirement account has been pillaged
11    by Karen's Ponzi scheme, we are dependent on my Social
12    Security income, my wife's small pension, and what remains
13    of a small emergency fund."
14            "This has strained us not only financially, my
15    husband and I haven't slept through the night since early
16    February, and I often wake up in a panic, with my heart
17    racing.  I have so much anxiety.
18            Do you know how crushing it feels to have your
19    daughter tell you that they will provide 500 a month to
20    help?
21            The money we invested with Karen was lost, and lost
22    because of her actions was my life savings and profit from
23    the sale of our personal home.  We will now be living with
24    our son.  I am 72 years old, have cancer, and suffer from
25    depression because of this loss.  I will now have to find
```

1     a job in order to buy food, pay bills, et cetera.  She has

2     totally destroyed my life."

3          "We will not be able to purchase a home now and

4     will live with our son.  At this age, we will never be

5     able to recover that investment and will be forced to work

6     the rest of our lives if we are able.  It is very

7     difficult to explain the stress and turmoil this has

8     placed on us."

9          One gentleman described the emotional impact as

10    "unbelief, anger, and foolishness" as to how he could let

11    someone "trick me out of most of our retirement savings.

12    Karen took more than money.  She stole whole generations

13    of family vacations, gifts, college educations, which

14    cannot be replaced."

15         "This money derived from my mom's hard work that

16    she left me in a family trust when she passed away.  I

17    felt that I had done her a great disservice in letting

18    this happen.  And it has sent me, at times, into a state

19    of deep depression.

20         This has made my current living situation very

21    unstable, to the point where I just break down.  It has

22    also caused some pre-existing medical problems to

23    intensify."

24         Since I no longer have this income, I was forced to

25    file for Social Security early, and now I am trying to

```
 1    make it on a little over 1,400 a month.  So this means
 2    that the home I have with my shop on it that keeps me
 3    entertained for 37 years has to go.  And I am currently
 4    trying to find somewhere I can afford to live."
 5            "Due to her actions, I have been forced to move in
 6    with a friend and try to obtain other employment and sell
 7    many other assets.  Karen McClaflin took money that I
 8    worked many years to obtain and used it as her own.  She
 9    made promises to me and several others that she could not
10    have ever intended to keep.  She has nearly destroyed my
11    life financially."
12            "Emotionally this has been devastating.  Karen had
13    become a trusted friend.  To be lied to and betrayed,
14    resulting in the loss of our life savings has been
15    extremely painful and difficult to cope with.  The
16    majority of our life savings was invested in HomeSource.
17    This loss caused us to lay off two employees, and the
18    viability of our organization, which was a non-profit, is
19    also at risk.
20            Any plans to move in 2017 have been delayed
21    indefinitely, and our kids' college funds and retirements
22    were seeded in this investment.  It has impacted every
23    area of our work and financial future."
24            "The loss of this income crushed our future plans.
25    Travel, possibly becoming snow birds, that plan is now
```

1   impossible.  We are still going to have to sell our

2   Colorado home to repay the HELOC and move into something

3   smaller, and the rest of the plan has been destroyed.

4          In addition to the emotional stress of having

5   $300,000 stolen and our retirement funds devastated, the

6   stigma of trusting Karen and having that trust betrayed

7   has left us with questions about our ability to discern

8   unscrupulous people and opportunities."

9          "This was inherited money from my mother and

10  father.  Some of it belonged to the family trust, which

11  includes myself and my two sisters.  Even writing this

12  statement is like tearing duct tape off an open wound.

13  Although our financial loss may not be as large as others,

14  in our, my sister's and I world, this is a huge loss.

15  There has been a noticeable increase in anxiety, not

16  knowing what our financial outcome may be.

17         I have also noticed an increase level of skepticism

18  that I never felt before.  My trust in humanity is quickly

19  disappearing.  I have been emotionally torn apart by

20  this."

21         "The principal amount was planned to be used to buy

22  a house for retirement.  I was hoping to have been able to

23  retire by September of 2017.  Now that this money is lost,

24  I have no idea if or when that may happen."

25         So those are just a few of the victim impact

```
 1    statements that were submitted that I felt were worthy of

 2    being put on the record.

 3          The Government has filed Document 20, the

 4    Government's motion for a variant sentence of 65 months

 5    based on the defendant's cooperation.  That would be

 6    greater than a 52 percent reduction from the

 7    bottom-of-the-advisory guideline range, as I believe has

 8    been properly calculated.

 9          The Government indicates that Ms. McClaflin's

10    efforts to aid the Government in its resolution of the

11    case have been substantial and unusual and warrants a

12    variant sentence.

13          In addition to meeting with the Government and

14    confessing to her crimes, Ms. McClaflin agreed to plead

15    guilty to an Information rather than requiring an

16    Indictment, which the Government indicates allowed it to

17    charge this case much more quickly than usual.

18          The Government also indicates, and the Receiver

19    testified here today, that Ms. McClaflin has been actively

20    providing information and locating documents to assist the

21    Government and the Receiver in its loss and restitution

22    calculations and to liquidate the estate to the benefit of

23    the recipients of those moneys.

24          She has stipulated that the loss and restitution in

25    this case exceeds 14 million, although apparently there is
```

80

1    a dispute over about 90,000 of that amount.

2         The Receiver in the El Paso County District Court

3    civil case did testify today.  He has reported that

4    Ms. McClaflin's assistance in the investigation has been

5    invaluable.  And I will agree with him and with everybody

6    else that this is a very unusual case.

7         Normally, in these cases, I find that the

8    defendants have either not kept records or have shredded

9    everything they can, and it is very difficult to put

10   together the records to show what has been invested, what

11   has been lost, and then to liquidate the assets.  And

12   generally investors receive maybe 10 cents on the dollar.

13        The Receiver in this case noted that her assistance

14   in deciphering her business records and which assets could

15   be liquidated in order to pay the investors was extremely

16   helpful.  And he believes that without her assistance it

17   could have taken years to determine the financial portion

18   of this offense.

19        He was appointed by the El Paso County District

20   Court to dissolve the defendant's company, and thus far

21   has recovered 6.4 million.  Unfortunately, it appears that

22   there is a real squabble over most, if not all, of that

23   from the deeds of trust that were forged by Ms. McClaflin

24   and put into the hands of the investors for the bank.

25        It was interesting to read that FBI Agent John

 1    Cronan indicated that the Ponzi scheme that the defendant

 2    was conducting was different from the average Ponzi scheme

 3    because the defendant did not pocket much of that money,

 4    nor did she close down her business and take the money and

 5    flee the jurisdiction.

 6         He indicates that she has accepted responsibility

 7    for her actions and has provided invaluable assistance to

 8    the FBI in this offense.

 9         In the majority of these types of cases, the

10    victims are rarely made whole.  I am hoping that there

11    will be prevailing outcomes with respect to Integrity

12    Bank, and that the investors here will be made somewhat

13    whole, if not entirely whole.

14         But I also noted that despite this assistance, the

15    Government objects to the presentence report, indicating

16    that Ms. McClaflin and her husband "divorced about one

17    month after her fraud was discovered."  Yet, both continue

18    apparently to reside in the same house, and her husband

19    has admitted that the primary reason for the divorce was

20    to secure his assets, and states that he hopes to stay

21    together with the defendant, because he still loves her.

22         The Government also indicates that Ms. McClaflin

23    has failed to account for personal assets.  The Court sees

24    this as hardly behavior of a defendant who is truly sorry

25    for her conduct and wishes to make her victims whole.  As

1   usual, it appears she is looking out for her own best

2   interest.

3       Therefore, based on my review of this case, and

4   after consideration of the 3553(a) factors, especially the

5   nature and circumstances of this offense, I would normally

6   not be inclined to vary or depart at all from the advisory

7   guideline range.

8       However, based on the conduct of Ms. McClaflin post

9   discovery of her fraud, I am inclined to grant a variant

10  sentence, but not one as low as that requested by the

11  Government.

12      If I had determined that there was insufficient

13  evidence to apply the 6-level enhancement of United States

14  Sentencing Guideline Section 2B1.1(b)(2)(C) in this case,

15  the advisory guideline range would have been 87 to 108

16  months.

17      In such a case, I would not have granted any

18  variant sentence, because despite her cooperation, I think

19  that range is sufficient, but not greater than necessary,

20  to meet the objectives of sentencing.

21      However, because of her cooperation, and the fact

22  that it is at least allowing assets to be put into the

23  hands of someone who will not dissipate them, while I am

24  inclined to deny the Government's motion, I am inclined to

25  grant a variant sentence somewhere within that adjusted

1   advisory guideline range had I not applied 2B1.1(b), so in

2   the guideline range of 87 to 108 months, because I believe

3   that is a sufficient, but not greater than necessary,

4   sentence.

5        However, I have not yet decided where within that

6   range of 87 to 108 months the sentence should actually be.

7   I am inclined to impose 3 years of supervised release,

8   with all of the special conditions, including the

9   restitution, as I indicated, in the amount of

10  $14,528,206.39 to the victims, as set forth in the

11  presentence report.

12       So, the sentence would run concurrently.  It would

13  be imposed as to both Counts 1 and 2, to be run

14  concurrently, and the supervised release to also be run

15  concurrently.

16       With that being said, Mr. Hammond, I will hear from

17  you, then I will hear from Ms. Rhyne, then, finally, if

18  Ms. McClaflin wishes to make any statement to me on her

19  own behalf, I will hear from you.

20       MR. HAMMOND:  Your Honor, I have heard the Court

21  talk about property that was misleading, or something like

22  that.  And I am going to assume -- so I am asking

23  direction from the Court -- that that had to do with the

24  vehicles that were mentioned?

25       THE COURT:  There were the vehicles that were

1    objected to, and then whatever -- I don't know what has

2    happened with this "divorce."

3            MR. HAMMOND:  Well, I can tell you, as far as the

4    vehicles go, the 2006 ML350 has been sold, and that was, I

5    believe, that was purchased in 2006.  It was sold as part

6    of the down payment -- or the payment on a 2011 ML350 that

7    belongs to Mr. McClaflin.  I am sorry, Mr. Strange.

8            The 2010 Audi SE coup was sold in 2017 to pay for

9    attorney fees.  The 2014 Audi Q5 belongs to Mr. Strange.

10   I don't know if that helps the Court or not.

11           THE COURT:  A bit.  But we have been going for 2

12   hours.  I need to give Ms. Martinez a break from typing.

13   So we are going to take a 15-minute break.  We will

14   reconvene at 1:15.

15           (A break is taken from 12:58 p.m. to 1:11 p.m.)

16           THE COURT:  You may be seated.

17           Mr. Hammond, you may proceed.

18           MR. HAMMOND:  Your Honor, I think the last place I

19   left off was about the personal property.  And my question

20   for the Court was, did that sufficiently answer the

21   Court's questions.

22           THE COURT:  Well, it did as to those vehicles, but

23   I don't know what other personal property is out there.

24           MR. HAMMOND:  And that's why I asked that question.

25   I am not aware of any other personal property that has

1    been mentioned besides the automobiles.

2         THE COURT:  All right.  And then the real property

3    that got split up in the divorce, I don't know much about

4    that.

5         MR. HAMMOND:  And I anticipate, or I'm going to

6    inform the Court that as far as I can tell about the

7    divorce, I think the divorce was something that

8    Ms. McClaflin initiated, in large part, because she had

9    betrayed her husband, as well as the rest of the people in

10    this room.  And in terms of feeling like she had to do

11    what she had to do, that is how the divorce came about.

12         I think that they don't have the same relationship.

13    I think that Mr. Strange cares deeply for her.  I think

14    she cares deeply for him.  But, as many of the people told

15    you this morning, it has caused severe marital problems,

16    and hers is one of the -- part of the wreckage of this

17    whole thing.  I don't know if that helps the Court with

18    respect to that, either.

19         One of the things that I don't believe you know, is

20    that while all of this has been going on, just before or

21    just after Ms. McClaflin was -- I think it was before,

22    because it was in March, before she was charged by

23    Information, her mother died on March 28, 2017.

24         It was after Ms. McClaflin had gotten out of the

25    hospital on her seventh surgery.  She had taken care of

```
 1    her mom, taken care of her dad.  She was very close with

 2    her dad.  He is also -- he was also a victim.  He had been

 3    hospitalized.  He got out of the hospital and was doing

 4    pretty well, and I think it was a massive heart attack,

 5    and he died on September 23, 2017.

 6         So, the train wreck basically continues for

 7    everybody.  The loss continues for everybody.  Financial

 8    loss, the emotional loss.

 9         I will tell you, as I started to say earlier this

10    morning at the very beginning, this is the first case that

11    I have seen in my practice, that started in 1993 in the

12    federal court, that the probation office recommended a

13    downward variance based on everything that was done, and

14    it was a substantial downward variance.  And it was a

15    variance of 60 months.

16         It is the first time I have seen, in the time that

17    I have been practicing in the United States District

18    Court, that the Government recommended a significant

19    downward variance on sentencing.  And I think, as I said,

20    there are -- well, I didn't get that far, so I will start

21    now.  I think there are four extremely relevant facts why

22    that happened, and I want the Court to consider them.

23         When Ms. McClaflin was confronted by the investors

24    who were associated with the bank, she admitted what she

25    had done and what she had been doing.
```

             Second, when the Receiver was appointed by the El
Paso County District Court, Ms. McClaflin was committed to
assisting the Receiver in sorting through the documents
and organizing all of the HomeSource material and business
records and assisting the Receiver in how everything
worked and how it started and how it would unravel.

             Third, she agreed that she would assist the
Government.  She agreed to assist FBI agents.  She agreed
to assist IRS agents.  She agreed to assist anyone in law
enforcement who had a question at any time they had a
question.

             When I was contacted on this case, there was a
meeting in the U.S. Attorney's Office.  I expressed my
constant concern about my client speaking to government
agents without my being present.

             But it became very clear that there were things
that had to be discussed in Colorado Springs that I
couldn't get there, the timing was something that had to
be resolved.  And the agents who called me said, do you
mind if I talk to Ms. McClaflin, and I said, go ahead and
do that.  She has been there for everything they have
asked about.  She has cooperated in every way possible.

             And, fourth, beginning in about 2011,
Ms. McClaflin's body went through hell.  She started
having medical issues with her hip.  And, as you have

```
 1    heard, she has now had 11 surgeries, and there may be
 2    more.  The likelihood -- it is more likely than not that
 3    there will be more surgeries.
 4           She has lost 30 to 40 pounds since 2011 based on
 5    her medical condition.  And it is interesting, because
 6    that explains a lot of how this happened.  As Agent Cronan
 7    said in the presentence report, this case is unique,
 8    because in any kind of a Ponzi scheme, the defendant takes
 9    the money, the defendant buys lavish things for himself or
10    whoever he wants to.  The defendant goes out and takes the
11    money or runs with the money and is never heard from
12    again.  They spend it.
13           She didn't spend it.  What she was doing was trying
14    to keep things afloat.  The Court noted, the issue about
15    Ms. McClaflin's partner and how he had -- he got out of
16    the business.  He saw what was happening, and he declared
17    bankruptcy and cut the losses.
18           She didn't do that.  The reason she didn't do that
19    wasn't because she wanted to keep a scheme going for
20    herself, it was so everybody would get back what they put
21    in.  That is why she kept doing it and kept doing it.  She
22    convinced herself that if she could do that, at some point
23    the economy was going to get better.  At some point, it
24    was going to turn.  And, in deed, it has.  And the values
25    were going to go up, and she was going to be able to pay
```

1    those folks.

2         How she did it was, to put it mildly, a mistake.

3    What she did was wrong.  The manner in which she did it

4    was wrong.  What she -- the goal she wanted to accomplish,

5    that was not wrong.

6         I have seen so many of these cases involving fraud

7    that -- and I have done them in front of this Court, and

8    we are familiar with each other.  I just did a sentence in

9    front of you 2 months ago.  You know my style.

10        I have seen these cases, and this is unique.  That

11   is why probation did what they did.  That is why the

12   Government did what they did.  That is why I would ask you

13   to reconsider, because I think she can still help.  She

14   can still help the Receiver.  She can still help whoever

15   needs to get the help, to get money back to those who

16   deserve to get their money back.

17        But I cannot stress enough that what happened was

18   she was working in a bad economy.  She kept trying to get

19   more money so she could pay people on the front end so

20   that she would have the money to get it when the economy

21   got better to pay them on the back end.

22        And she was able to juggle those balls.  She was

23   able juggle those for a number of years, until she got

24   sick, until she started having surgeries, and then she

25   couldn't keep doing it.  She couldn't keep her -- she

```
 1   couldn't get focused.  She couldn't even go to work.
 2          The business plan -- there were people who did due
 3   diligence, and they did check it out.  And someone
 4   testified earlier, that told you earlier this morning,
 5   they went with the most cynical person, and that person
 6   said, she is sitting on a gold mine.
 7          And the business plan made sense.  The problem was,
 8   the business plan started to fall.  And instead of doing,
 9   as her partner did, and declaring bankruptcy and cutting
10   the losses, maybe for them, but certainly for him,
11   Ms. McClaflin was trying to make sure that everybody got
12   taken care of.
13          THE COURT:  The ends do not justify the means.
14          MR. HAMMOND:  I understand.
15          THE COURT:  They don't.
16          MR. HAMMOND:  And I have said that it was wrong.
17   But, I think -- and I know this Court knows that this is a
18   different kind of case.  I'm willing to bet that this
19   Court has never seen a scheme like this.
20          THE COURT:  I have never seen a defendant
21   cooperate, which is why I am willing to vary somewhat.
22          MR. HAMMOND:  Okay.  But does the Court also agree
23   -- well --
24          THE COURT:  Everybody comes here and tells me, for
25   the most part, that we were just trying to get them their
```

1     money back.

2              MR. HAMMOND:  Right.

3              THE COURT:  I had one of those, what, 2 or 3 years

4     ago, a lawyer who did it.

5              MR. HAMMOND:  I understand.

6              THE COURT:  So, yeah, but you did this fraudulent

7     scheme.  How much extra work did it take to develop all of

8     these false documents to keep her scheme going?  I mean,

9     she put an awful lot of time and efforts into falsifying

10    things, as opposed to doing something constructive.

11             MR. HAMMOND:  And, I am sorry, I am not sure what

12    was constructive.  She did --

13             THE COURT:  There wasn't anything constructive.

14             MR. HAMMOND:  Well, and I understand that the end

15    result was bad.  I am not arguing with the Court on the

16    ends justifying the means.  I am not doing that.  What I

17    am saying is, you know that that other person who was

18    sentenced before you didn't mean it.  You know that that

19    other person was, as you were talking about, was involved

20    in their own personal greed.

21             You can look through these things, and I think the

22    agents told you in the presentence report, that they

23    believe that that was what the motive was to keep this

24    going.  That is what they believe the motive was.  That is

25    unique in this jurisdiction, and I believe every

1     jurisdiction in the country.  That, I think, is important.

2          The fact is, as I said before, her body began to

3     betray her.  She got sick.  And I know the Court is

4     considering the fact that even though she has had a number

5     of surgeries, even though she has had a number of

6     infections that had to be treated, even though this is

7     ongoing, she still went into the office and assisted the

8     Receiver and the Receiver's assistant every day that she

9     could.  She went in and assisted the agents every day that

10    she could.  She went and did everything that she could.

11         I can probably guarantee -- I don't know, I don't

12    have a crystal ball, but I can probably guarantee that

13    that person who got sentenced last before you, didn't go

14    in and cooperate with the agents, didn't go in every day

15    with the Receiver and try to make sense of the records and

16    put them straight so that those people would not only get

17    paid, but tried to make it sooner rather than later.

18         That is another thing that is interesting, I think,

19    about this case, because as you were talking about that

20    other person, there is a certain amount of arrogance that

21    people have when they think that they can get away with

22    something.  In this case, I don't think the failure was

23    arrogant.  And I don't think the human failure was

24    arrogance.  I think the human failure was vanity.  I think

25    the human failure of vanity was that she thought she could

```
 1    get there on the other side, and it didn't happen.
 2          There were people who, I believe, appealed to that
 3    sense of vanity when they came to her and said, look, we
 4    can give you a whole lot of capital, but you have to
 5    consolidate all of those with us and put us first.  And I
 6    think that appealed also to the vanity.  And I think that
 7    is a different factor than the arrogance that you normally
 8    see.
 9          Everyone agrees, I think, in this case, that the
10    guidelines really don't work.  This is not a guideline
11    sentencing case.  You have the authority to issue a
12    different kind of sentence.  You can create a sentence
13    that will provide an adequate amount of punishment under
14    18 U.S.C. 3553.  The other needs that she has, which are
15    primarily her medical needs, and the needs that I believe
16    that the Receiver told you that he had to maintain contact
17    and communication with her.
18          I think that the Court has already indicated that
19    there will be a sentence to the Bureau of Prisons.
20    Assuming that that happens, I am just trying to remember
21    to do this now rather than later, I am going to ask that
22    you recommend a sentence to a federal medical center.
23          THE COURT:  All right.  Thank you.
24          Ms. Rhyne, do you wish to have the podium?
25          MS. RHYNE:  If I could, Your Honor.
```

 1           THE COURT:  All right.  If you can have a seat.

 2           MS. RHYNE:  Your Honor, I would like to preface for

 3    my remarks, so they are not confusing or perceived as

 4    disrespectful by the Court, but there is Tenth Circuit

 5    authority that says the Government can't argue for a

 6    sentence that was not contemplated by the plea agreement

 7    or is in conflict with the plea agreement.

 8           So, I hear the Court's directive that I am to argue

 9    for what the appropriate sentence is between 87 and 108

10    months, which would have been the calculation the parties

11    came up with absent any downward variance requested by the

12    Government.  So I am going to use that terminology.  It is

13    not because I misunderstand, it is just trying to --

14           THE COURT:  Well, actually, I had a question about

15    that, because I thought her plea agreement said that she

16    would waive her right to appeal only if her guideline

17    sentence was with an offense level 27, not 29.  So I

18    wasn't quite sure what had really been agreed to.

19           MS. RHYNE:  I think that represents the

20    acknowledgment in the calculation that she was not

21    agreeing to the 2-level enhancement for the more than $1

22    million.

23           THE COURT:  All right.

24           MS. RHYNE:  And I may be overly cautious, Your

25    Honor, I just don't want the Tenth Circuit to find that I

1    have breached the plea agreement.

2            THE COURT:  Okay.

3            MS. RHYNE:  Be that as it may, understanding your

4    construct of where should she be sentenced within 87 to

5    108 months, the Government does believe she should be

6    acknowledged or rewarded for her efforts, which have been

7    long talked about in this hearing, so I won't go over it.

8            THE COURT:  And your recommendation was essentially

9    a 25 percent downward variance.

10           MS. RHYNE:  That was the intention based on the

11   calculation in the plea agreement.  So, yes, that is the

12   rubric.  So the Government would ask that between the 87

13   and 108 months, she be sentenced to 87 months, because at

14   least under my rubric, that would be a low-end guideline

15   sentence, understanding that the Court would view that as

16   a variant sentence.  But that is going to be my position.

17           Not only that she substantially helped in this

18   case, both in putting loss calculations together, but also

19   the Receiver has indicated, in wrapping things up.  And I

20   know it is not expedient in the eyes of most people, but

21   federal litigation and, apparently, state litigation,

22   often takes a long time.  And to get this case from a

23   charging document to a sentencing in a year is actually

24   pretty fast.

25           And I would like to comment, one of the reasons

```
 1    that the Government was willing to go forward early on and
 2    perhaps cut a deal before it had all of the facts, was
 3    because I, too, have litigated these cases, and I have
 4    seen them when they take a year to 2 years to charge,
 5    because we need to get all of the bank records and make
 6    sure we have everything, and another year to 2 years to
 7    sometimes 3 years to go to trial, and another 3 to 7 to 8
 8    months to sentence.
 9          And there we are -- my math is not quite up to
10    speed yet -- but maybe 5 years later, the defendant is
11    being sentenced, the victims haven't received restitution,
12    and there is no money left.
13          And that is something I see frequently in large
14    white collar cases.  That was why the Government was
15    willing to go forward quickly, with the idea that she was
16    wanting to confess, plead guilty, and assist the case,
17    even at the expense of the 4 levels that the Court has
18    found that the Government missed.  And I appreciate the
19    Court's disagreement there.
20          But that is where those compromises get made,
21    because in looking at the lay of the land, what do we
22    think is the best approach to serve justice in the bigger
23    picture, and that is the compromise the Government made.
24          And, so, with that in mind, at least an 87-month
25    sentence does acknowledge her assistance in cooperating,
```

     1    which was valuable, and we want to encourage any other
     2    defendant who might be willing to do that, to do so in the
     3    future.  And if there was a message from this case, that
     4    that would not be rewarded, that becomes an even less
     5    likely result for the future.
     6           So, that is the Government's position.  You have
     7    heard from the victims.  You understand fully the impact
     8    of this case, but that is the Government's position.
     9           THE COURT:  All right.  Thank you.
    10           All right.  Mr. Hammond, would you and
    11    Ms. McClaflin please retake the podium.
    12           Ms. McClaflin, do you wish to make any statement to
    13    me on your own behalf before I impose sentence?
    14           THE DEFENDANT:  Yes, Your Honor, I do.
    15           THE COURT:  You may.
    16           THE DEFENDANT:  This is really tough.  I guess one
    17    of the first things that I want to say, and this is really
    18    to the victims, is just how sorry I am that we're here
    19    today; that I made such a mess of things, because I never
    20    set out to hurt anybody.  I really screwed up.  I tried to
    21    make it right, and in my desperation in trying to make it
    22    right, I crossed the line, and I did some illegal things
    23    that I should not have done.
    24           I did a lot of things right, but I did a lot of
    25    things wrong, and that is why I'm here today.

```
1              One of my co-workers was suspected of altering an
2     ownership and encumbrance report that was provided to one
3     of our investors, and when they questioned her about it, I
4     went to them and admitted that it was me that had done
5     that and not her, and that is what brought down the whole
6     kind of crash of HomeSource, if you can call it that.
7              All of these years, I have tried so desperately to
8     hold this up, believing, genuinely believing, given enough
9     time, that I could make it right.  And I realize now, over
10    the last 13 months, in working with Denise, who works for
11    the Receiver, and she and I meet over at the office, and
12    going through all of the records and holding each of the
13    investor files, I see I see their faces.
14             I see the Jacksons.  I see the Tinkles.  I see
15    their victim impact statements, because I have read them
16    over and over and over, and even the ones that you have
17    read, I could tell you who wrote each one, because I have
18    read them so often.
19             And I know that the pain that they wrote in those
20    impact statements is the same pain that I carry, because I
21    am responsible.  I am the one that did this.  I took money
22    from, you know, that I shouldn't have, from my marital
23    assets, that I never told my husband about, and plowed it
24    into the company to make sure everybody was getting their
25    payments, and that nothing was wrong, because I needed to
```

1   buy time to make it right.

2          My dad is a victim of HomeSource.  My husband is a

3   victim of HomeSource.  My friends, and the people who are

4   standing here, sitting behind me, were my friends.  And I

5   didn't befriend them so -- some of them became friends

6   after they were investors.

7          But I didn't befriend Paula Greco so that she would

8   be an investor.  She was my friend.  I was just unable to

9   call and talk to anybody after this whole thing happened,

10  and I wanted to so desperately, to reach out and talk to

11  everybody and tell them how sorry I was and how hard I was

12  working to try and get them their money back, and that I

13  continued to try to get them their money back.

14         And by working with Denise and working with the

15  Receiver and this lawsuit, and claw backs, I believe we

16  have a really good shot in making these people whole.  And

17  I don't want to stop until they are whole.  I mean, I

18  can't.  I can't stop.

19         And I wake up with it in the morning.  I go to bed

20  with it at night.  It is all encompassing to me.  I told

21  one of the, I think it was Mr. Sims, said that I had told

22  him that I never lost a dime of money for anybody, and I

23  hadn't.  And I never intended to.

24         THE COURT:  But you had.  You had lost it.  And you

25  defrauded others to try to make it look like you didn't.

```
 1              THE DEFENDANT:  I guess that is right.  I didn't
 2    see it that way at the time, but it was like the wrong
 3    words seemed to rhyme.  And I thought, just another couple
 4    of years, I can make this right.  And I realize now how
 5    unrealistic that was.
 6              I am so -- I am ashamed.  If there is one good
 7    thing about my dad passing in September, it is that he is
 8    not here to see my shame.  And I am doing everything I
 9    know to do to try and make this right for everybody.  And
10    I don't want these -- any of these investors to lose a
11    dime.
12              And I want -- I will spend the rest of my life
13    making restitution, until everybody is okay.  Whether it
14    comes from this court case, whether it comes from me
15    working and making it happen that way, I won't stop until
16    they are okay.
17              And I'm just so sorry.  And it is my fault.  I take
18    complete responsibility for it.  I always have.  It is no
19    one else's fault but mine.  I created HomeSource, and I
20    destroyed HomeSource.  And I never meant to destroy all
21    these people and the lives in between.  Never intended to
22    do that, never.
23              And it is very painful to hear what -- you know,
24    when they get up here and talk, because I care very much
25    about them.  And what -- my actions have, you know, hurt
```

```
 1    them.  And it is not who I am.  And I wish I could go back
 2    and never have started HomeSource, and stayed a realtor,
 3    and just had had my simple little company, and done things
 4    correctly, like we always had.
 5          The little real estate company was perfect.  And
 6    then when HomeSource started, then everything was -- it
 7    was like there was a cancer, and I couldn't cure it.  I
 8    couldn't.  And I should have stopped.  And my big mistake
 9    was to continue.  I never should have continued, and I
10    should have stopped.
11          And, you know, at that point, there is a lot of
12    things I should have done that I didn't do.  But what I
13    can do is to continue to help the Receiver for as long as
14    this Court will allow me, and in helping to get as much
15    money back for these investors as I possibly can.  And
16    that is what I intend to do for as long as I can.
17          THE COURT:  All right.  As a result of the United
18    States Supreme Court's rulings in United States v. Booker
19    and United States v. Fanfan, the United States Sentencing
20    Commission Guidelines have become advisory to this Court.
21    Although this Court is not bound to apply those
22    guidelines, it has consulted them and taken them into
23    account, along with the sentencing factors set forth at 18
24    United States Code Section 3553(a).
25          The Court finds that the 6-level enhancement
```

1    pursuant to United States Sentencing Guideline

2    2B1.1(b)(2)(C) does apply in this case.  The Court

3    determines that no finding is necessary concerning the

4    remaining objections to the presentence report, because

5    the controverted matters will not be taken into account in

6    imposing sentence, nor will they affect the sentence that

7    the Court imposes.

8           Neither the Government nor the defendant has

9    challenged any other aspect of the presentence report,

10   therefore, the remaining factual statements and guideline

11   applications are adopted without objection as the Court's

12   findings of fact concerning sentencing.

13          The Court finds that the total offense level is 33.

14   The defendant's Criminal History Category is a I.  That

15   results in an advisory imprisonment range of 135 to 168

16   months, and a fine range of $17,500 to $29,056,412.78.

17   The supervised release range is not more than 3 years.

18          The Court denies the Government's motion for a

19   variant sentence of 65 months.

20          However, for the reasons previously stated by this

21   Court, in particular, the cooperation of the defendant

22   post discovery of her criminal fraudulent scheme, the

23   Court finds that a variant sentence is warranted in this

24   case.

25          Pursuant to the Sentencing Reform Act of 1984, it

1    is the Judgment of the Court that the defendant, Karen

2    Lynne McClaflin, is hereby committed to the custody of the

3    Bureau of Prisons to be imprisoned for a term of 96 months

4    on Counts 1 and 2, to run concurrently.

5         Upon release from imprisonment, she shall be placed

6    on supervised release for a term of 3 years on Counts 1

7    and 2, both terms to run concurrently.

8         Within 72 hours of release from the custody of the

9    Bureau of Prisons, she shall report in person to the

10   probation office in the district to which she is released.

11        While on supervised release, she shall not commit

12   another federal, state, or local crime; shall not possess

13   a firearm, as defined in 18 United States Code Section

14   921; and shall comply with the standard conditions that

15   have been adopted by this Court in General Order 2016-1.

16        She shall not unlawfully possess a controlled

17   substance.  The Court waives the mandatory drug testing

18   provisions, because the presentence report indicates a low

19   risk of future substance abuse by this defendant.

20        She shall cooperate in the collection of DNA as

21   directed by the probation officer.

22        The Court finds that the following special

23   conditions of supervision are reasonably related to the

24   factors set forth at 18 United States Code Sections

25   3553(a) and 3583(d).

1        Further, based on the nature and circumstances of

2   this offense and the history and characteristics of this

3   particular defendant, these conditions do not constitute a

4   greater deprivation of liberty than reasonably necessary

5   to accomplish the goals of sentencing.

6        The defendant shall make restitution in the total

7   amount of $14,528,206.39 to the victims, and in the

8   amounts indicated in the presentence report.  Each victim

9   shall receive an approximately proportionate payment based

10  on victim's share of total loss.  Any disbursements

11  returned to the Clerk of the Court as unclaimed or

12  undeliverable shall be deposited into the Court's registry

13  and disbursed to the remaining victims on a pro rata

14  basis.

15       Restitution is ordered and directed to the

16  addresses provided to the Clerk of the Court by the

17  probation officer.  The Court has determined that the

18  defendant does not have the ability to pay interest, and

19  it is ordered that the interest requirement is waived for

20  the restitution.

21       The defendant shall not incur new credit charges,

22  open additional lines of credit, or obtain or entering

23  into any financing agreement or arrangement without the

24  approval of the probation officer unless the defendant is

25  in compliance with the periodic payment obligations

1   imposed pursuant to the Court's judgment and sentence.

2          As directed by the probation officer, the defendant

3   shall apply any moneys received from income tax refunds,

4   lottery winnings, inheritances, judgments, and any

5   anticipated or unexpected financial gains to the

6   outstanding Court-ordered financial obligation in this

7   case.

8          The defendant must provide the probation officer

9   with access to any requested financial information, and

10  authorize the release of any financial information to the

11  probation officer until all financial obligations imposed

12  by the Court are paid in full.

13         She shall make payment on the restitution

14  obligation that remains unpaid at the commencement of the

15  supervised release.  Within 60 days of release from

16  confinement, she shall meet with probation officer to

17  develop a plan for the payment of restitution.  She shall

18  work with the probation officer in the development of a

19  monthly budget that shall be reviewed with the probation

20  officer quarterly.

21         She shall document all income, compensation, and

22  financial support generated or received from any source,

23  and provide that information to the probation officer as

24  requested.  The plan of payment will be based upon

25  defendant's income and expenses, with the restitution

1    amount to be paid in monthly installment payments.  Such

2    monthly installment payments shall be at least 10 percent

3    of the defendant's gross monthly income.

4         Because this sentence imposes restitution, it is a

5    condition of supervision that she pay in accordance with

6    this Order.

7         All employment must be approved in advance by the

8    probation officer, and the defendant shall not engage in

9    any business activity unless approved by the probation

10   officer.  All approved business activity must operate

11   under a formal registered entity, and the defendant shall

12   provide the probation officer with a business entities and

13   their registered agents.

14   She shall maintain business records for any

15   approved business activity and provide all documentation

16   and records as requested by the probation officer.

17   She shall maintain separate personal and business

18   finances and shall not commingle personal and business

19   funds or income in any financial accounts, including, but

20   not limited to bank accounts and lines of credit.

21        If she has an outstanding financial obligation, the

22   probation officer may share any financial or employment

23   documentation relevant to the defendant with the Asset

24   Recovery Division of the United States Attorney's Office

25   to assist in the collection of the obligation.

```
 1              She shall pay a special assessment of $200.  The
 2      Court finds that the defendant does not have the ability
 3      to pay a fine, so the Court waives the fine in this case.
 4              It is ordered that the payment of the special
 5      assessment and restitution obligations are due and payable
 6      immediately.  Any unpaid restitution balance upon release
 7      from incarceration shall be paid in monthly installment
 8      payments as previously described by this Court.
 9              Pursuant to Rule 32.2 of the Federal Rules of
10      Criminal Procedure and the defendant's admission to the
11      forfeiture allegation contained in the Indictment -- or it
12      in the Information, rather, the defendant shall forfeit to
13      the United States any and all property, real or personal,
14      derived from proceeds from the instant offense.
15              Now, Ms. McClaflin, I want you, and I want
16      everybody in the audience to know that I take my task of
17      sentencing very seriously.  As you can see, I have spent
18      hours and hours on this case.  Because, on one hand I want
19      to be fair to you, because I understand I have impacting
20      your life by the sentence I impose.  But I also have an
21      obligation to the public and to society to protect them
22      from further crimes by you and by others, to promote force
23      the laws of the United States, and to impose a sentence
24      that is going to deter you and others from committing
25      similar criminal conduct.
```

1          Now, in this particular case, I just cannot fathom
2    how you could look at people and pretend to be their
3    friend, and then take their money, knowing they were never
4    going to get it.  Because while you may have had this
5    pie-in-the-sky thought that you could do it, this went on
6    for years.
7          You knew you were in way over your head.  And you
8    looked at them and you lied to them, and then you
9    fraudulently did documents when the bank came to you and
10   said, we want our investors in the first place, you took
11   them out of that position and put these others in that
12   place.  I just can't imagine how anyone, who has any
13   conscience, could do that.
14         I gave you a break here because you did cooperate,
15   otherwise you would have been looking at spending probably
16   the 135 months in prison, more than 10 years.  I gave you
17   a break which is equal to approximately the 25 percent
18   that the Government was seeking for your cooperation.
19         And, normally, I will tell you the truth, I take
20   these fraudulent white collar fraud crimes very seriously,
21   because, I think that, for the most part, the guidelines
22   really slap defendants who sell drugs, as it should, and
23   others very hard, and they give people like you a slap on
24   the wrist.  But you took $14 million, and you destroyed
25   the lives of all of these people.

```
 1              I think that the 135 of the original range that
 2     came up here was a sufficient, but not greater than
 3     necessary, sentence.  And if you hadn't cooperated, I
 4     would have probably given you a sentence at the top of
 5     that guideline.  But, because you cooperated, and this
 6     case is unique because of that.  Most of the other cases,
 7     the money is gone, the defendant won't help.  I am hopeful
 8     that your victims will get at least some money back.
 9              And I am hopeful that the Receiver and the attorney
10     are going to be able to help do that.  But, for some of
11     them, it is going to be too late.  They are elderly.
12     Their parents are elderly.  And it is going to take years
13     to unravel the mess that you made.
14              I do believe that this sentence of 96 months of
15     imprisonment, with the 3 years of supervised release and
16     the restitution, does reflect the seriousness of this
17     offense and is a sufficient, but not greater than
18     necessary, sentence to achieve the objectives of
19     sentencing.
20              Now, Ms. McClaflin, although you waived your right
21     to appeal the under the circumstances outlined in your
22     plea agreement, to the extent that you have not waived
23     your right to appeal, you are advised that if you desire
24     to appeal, a Notice of Appeal must be filed with the Clerk
25     of the Court within 14 days after entry of Judgment or
```

1    your right to appeal will be lost.

2         If you are not able to afford an attorney for an

3    appeal, one will be appointed to represent you.  And, if

4    you request, the Clerk of the Court must immediately

5    prepare and file a Notice of Appeal on your behalf.

6         I guess I need to ask Ms. Rhyne, are you wanting me

7    to remand immediately, or are you willing to allow

8    Ms. McClaflin to voluntarily surrender?

9         MS. RHYNE:  Your Honor, we agreed to allow her to

10   voluntarily surrender.

11        May I make a point as to the order of forfeiture,

12   Your Honor?

13        THE COURT:  Yes.

14        MS. RHYNE:  On April 25, 2018, you entered a

15   preliminary order of forfeiture, and I wanted a

16   clarification that you are making it a final order of

17   forfeiture as of your Order today.

18        THE COURT:  Yes.

19        MS. RHYNE:  Thank you, Your Honor.

20        THE COURT:  All right.  The Court does find that

21   the defendant's bond conditions do reasonably assure that

22   she will not flee or pose a danger to the safety of any

23   other person or the community.  And, as such, I hereby

24   allow Ms. McClaflin to remain free on bond, subject to the

25   same conditions as set forth in her Order setting

```
 1    conditions of release.

 2           It is ordered, however, Ms. McClaflin, that you

 3    will surrender to the institution designated by the Bureau

 4    of Prisons before noon within 15 days of the date of

 5    designation.  Your bond is exonerated at the time of your

 6    voluntary surrender at the institution designated by the

 7    Bureau of Prisons.

 8           I am directing you, immediately after this hearing,

 9    to go down to the third floor of this building, to the

10    Marshal's Office, and fill out the self-surrender card

11    with them.

12           Is there anything further, Mr. Hammond?

13           MR. HAMMOND:  Your Honor, as I said earlier, I

14    would ask the Court to consider designation to a federal

15    medical center.  I met the former chief of designations

16    for the Bureau of Prisons last year at a Sentencing

17    Commission seminar here in Denver.

18           It is my understanding, from the brief conversation

19    I was able to have with him, that a designation to an FMC

20    would be the best.  He suggested Carswell.  I also learned

21    from that seminar that a specific designation to a

22    specific institution isn't as easy to do, but a general

23    designation to a medical center is considered by the

24    Bureau of Prisons.

25           THE COURT:  All right.  I am not willing to make
```

```
 1    that recommendation.  I think the Bureau of Prisons can

 2    sort out whether she really does have serious medical

 3    issues that are different from any of the other defendants

 4    that they see on a regular basis who have medical issues.

 5    So I am not willing make that designation or that

 6    recommendation to the Bureau of Prisons.

 7            Nothing further, then Court will be in recess.

 8            (Proceedings conclude at 1:51 p.m.)

 9

10            R E P O R T E R ' S   C E R T I F I C A T E

11

12            I, Darlene M. Martinez, Official Certified

13    Shorthand Reporter for the United States District Court,

14    District of Colorado, do hereby certify that the foregoing

15    is a true and accurate transcript of the proceedings had

16    as taken stenographically by me at the time and place

17    aforementioned.

18

19            Dated this 24th day of May, 2018.

20

21            _____

22            s/Darlene M. Martinez

23            RMR, CRR

24

25
```

AO 245C (Rev. 09/17)     Amended Judgment in a Criminal Case                                      (NOTE: Identify Changes with Asterisks (*))
Sheet 1

# UNITED STATES DISTRICT COURT

District of Colorado

| UNITED STATES OF AMERICA | | |
| --- | --- | --- |

**UNITED STATES OF AMERICA**

**v.**

**KAREN LYNN MCCLAFLIN**

)
)
)
)
)
)
)
)
)
)
)
)
)

**AMENDED JUDGMENT IN A CRIMINAL CASE**

Case Number:     17-cr-00168-CMA-1

USM Number:     44166-013

Thomas James Hammond
_Defendant's Attorney_

**Date of Original Judgment:** <u>5/10/2018</u>
*(Or Date of Last Amended Judgment)*

## Reason for Amendment:

- ☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
- ☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim.P. 35(b))
- ☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))
- ☒ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)
- ☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))

- ☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))
- ☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
- ☐ Direct Motion to District Court Pursuant to
  - ☐ 28 U.S.C. § 2255 or     ☐ 18 U.S.C. § 3559(c)(7)
- ☐ Modification of Restitution Order (18 U.S.C. § 3664)

## THE DEFENDANT:

☒ pleaded guilty to count(s)   <u>1 and 2 of the Information</u>

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
| --- | --- | --- | --- |
| 18 U.S.C. § 1343 | Wire Fraud | 02/2017 | 1 |
| 18 U.S.C. § 1957 | Monetary Transaction in Property Derived from Wire Fraud | 09/02/2016 | 2 |

The defendant is sentenced as provided in pages 2 through <u>9</u> of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____     ☐ is   ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

<u>May 10, 2018</u>
Date of Imposition of Judgment

*Christine M Arguello*
Signature of Judge

Christine M. Arguello, United States District Judge
Name and Title of Judge
<u>6/11/2018</u>
Date

AO 245C (Rev. 09/17)  Amended Judgment in Criminal Case

DEFENDANT:        KAREN LYNN MCCLAFLIN
CASE NUMBER:      17-cr-00168-CMA-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
        **NINETY-SIX (96) MONTHS** as to each count, to run concurrently.

☐    The court makes the following recommendations to the Bureau of Prisons:

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

  ☐    at _____ ☐ a.m. ☐ p.m.  on _____ .

  ☐    as notified by the United States Marshal.

☒    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

  ☒    before 2 p.m. within 15 days of designation            .

  ☐    as notified by the United States Marshal.

  ☒    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245C (Rev. 09/17) Amended Judgment in Criminal Case

| | Judgment — Page ___3___ of ___9___ |
|---|---|

DEFENDANT:        KAREN LYNN MCCLAFLIN
CASE NUMBER:     17-cr-00168-CMA-1

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: **THREE (3) YEARS**, as to each count, to run concurrently.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☒ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

126

AO 245C (Rev. 09/17) Amended Judgment in Criminal Case

| | Judgment — Page 4 of 9 |
|---|---|

DEFENDANT: KAREN LYNN MCCLAFLIN
CASE NUMBER: 17-cr-00168-CMA-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____ Date _____

AO 245C (Rev. 09/17) Amended Judgment in Criminal Case

Judgment — Page 5 of 9

DEFENDANT: KAREN LYNN MCCLAFLIN
CASE NUMBER: 17-cr-00168-CMA-1

## SPECIAL CONDITIONS OF SUPERVISION

1. You must not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless you are in compliance with the periodic payment obligations imposed pursuant to the Court's judgment and sentence.
2. You must provide the probation officer access to any requested financial information and authorize the release of any financial information until all financial obligations imposed by the court are paid in full.
3. As directed by the probation officer, you must apply any monies received from income tax refunds, lottery winnings, inheritances, judgments, and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation in this case.
4. You must make payment on the restitution obligation that remains unpaid at the commencement of supervision. Within 60 days of the commencement of supervision, you must meet with the probation officer to develop a plan for the payment of the obligation. This plan will be based upon your income and expenses. The plan will be forwarded to the Court for review and approval.
5. You must work with the probation officer in development of a monthly budget that will be reviewed with the probation officer quarterly.
6. If you have an outstanding financial obligation, the probation office may share any financial or employment documentation relevant to you with the Asset Recovery Division of the United States Attorney's Office to assist in the collection of the obligation.
7. You must document all income and compensation generated or received from any source and must provide that information to the probation officer as requested.
8. All employment for you must be approved in advance by the supervising probation officer and you must not engage in any business activity unless it is approved by the probation officer. All approved business activity must operate under a formal, registered entity, and you must provide the probation officer with the names of the business entities and their registered agents. You must maintain business records for any approved business activity and provide all documentation and records as requested by the probation officer.
9. You must maintain separate personal and business finances and must not co-mingle personal and business funds or income in any financial accounts, including but not limited to bank accounts and lines of credit.

AO 245C (Rev. 09/17)  Amended Judgment in Criminal Case

| | | | Judgment — Page | 6 | of | 9 |
|---|---|---|---|---|---|---|

**DEFENDANT:**     KAREN LYNN MCCLAFLIN
**CASE NUMBER:**    17-cr-00168-CMA-1

# CRIMINAL MONETARY PENALTIES*

The defendant must pay the total criminal monetary penalties under the schedule of payments on the following page.

| | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** $ | 200.00 | $ 0.00 | $ 0.00 | $ 14,528,206.39 |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☒  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid. Disbursement of restitution payments sent to victims and returned to the Clerk of Court as unclaimed or undeliverable shall be deposited into the Court's registry and disbursed to the remaining victims.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| Willem & Emily Adams | $213,500.00 | $213,500.00 | |
| ASI Capital Income Fund Inc | $319,450.00 | $319,450.00 | |
| Wendy Banning | $24,250.00 | $24,250.00 | |
| Roger Barrack | $793,673.01 | $793,673.01 | |
| Trevor & Laura Black | $94,000.00 | $94,000.00 | |
| John Jay Bradley | $671,890.27 | $671,890.27 | |
| Leland & Delores Brinkman | $268,262.49 | $268,262.49 | |
| Camisa LLC | $47,665.75 | $47,665.75 | |
| Karole Campbell | $11,906.14 | $11,906.14 | |
| William & Jeanette Childs | $85,979.72 | $85,979.72 | |
| Sarah Davison-Steward | $104,595.04 | $104,595.04 | |
| Carol Dobbin | $124,549.84 | $124,549.84 | |
| Mark & Jodi Dunn | $141,851.56 | $141,851.56 | |
| GST Exempt Trust (Sandra D. Elliot) | $60,094.70 | $60,094.70 | |
| Judith Fasano | $68,055.60 | $68,055.60 | |

**SEE NEXT PAGE FOR ADDITIONAL PAYEES**

☐  Restitution amount ordered pursuant to plea agreement     $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☒  the interest requirement is waived for the   ☐  fine   ☒  restitution.

☐  the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

AO 245C (Rev. 09/17)  Amended Judgment in Criminal Case

| | | Judgment — Page 7 of 9 |
|---|---|---|

DEFENDANT:       KAREN LYNN MCCLAFLIN
CASE NUMBER:     17-cr-00168-CMA-1

### ADDITIONAL PAYEES*

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Chris and Laura Fowler | $64,425.54 | $64,425.54 | |
| Susan Fowler | $88,000.00 | $88,000.00 | |
| Westcor Land Title (formerly Ganz) | $92,400.00 | $92,400.00 | |
| Gerald & Gertie Geurin | $88,000.00 | $88,000.00 | |
| Diane E. Glaser, Living Trust | $79,717.56 | $79,717.56 | |
| Jeffrey B. Grafton | $156,236.30 | $156,236.30 | |
| Mark Grissom | $77,941.20 | $77,941.20 | |
| Samuel & Sarah Grondin | $56,786.20 | $56,786.20 | |
| Robert M. Haddock | $494,320.00 | $494,320.00 | |
| Metal Roof (Robert Haddock) | $253,175.84 | $253,175.84 | |
| Renee Hames | $92,500.00 | $92,500.00 | |
| Mark & Peggy Henjum | $132,318.10 | $132,318.10 | |
| Cynthia Henson | $17,597.96 | $17,597.96 | |
| Edward H. Houle | $132,000.00 | $132,000.00 | |
| Patrick & Susie Houle | $133,650.00 | $133,650.00 | |
| John O. Howard, Jr. | $216,773.12 | $216,773.12 | |
| Scott Charles Ignatius | $286,140.00 | $286,140.00 | |
| Pearl R. Jackson | $129,050.00 | $129,050.00 | |
| Richard Jackson | $410,884.50 | $410,884.50 | |
| Richard C. & Pearl R. Jackson | $71,538.52 | $71,538.52 | |
| Lois H. Jackson | $183,530.56 | $183,530.56 | |
| Christopher A. Jahns | $89,700.00 | $89,700.00 | |
| Venkatesan & Jayanthi Kailasam | $5,588.63 | $5,588.63 | |
| Hunter Kemper | $148,500.00 | $148,500.00 | |
| Larry & Pauline King | $304,642.77 | $304,642.77 | |
| Brent W. King | $29,600.00 | $29,600.00 | |
| Doug Klimas | $165,266.66 | $165,266.66 | |
| Douglas J. & Donna K. Klimas | $296,661.16 | $296,661.16 | |
| Donna K. Klimas | $154,939.79 | $154,939.79 | |
| Good Life Properties (Klimas) | $23,850.00 | $23,850.00 | |
| Randy Knoche | $80,000.00 | $80,000.00 | |
| Bernard L. & Ruthanne Koch | $199,000.00 | $199,000.00 | |
| Jeff Koch | $198,500.00 | $198,500.00 | |
| Joyce Koch Living Trust | $183,050.00 | $183,050.00 | |
| Scott R. Koch Living Trust | $243,950.00 | $243,950.00 | |
| Donald & Carol Koenig Revocable Trust | $295,723.15 | $295,723.15 | |
| Lindholm Family Trust | $34,964.72 | $34,964.72 | |
| Rob Loren | $31,536.10 | $31,536.10 | |
| Rob Loren Revocable Trust | $85,424.24 | $85,424.24 | |
| Glenn W. & Elizabeth W. Lutjens | $148,913.15 | $148,913.15 | |
| Kim Young-Wha, Kim Lutjens Trust | $10,003.66 | $10,003.66 | |
| M&M Technology LLC (Mark Manthei) | $847,309.44 | $847,309.44 | |
| Robert S. Maness | $267,874.30 | $267,874.30 | |
| Timothy J. & Janice C. Mayer | $100,889.63 | $100,889.63 | |
| Michael McCoy | $56,440.56 | $56,440.56 | |
| John McDougal | $57,835.44 | $57,835.44 | |
| Aspen Capital (formerly McDougall Capital Management LLC) | $104,111.55 | $104,111.55 | |
| Mark McMillen | $799,252.32 | $799,252.32 | |
| Sue McMillin* | $21,643.57 | $21,643.57 | |
| Robyn Menard a/k/a Robyn Haddock | $132,920.00 | $132,920.00 | |
| Maureen L. Miller | $159,647.71 | $159,647.71 | |
| Judy A. Moffat | $409,017.98 | $409,017.98 | |
| Gerald Mork | $39,479.36 | $39,479.36 | |
| William & Mary Emily Nelson | $68,000.00 | $68,000.00 | |
| Michael O'Connor Revocable Trust | $39,179.05 | $39,179.05 | |

AO 245C (Rev. 09/17) Amended Judgment in Criminal Case

| | Judgment — Page 8 of 9 |
|---|---|

DEFENDANT:      KAREN LYNN MCCLAFLIN

CASE NUMBER:      17-cr-00168-CMA-1

| **Name of Payee** | **Total Loss**\*\* | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| Paulette O'Hotto | $228,750.00 | $228,750.00 | |
| OREV, LLC (Elliott Orsillo) | $129,924.82 | $129,924.82 | |
| Corliss Palmer | $67,366.88 | $67,366.88 | |
| Parks Properties, LLC* | $154,259.22 | $154,259.22 | |
| John Reinsma | $42,300.00 | $42,300.00 | |
| Darryn Roasa | $88,000.00 | $88,000.00 | |
| David C. Roudebush | $182,355.19 | $182,355.19 | |
| Joseph A. & Melissa Saliba | $11,046.44 | $11,046.44 | |
| Lauren D. Schneider Revocable Trust | $142,500.00 | $142,500.00 | |
| Grant & Lauren Schneider | $263,295.44 | $263,295.44 | |
| Justin & Rebecca Scott | $94,800.00 | $94,800.00 | |
| Simpson Living Trust | $18,650.28 | $18,650.28 | |
| Cecil D. & Elizabeth A. Revocable Trust | $66,750.00 | $66,750.00 | |
| Dean Steward | $58,967.93 | $58,967.93 | |
| Leona Strait | $74,000.00 | $74,000.00 | |
| Robbie D. Strait | $165,621.97 | $165,621.97 | |
| Michael & Linda Thornton | $183,950.44 | $183,950.44 | |
| David W. Tinkle, Jr. | $48,000.00 | $48,000.00 | |
| David W. Tinkle, Sr. | $99,000.00 | $99,000.00 | |
| Robyn Tinkle | $50,000.00 | $50,000.00 | |
| Truesdell Family Trust | $24,000.00 | $24,000.00 | |
| Eric E. & Janet Y. Wermel | $31,926.53 | $31,926.53 | |
| Gregory T. & Kelly J. Wise | $182,616.79 | $182,616.79 | |

**TOTALS**      $    14,528,206.39      $    14,528,206.39

\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/17)  Judgment in Criminal Case

Judgment — Page    9    of       9

DEFENDANT:          KAREN LYNN MCCLAFLIN
CASE NUMBER:        17-cr-00168-CMA-1

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☐   Lump sum payment of  $ _____  due immediately, balance due

      ☐   not later than  _____ , or
      ☐   in accordance with   ☐   C,   ☐   D,   ☐  E, or  ☐  F below; or

B  ☒   Payment to begin immediately (may be combined with   ☐  C,   ☐  D, or   ☒  F below); or

C  ☐   Payment in equal  _____ *(e.g., weekly, monthly, quarterly)* installments of  $ _____  over a period of
      _____ *(e.g., months or years)*, to commence  _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐   Payment in equal  _____ *(e.g., weekly, monthly, quarterly)* installments of  $ _____  over a period of
      _____ *(e.g., months or years)*, to commence  _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
      term of supervision; or

E  ☐   Payment during the term of supervised release will commence within  _____ *(e.g., 30 or 60 days)* after release from
      imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☒   Special instructions regarding the payment of criminal monetary penalties:

      The special assessment is due immediately. The defendant shall make payment on the restitution obligation that remains unpaid at
      the commencement of supervised release. Within 60 days of commencement of supervision, the defendant shall meet with the
      probation officer to develop a plan for the payment of restitution. This plan will be based upon the defendant's income and
      expenses. The plan will be forwarded to the Court for review and approval. The balance of the monetary obligations will be paid
      in monthly installments calculated as at least 10 percent of the defendant's gross monthly income.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

      Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
      and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☒   The defendant shall forfeit the defendant's interest in the following property to the United States:
      As addressed in the Preliminary Order of Forfeiture, filed April 25, 2018 in Docket No. 32.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine
interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

FILED
United States Court of Appeals
Tenth Circuit

September 20, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

                                              No. 18-1217

KAREN LYNN MCCLAFLIN,

      Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CR-00168-CMA-1)**

_____

Ann Marie Taliaferro, Brown, Bradshaw & Moffat, L.L.P., Salt Lake City, Utah, for Defendant-Appellant.

James C. Murphy, Assistant United States Attorney (Jason R. Dunn, United States Attorney, with him on the brief), Denver Colorado, for Plaintiff-Appellee.

_____

Before **MATHESON**, **SEYMOUR**, and **BACHARACH**, Circuit Judges.

_____

**SEYMOUR**, Circuit Judge.

_____

Defendant Karen McClaflin pled guilty to two counts stemming from the operation of a residential Ponzi scheme which defrauded investors of more than $14.5 million dollars.  At sentencing, the district court calculated the advisory sentencing guidelines at 135 to 168 months' imprisonment, applied a 6-level

enhancement for substantial financial hardship to more than twenty-five victims, and then determined that a downward variant sentence of 96 months was appropriate. On appeal, Ms. McClaflin argues the district court: (1) abused its discretion by denying her motion for an additional continuance of the sentencing hearing, (2) procedurally erred by imposing the 6-level enhancement based upon victim impact statements, and (3) failed to consider all of the requisite 18 U.S.C. § 3553(a) factors. We affirm.

I.

Between March 2011 and early 2017, Ms. McClaflin operated a "fix and flip" real estate Ponzi scheme in which she made false promises to investors. On June 21, 2017, Ms. McClaflin entered into a plea agreement with the government for wire fraud and money laundering. The plea deal included a 2-level enhancement for a crime involving more than ten victims. The government indicated that it did not have the evidence at that time to support a 6-level enhancement for substantial financial hardship to more than twenty-five victims.

The parties jointly filed a motion to continue on September 1, 2017, and the district court moved the sentencing hearing set for January 17, 2018 to March 14 to give the parties more time to analyze documents regarding loss and restitution. On March 5, counsel for Ms. McClaflin requested another continuance due to Ms. McClaflin's poor health and hip problems. The district court moved the sentencing hearing to May 10, nearly an entire year after Ms. McClaflin pled guilty to the

charges.  The week of the hearing Ms. McClaflin again requested her sentencing be

continued on the grounds of her ill health.  The district court denied the motion and it

repeated this denial when Ms. McClaflin's counsel urged a continuance at the

sentencing hearing.

At sentencing, the court questioned the government's decision not to pursue

the 6-level enhancement.  Notwithstanding the government's reticence and in order to

implement the enhancement, the district court conducted an extensive review of the

sworn victim impact statements attached to the presentence Report ("PSR").  The

court made independent findings of fact regarding Ms. McClaflin's scheme and

specifically found that Ms. McClaflin's offense resulted in substantial financial

hardship to twenty-five or more victims.  *See* U.S.S.G. § 2B1.1(b)(2)(C).

Prior to passing sentence, the district court heard testimony from victims of

Ms. McClaflin's scheme from the Receiver who had been appointed by the court to

recover assets related to the scheme, and from Ms. McClaflin herself.  Finding that

Ms. McClaflin committed a level 33 offense with a criminal history category of I,

resulting in an advisory imprisonment range between 135 and 168 months, the court

determined a downward variant sentence of 96 months was warranted.  Ms.

McClaflin appeals.

## II.

We review the denial of a motion for continuance for abuse of discretion and

will only find error if the district court's decision was "arbitrary or unreasonable and

3

materially prejudiced" the defendant. *Rogers v. Andrus Transp. Services,* 502 F.3d 1147, 1151 (10th Cir. 2007). In determining whether the denial of a continuance constitutes an abuse of discretion, we look to the individual circumstances of the case. *Id.*

The framework for reviewing the denial of a motion for a continuance "involves an examination of four factors: (1) the diligence of the party seeking the continuance; (2) the likelihood the continuance, if granted, would have accomplished the stated purpose; (3) the inconvenience to the opposing party, witnesses, and the court; and (4) the need for the continuance and any harm resulting from its denial." *United States v. Glaub,* 910 F.3d 1334, 1345 (10th Cir. 2018). "The final factor is the most important." *United States v. Orr,* 692 F.3d 1079, 1100 (10th Cir. 2012).

Of those four factors, Ms. McClaflin has not clearly satisfied any of them. Ms. McClaflin's counsel admitted that he was not prepared for the sentencing hearing, that he had not sufficiently talked to witnesses, and that he had not explained the extent of Ms. McClaflin's medical condition or ascertained proper facilities through the BOP. Nor had he filed a motion for a variant sentence. There was not a high likelihood that if a continuance were granted, Ms. McClaflin's health would improve much more than it already had. The district court noted that Ms. McClaflin was not undergoing an imminent medical procedure, and Ms. McClaflin's counsel conceded that her hip infection was "as low as it can be right now." Rec., vol. IV at 11.

Conversely, granting the continuance would have greatly inconvenienced the

opposing party and the court.  Ms. McClaflin requested the continuance a mere five days before the hearing was set to commence, and it is likely that the victims and witnesses had previously made preparations to attend.  The district court already had granted Ms. McClaflin and the government almost a year to review financial information and to prepare for sentencing, and it would have been required to rearrange its calendar even further in order to grant Ms. McClaflin a new hearing date.

Significantly, Ms. McClaflin has failed to demonstrate prejudice.  In *United States v. West*, 828 F.2d 1468, 1471 (10th Cir. 1987), we held that the district court abused its discretion in denying the requested continuance because it precluded the defendant from calling "the only eyewitness who might have presented directly exculpatory testimony." [1]  There, "the testimony was important and the prejudice resulting from the denial of a continuance was severe."  *Id.*  Here, however, the continuance would merely allow Ms. McClaflin to accumulate additional mitigating evidence.  The district court did not abuse its discretion in denying the motion for a continuance.

---

[1] In *West*, 828 F.2d at 1470, the defendant's primary defense to a first-degree murder charge was that he did not strike the victim and was therefore innocent.  The court denied the defendant's continuance motion until the next day, even when a subpoenaed witness who would testify that the defendant did not strike the victim did not appear on the day he was called and a reasonable possibility existed he would voluntarily appear the next day.  *Id.* at 1470–71.

III.

Ms. McClaflin also contends that the district court made two procedural errors: first, by relying on sworn victim impact statements to *sua sponte* impose the 6-level enhancement; and second by failing to consider the requisite § 3553(a) factors. The parties disagree on the relevant standard of review.

"Fairness and judicial efficiency demand that litigants notify the district court of a procedural sentencing error with reasonable specificity, thereby providing that court the opportunity to correct its action in the first instance." *United States v. Robertson,* 568 F.3d 1203, 1209 (10th Cir. 2009). We require timely objections so the district court can consider and resolve them at the time they are raised and because "[i]n the case of an actual or invited procedural error, the district court can often correct or avoid the mistake so that it cannot possibly affect the ultimate outcome." *Puckett v. United States,* 556 U.S. 129, 134 (2009). It is Ms. McClaflin's position that she properly objected to the procedural errors and any failure to preserve the issues was excused because it was plain that further objection would have been futile. On the other hand, the government contends these claims were not properly objected to and should only be reviewed for plain error, which requires there be an "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Wright,* 848 F.3d 1274, 1278 (10th Cir. 2017).

A. *6-level enhancement*

Prior to sentencing, the government filed a written objection to the 6-level
enhancement recommended in the PSR for substantial financial hardship to twenty-
five or more victims. The only ground stated for the objection was that the
government elected to stand by the plea agreement's offense level calculation of a 2-
level enhancement based on more than ten victims. Ms. McClaflin joined the
government's objection. At sentencing, the district court explained its process for
applying the 6-level enhancement and walked through its underlying findings of fact.
When the court prompted Ms. McClaflin's counsel to make any statement in regards
to the written objection to the 6-level enhancement, defense counsel merely stated,
"[i]t is the Government's objection . . . not the defendant's." Rec., vol. IV at 22. The
judge prompted counsel a second time "to make any statement for purposes of your
record on appeal" and counsel reiterated that he did not have a statement. *Id.* Ms.
McClaflin's claim that further objection would have been futile is thus unconvincing.

We require that parties object with specificity so that the district court can
correct its actions in the first instance. *See, e.g.*, *United States v. Holloway,* 826 F.3d
1237, 1251 (10th Cir. 2016); *Robertson,* 568 F.3d at 1209. Ms. McClaflin did not
object to the accuracy of the sworn victim impact statements nor to the district
court's reliance upon them. "We have repeatedly held that if a defendant fails to
object to his presentence report, he waives his right to challenge the district court's
reliance on it, unless the district court's decision to do so amounts to plain error."
*Holloway,* 826 F.3d at 1251; *see also United States v. Figueroa-Labrada*, 720 F.3d

1258, 1266 (10th Cir. 2013).  Because Ms. McClaflin did not properly preserve the issue at sentencing, we review for plain error.

The district court did not err by using the sworn victim impact statements to make its own independent findings of fact.  "The sentencing judge remains ultimately responsible for determining the facts and must establish the relevant facts even if all the parties argue to the contrary."  *United States v. Aragon,* 922 F.3d 1102, 1109 (10th Cir. 2019) (internal brackets omitted).  In determining the number of victims and calculating loss, a district court must make independent findings supporting its conclusions.  *Holloway,* 826 F.3d at 1251.  In doing so, the court can look beyond admissible evidence at trial as long as the information has a sufficient indica of reliability to support its probable accuracy.  *See, e.g.*, *United States v. Caiba-Antele*, 705 F.3d 1162, 1165 (10th Cir. 2012); *see also United States v. Sunmola,* 887 F.3d 830, 836–37 (7th Cir. 2018); U.S.S.G. § 6A1.3(a).

Here, the district court made independent factual findings by relying upon victim impact statements that were submitted under penalty of perjury and whose accuracy was not disputed by any party.  The court heard testimony from the government's IRS agent who likewise relied upon the victim impact statements.  Speaking in allocution, Ms. McClaflin referred to the statements, indicating she had "read them over and over and over . . .."  Rec., vol. IV at 101.  At no point did Ms. McClaflin raise any concerns or objection or otherwise contend that these sworn victim impact statements were unreliable.  Accordingly, the victim impact statements were properly considered by the court.

8

In calculating the number of victims who suffered substantial financial

hardship[2], the district court first determined that there were over ninety investors who

were defrauded by Ms. McClaflin, counting husband and wife couples together as

one victim.  Of those ninety, sixty-three filed victim impact statements under penalty

of perjury.  Twenty-eight of these indicated that they had to make substantial changes

to their employment or substantial changes to their living arrangements as a direct

result of Ms. McClaflin's fraudulent scheme.  At the very least the twenty-eight

sworn statements meet the standard for substantial financial hardship laid out in the

Sentence Guidelines Application Note.  *See* U.S.S.G. § 2B1.1, cmt. n.4(f) (iv), and

(v).  Because the district court's consideration of this evidence was well within its

discretion, the district court did not procedurally err in relying on the sworn victim

impact statements.

   B. *§ 3553(a) factors*

---

[2] "**Substantial Financial Hardship.—**In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—
(i) becoming insolvent;
(ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
(iii) suffering substantial loss of a retirement, education, or other savings or investment fund;
(iv) making substantial changes to his or her employment, such as postponing his or her retirement plans;
(v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
(vi) suffering substantial harm to his or her ability to obtain credit."

U.S.S.G. § 2B1.1, cmt. n.4(f).

9

Ms. McClaflin also claims the district court failed to properly consider all of the relevant § 3553(a) factors before imposing its sentence.  But, once again, she never objected to the district court's sentencing process at trial.  We therefore review only for plain error.

Ms. McClaflin contends that the court did not ask to hear from counsel or the defendant until after it had already made up its mind.  She relies on the court's statement prior to sentencing that "I am inclined to grant a variant sentence somewhere within that adjusted advisory guideline range . . . .  However, I have not decided where within that range of 87 to 108 months the sentence should actually be."  Rec., vol. IV at 85-86.  But Ms. McClaflin takes a single statement out of the context of the entire sentencing process.  Overall that process shows that the district court proceeded properly and considered the requisite factors.  For example, when the court began it's sentencing, it stated:

> I will tell you where I am going, in terms of my inclinations, so that
> you can target any arguments you have to what my concerns are, and
> to persuade me otherwise, or to persuade me to go the way I have
> indicated, if that is what you want.  I will hear from [defense counsel],
> then [the government], and finally, if Ms. McClaflin wishes to make
> any statement to me on her own behalf, I will hear from her.

*Id.* at 73–74.  The court thus clearly demonstrated that, although it had a general idea based upon the PSR, it would hear from the parties involved before making the final decision.

Ms. McClaflin further contends the district court failed to consider other relevant mitigating factors besides Ms. McClaflin's cooperation with the government

when imposing her sentence.  We disagree.  While the court put an emphasis on Ms. McClaflin's cooperation, this was not the only factor it considered.  For example, the court clearly considered the nature and circumstances of the offense by noting the impact of Ms. McClaflin's scheme on her victims.  It also noted that Ms. McClaflin did not act in a manner entirely consistent with a woman who was truly sorry for her conduct, expressing concerns about Ms. McClaflin's failure to account for personal assets and her divorce from her husband to secure his assets.  With respect to the § 3553(a) factors, "[w]e do not require a ritualistic incantation to establish consideration of a legal issue, nor do we demand that the district court recite any magic words to show us that it fulfilled its responsibility to be mindful of the factors that Congress has instructed it to consider."  *United States v. Lopez-Flores*, 444 F.3d 1218, 1223 (10th Cir. 2006) (citation omitted); *see also United States v. Rines,* 419 F.3d 1104, 1107 (10th Cir. 2005) ("It is true that the district court did not march through § 3553(a)'s sentencing factors, but we have never imposed such a requirement.").

Although Ms. McClaflin specifically alleges that the district court did not consider her medical circumstances, the record reveals that in fact it did do so before determining that the Bureau of Prisons was better suited to decide which facilities and treatments were necessary.  Rec., vol. IV at 115 ("I think the Bureau of Prisons can sort out whether she really does have serious medical issues that are different from any of the other defendants that they see on a regular basis who have medical

11

issues.").  The court was clearly aware of and considered Ms. McClaflin's medical needs at sentencing, but it did not deem them determinative, noting that Ms. McClaflin was not at risk of undergoing a major procedure in the imminent future. Because the district court clearly considered the relevant § 3553(a) factors, it did not plainly err when it sentenced Ms. McClaflin.

We AFFIRM the judgment of the district court.

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

September 20, 2019

Chris Wolpert
Chief Deputy Clerk

Ms. Ann Marie Taliaferro
Brown, Bradshaw & Moffat
10 West Broadway
Suite 210
Salt Lake City, UT 84101-0000

RE:     **18-1217, United States v. McClaflin**
        Dist/Ag docket: 1:17-CR-00168-CMA-1

Dear Counsel:

Attached is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:      James C. Murphy

EAS/at

2

146

Original

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
AT DENVER

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUN -5 2020

JEFFREY P. COLWELL
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 1:17-cr-168-CMA-1 |
| | ) | Civil No. |
| Plaintiff-Respondent, | ) | |
| | ) | HON. CHRISTINE M. ARGUELLO |
| vs. | ) | MAG. |
| | ) | |
| KAREN LYNN MCCLAFLIN, | ) | MOTION FOR COMPASSIONATE |
| | ) | RELEASE OR HOME CONFINEMENT |
| Defendant-Movant. | ) | PER THE CARE & FIRST STEP ACTS |

\* \* \* \* \* \* \* \* \* \*

COMES NOW DEFENDANT-MOVANT Karen Lynn McClaflin and respectfully moves this Honorable Court to for an **EMERGENCY ORDER** for her compassionate release or home confinement pursuant to 18 U.S.C. § 3624(c)(2) (Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement) 18 U.S.C. § 3582(c)(1)(A)(i) and the Cares Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) and the Barr Memorandums of March 26, 2020 and April 3, 2020 and 18 U.S.C. § 3553(a).

### *ISSUES PRESENTED*

| Issue: | Page: |
|---|---|

1.) This Court Should Grant Immediate Compassionate Release For Ms McClaflin Pursuant 18 U.S.C. § 3582(c)(1)(A)(i) As Amended By The CARES Act, And The Barr Memo And Consistent With 18 U.S.C. § 3553(a) ............................................................................................................... 5

2.) Given The Life And Death Consequences To Karen Lynn McClaflin, This Court Can And Should Reach And Rule On The Merits Of Her Motion Without Requiring Further Exhaustion Of Administrative Remedies ......................................................................................................... 18

Conclusion ............................................................................................................... 20

iii

**Certificate of Filing and Service**.........................................................................21

**Appendix of Exhibits** ................................................................................**End**

Administrative Remedies..........................................................................A

iv

**Statement Of Facts And Procedural History**

On 5-10-18 Ms McClaflin was sentenced to 96 months incarceration plus 3 years
supervised release, $200.00 special assessment and $14,528,206.39 restitution for violation of 18
U.S.C. § 1343 (Wire Fraud) (Count 1); 18 U.S.C. § 1957 (Monetary Transaction in Property
Derived from Wire Fraud) (Count 2).

With good time, Ms McClaflin has served 12 months months of her sentence. This is
15% of her sentence.

For at least the last year, Ms McClaflin prison record has been exemplary.

Ms McClaflin is 61 years old.

Ms McClaflin is currently housed in FMC Carswell. While Ms McClaflin is currently
housed in other than a low or minimum security facility, her actual security level is minimum.

Ms McClaflin has a minimal PATTERN score.

Ms McClaflin suffers from the following medical conditions which cause her to be
especially vulnerable to the coronavirus in accordance with the Centers for Disease Control and
Prevention (CDC) guidelines[1]:

> 1. Autoimmune disorder due to massive amounts of broad-spectrum antibiotics
> used to treat infections following 18 hip surgeries. (Documentation available
> through my medical records). I am exceptionally susceptible to any & all virus' to
> which I am exposed. I actually got an infection in my hip from a routine teeth
> cleaning even though I took 4 amoxicillin as recommended by my doctor.

---

[1] Based on what we know now, those at high-risk for severe illness from COVID-19 are: People
of all ages with underlying medical conditions, particularly if not well controlled, including:
People 65 years and older;  People with chronic lung disease or moderate to severe asthma;
People who have serious heart conditions;  People who are immunocompromised;   Many
conditions can cause a person to be immunocompromised, including cancer treatment, smoking,
bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and
prolonged use of corticosteroids and other immune weakening medications;  People with severe
obesity (body mass index [BMI] of 40 or higher);  People with diabetes;  People with chronic
kidney disease undergoing dialysis;     People with liver disease.     See:
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

1

2. I suffered through one episode of Clostridium difficile due to the antibiotic treatments. Clostridium difficile is a highly contagious, deadly condition if not immediately treated. See: https://www.mayoclinic.org/diseases-conditions/c-difficile/symptoms-causes/syc-20351691

3. Thyroid disease - have taken thyroid medications for 20+ years. Thyroid disease runs in my family.

4. Former smoker - lungs are borderline to needing oxygen during the day.

5. I have been recommended the use of a C-PAP at night, but have not gotten one here at Carswell yet.

(See attachments)

These multiple and severe comorbidities increase her likelihood of death exponentially when she inevitably contracts COVID-19 if she continues to be held at FMC Carswell.[2]

Ms McClaflin also suffers from the following serious medical condition which was not known to the Sentencing Court:

> I was assigned to FMC Carswell as the Judge in my case, Hon. Christine Arguello, was under the impression that this facility was a medical facility and that my medical issues would be addressed here. such is not the case as Carswell has not passed their inspection for many years to receive accreditation as a Medical Facility. Carswell is a Nursing Facility, Behavioral Modification Unit & Ambulatory Care Unit. As such, I self-surrendered here on 6/11/20 with the expectation that I could receive appropriate medical care for my medical issues. I was originally sentenced to the AZ (Phoenix) Satellite Camp as I am a low-level offender. After meeting with the BOP Contractor, Dr. Santos - (Orthopedic Surgeon), it was determined that I should wait at least 6-12 months before considering any 'reimplantation' surgery. A 'Girdlestone Procedure' was performed in December, 2018. As that date approached, Dr. Santos on his second meeting with me expressed his concerns about his unfamiliarity with my condition as well as the Doctors at the Hospital where he worked. I asked Dr. Jowdy, (my BOP assigned physician), whether or not I should even contemplate having the surgery done while at Carswell and what he would do if he was me. He stated that under no circumstances would he have the surgery done here. He would go to The Hospital for Special Surgery in New York or the Mayo Clinic. He was so adamant about it that he looked it up on his computer while I was in his consultation room and had me scoot around to see the screen. He typed in the HSS in NY and we picked out 2 physicians that only specialized in hip replacements. *It is to be noted that my right leg is now over 6 inches shorter than my left leg.*

(See attachments)

2

Ms McClaflin's re-entry plan will prevent recidivism and maximize public safety as hereinafter more fully appears. She will be picked up at the prison by private vehicle and carried directly to her available Probation Approved housing at 1630 drive, Colorado Springs, Colorado, 80921. At this location she will have a private room and bath segregated from anyone else. She will contact the local Federal Probation Office at Colorado Springs to coordinate her supervision. She is disabled and will apply for supplemental Social Security but will still be able to assist the "receiver" in her underlying case to continue returning funds to the victims of the case. She will have medical care available thru her ex-husband's insurance where he works.. Under these verifiable conditions, Ms McClaflin would maximize public safety and present a vastly lower risk of contracting COVID-19 than if allowed to continue incarceration at FMC Carswell.

Due to Ms McClaflin's minimal PATTERN score, she is *by definition* NOT a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).

Ms McClaflin has filed 3 (three) BP-9 administrative remedy requests with the warden of the facility in which she is incarcerated. The dates of filing the first two of the requests are 11-18-19 and 1-27-20. The third request was filed shortly before the filing of this motion. The BP-10 request was denied on 3-12-20 as untimely. It was untimely because she was in quarantine when the second BP-9 was answered and so she was unable to file the BP-10 on time. (See attachments) The institution where Ms McClaflin is incarcerated has explicitly advised that she is NOT eligible for release under the CARES Act. As much as Ms McClaflin has tried to exhaust administrative remedies, she has been unable to because the BOP simply runs her around in a circle.

---

[2] *Id.*

3

Ms McClaflin argues below that this Court can and should grant emergency release to home confinement pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and the Cares Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) and the Barr Memorandums of March 26, 2020 and April 3, 2020 and 18 U.S.C. § 3553(a).

4

## Argument

1.) **This Court Should Grant Immediate Compassionate Release For Ms McClaflin Pursuant 18 U.S.C. § 3582(c)(1)(A)(i) As Amended By The CARES Act, And The Barr Memo And Consistent With 18 U.S.C. § 3553(a).**

18 U.S.C. § 3582(c)(1) provides in relevant part:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that--
> (1) in any case--
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) [18 USCS § 3553(a)] to the extent that they are applicable, if it finds that-
> (i) ***extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission***;

*Id.* 18 U.S.C. § 3582(c)(1) (As Amended Dec. 21, 2018,P.L. 115-391, Title VI, § 603(b), 132 Stat. 5239) (emphasis added). See *United States v. Maumau*, 2020 U.S. Dist. LEXIS 28392 *; 2020 WL 806121 (D UT 2-18-20).

18 U.S.C. § 3553(a) provides that the Court should consider the following in determining whether to grant compassionate release under 18 U.S.C. § 3582(c)(1):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the [*17] sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;

5

(4) the kinds of sentence[s] and the sentencing range established for—
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ... [;]
(5) any pertinent policy statement ... [;]
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). See *United States v. Cantu*, No. 1:05-CR-458-1, 2019 U.S. Dist. LEXIS

100923, at *16-17 (SD TX 6-17-19).

Sec. 12003 of the CARES Act, Congressional Record Vol. 166, No. 59, Section 12003

(Senate - March 25, 2020) provides:

(a) Definitions.--In this section--
(1) the term ``Bureau'' means the Bureau of Prisons;
(2) *the term ``covered emergency period'' means the period beginning on the date on which the President declared a national emergency under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID-19) and ending on the date that is 30 days after the date on which the national emergency declaration terminates;* and
(3) the term ``Secretary'' means the Secretary of Health and Human Services.
(b) Supply of Personal Protective Equipment and Test Kits to Bureau of Prisons; Home Confinement Authority.--
(1) Personal protective equipment and test kits.--
(A) Findings.--Congress finds the following:
(i) There is an urgent need for personal protective equipment and test kits to the Bureau based on the density of the inmate population, the high traffic, the high volume of inmates, the high rate of turnover of inmates and personnel, and the number of high-security areas, within the facilities of the Bureau.
(ii) The inability of the Bureau to secure the purchase of infectious disease personal protective equipment and related supplies now and in the future is a vulnerability.
(iii) The Bureau is currently competing in and engaging the same landscape of vendors as all other Federal agencies and private entities.
(iv) The ability of the Bureau to purchase needed equipment and supplies is currently subject to an individual manufacturer's specific recognition of the

6

Bureau as a priority and subsequent allocation of the inventory of the manufacturer to the Bureau.

(B) Consideration.--The Secretary shall appropriately consider, relative to other priorities of the Department of Health and Human Services for high-risk and high-need populations, the distribution of infectious disease personal protective equipment and COVID-19 test kits to the Bureau for use by inmates and personnel of the Bureau.

*(2) Home confinement authority.--During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.*

c) Video Visitation.--

(1) In general.--During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau shall promulgate rules regarding the ability of inmates to conduct visitation through video teleconferencing and telephonically, free of charge to inmates, during the covered emergency period.

(2) Exemption from notice-and-comment rulemaking requirements.-- Section 553 of title 5, United States Code, shall not apply to the promulgation of rules under paragraph

(1) of this subsection.

(d) Emergency Requirement.--The amount provided by this section is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

*Id.* CARES Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25,

2020) (emphasis added).

The so-called "Barr Memo" of March 26, 2020 by the Attorney General states as follows:

Office of the Attorney General
Washington, DC 20530
March 26, 2020

**MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS FROM: THE ATTORNEY GENERAL**

SUBJECT: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic

7

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

## I. TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

> • The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;
>
> • The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;
>
> • The inmate's conduct in prison, with inmates who have engaged in violent or gang related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;
>
> • The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

8

• Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

• The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II. PROTECTING THE PUBLIC

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

*Id.* Memorandum from Attorney General Barr dated 3-26-20.

On 4-3-20, the Attorney General has subsequently issued an updated memorandum as hereinafter more fully appears:

9

**MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS**
**FROM:** THE ATTORNEY GENERAL
**SUBJECT:** Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

**I. IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

10

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

*Id.* Memorandum from Attorney General Barr dated 4-3-20.

While old policy statements provide helpful guidance, they do not constrain the Court's independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i). An interpretation of the old policy statements as binding on the new compassionate release procedure is likely inconsistent with the Commission's statutory role. . . . It is also inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BOP finds they are not appropriate. . . . Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement. *United States v. Maumau*, 2020 U.S. Dist. LEXIS 28392 *; 2020 WL 806121

11

(D UT 2-18-20) (citing and quoting *United States v. Beck*, 2019 U.S. Dist. LEXIS 108542, 2019 WL 2716505 at *5-6 (M.D.N.C. June 28, 2019) and collecting cases.)[3].

    In Ms McClaflin's case, as set forth in the Statement of Facts, supra, on 5-10-18 she was sentenced to 96 months incarceration plus 3 years supervised release, $200.00 special assessment and $14,528,206.39 restitution for violation of 18 U.S.C. § 1343 (Wire Fraud) (Count 1); 18 U.S.C. § 1957 (Monetary Transaction in Property Derived from Wire Fraud) (Count 2). With good time, Ms McClaflin has served 12 months months of her sentence. This is 15% of her sentence. For at least the last year, Ms McClaflin prison record has been exemplary. Ms McClaflin is 61 years old. She is currently housed in FMC Carswell. While Ms McClaflin is currently housed in other than a low or minimum security facility, her actual security level is minimum. Ms McClaflin has a minimal PATTERN score. Ms McClaflin suffers from the

---

[3] see also *United States v. Cantu*, No. 1:05-CR-458-1, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923 at *5 (S.D. Tex. June 17, 2019) ("[T]he correct interpretation of § 3582(c)(1)(A)— based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statements at any time . . . —is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief."). [*6] Accord *United States v. Cantu-Rivera*, No. H-89-204, 2019 U.S. Dist. LEXIS 105271, 2019 WL 2578272 at *2 n.1 (S.D. Tex. June 24, 2019); *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, 2019 WL 3046086 at *3 (D. Me. July 11, 2019); *United States v. Rivernider*, No. 3:10-cr-222(RNC), 2019 U.S. Dist. LEXIS 137134, 2019 WL 3816671 at *2 (D. Conn. Aug. 14, 2019); *United States v. Bucci*, 409 F. Supp. 3d 1, 2019 WL 5075964 at *1 (D. Mass., 2019); *United States v. Brown*, No. 4:05-CR-00227-1, 2019 U.S. Dist. LEXIS 175424, 2019 WL 4942051 at *4 (S.D. Iowa Oct. 8, 2019); *United States v. Urkevich*, No. 8:03CR37, 2019 U.S. Dist. LEXIS 197408, 2019 WL 6037391 at *3 (D. Neb. Nov. 14, 2019); *United States v. Dusenbery*, No. 5:91-cr-291, 2019 U.S. Dist. LEXIS 199502, 2019 WL 6111418 at *3 n.3 (N.D. Ohio Nov. 18, 2019); *United States v. Valdez*, No. 3:98-cr-0133-01-HRH, 2019 U.S. Dist. LEXIS 223651, 2019 WL 7373023 at *2-3 (D. Alaska Dec. 31, 2019); *United States v. Schmitt*, No. CR12- 4076-LTS, 2020 U.S. Dist. LEXIS 2832, 2020 WL 96904 at *3 (N.D. Iowa Jan. 8, 2020).

following medical conditions which cause her to be especially vulnerable to the coronavirus in accordance with the Centers for Disease Control and Prevention (CDC) guidelines[4]:

> 1. Autoimmune disorder due to massive amounts of broad-spectrum antibiotics used to treat infections following 18 hip surgeries. (Documentation available through my medical records). I am exceptionally susceptible to any & all virus' to which I am exposed. I actually got an infection in my hip from a routine teeth cleaning even though I took 4 amoxicillin as recommended by my doctor.
> 2. I suffered through one episode of Clostridium difficile due to the antibiotic treatments. Clostridium difficile is a highly contagious, deadly condition if not immediately treated. See: https://www.mayoclinic.org/diseases-conditions/c-difficile/symptoms-causes/syc-20351691
> 3. Thyroid disease - have taken thyroid medications for 20+ years. Thyroid disease runs in my family.
> 4. Former smoker - lungs are borderline to needing oxygen during the day.
> 5. I have been recommended the use of a C-PAP at night, but have not gotten one here at Carswell yet.

(See attachments)

These multiple and severe comorbidities increase her likelihood of death exponentially when she inevitably contracts COVID-19 if she continues to be held at FMC Carswell.[5]

Ms McClaflin also suffers from the following serious medical condition which was not known to the Sentencing Court:

> I was assigned to FMC Carswell as the Judge in my case, Hon. Christine Arguello, was under the impression that this facility was a medical facility and that my medical issues would be addressed here. such is not the case as Carswell has not passed their inspection for many years to receive accreditation as a Medical Facility. Carswell is a Nursing Facility, Behavioral Modification Unit &

---

[4] Based on what we know now, those at high-risk for severe illness from COVID-19 are: People of all ages with underlying medical conditions, particularly if not well controlled, including: People 65 years and older; People with chronic lung disease or moderate to severe asthma; People who have serious heart conditions; People who are immunocompromised; Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; People with severe obesity (body mass index [BMI] of 40 or higher); People with diabetes; People with chronic kidney disease undergoing dialysis; People with liver disease. See: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html
[5] *Id.*

13

Ambulatory Care Unit. As such, I self-surrendered here on 6/11/20 with the expectation that I could receive medical care for my medical issues. I was originally sentenced to the AZ (Phoenix) Satellite Camp as I am a low-level offender. After meeting with the BOP Contractor, Dr. Santos - (Orthopedic Surgeon), it was determined that I should wait at least 6-12 months before considering any 'reimplantation' surgery. A 'Girdlestone Procedure' was performed in December, 2018. As that date approached, Dr. Santos on his second meeting with me expressed his concerns about his unfamiliarity with my condition as well as the Doctors at the Hospital where he worked. I asked Dr. Jowdy, (my BOP assigned physician), whether or not I should even contemplate having the surgery done while at Carswell and what he would do if he was me. He stated that under no circumstances would he have the surgery done here. He would go to The Hospital for Special Surgery in New York or the Mayo Clinic. He was so adamant about it that he looked it up on his computer while I was in his consultation room and had me scoot around to see the screen. He typed in the HSS in NY and we picked out 2 physicians that only specialized in hip replacements. ***It is to be noted that my right leg is now over 6 inches shorter than my left leg***.

(See attachments)

Ms McClaflin's re-entry plan will prevent recidivism and maximize public safety as hereinafter more fully appears. She will be picked up at the prison by private vehicle and carried directly to her available Probation Approved housing at 1630 drive, Colorado Springs, Colorado, 80921. At this location she will have a private room and bath segregated from anyone else. She will contact the local Federal Probation Office at Colorado Springs to coordinate her supervision. She is disabled and will apply for supplemental Social Security but will still be able to assist the "receiver" in her underlying case to continue returning funds to the victims of the case. She will have medical care available thru her ex-husband's insurance where he works.. Under these verifiable conditions, Ms McClaflin would maximize public safety and present a vastly lower risk of contracting COVID-19 than if allowed to continue incarceration at FMC Carswell.

Due to Ms McClaflin's minimal PATTERN score, she is ***by definition*** NOT a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).

14

Extraordinary events that could not have been foreseen at the time of sentencing have made Ms McClaflin's current state of confinement at FMC Carswell extremely dangerous for her. In recent months, COVID-19 has spread across the globe and throughout the United States. As of 5-18-20 COVID-19 has sickened over 4,789,376 people, leading to at least 316,049 deaths worldwide[6]. As of 5-18-20 COVID-19 has sickened over 1,524,215 people, leading to at least 90,897 deaths in the United States[7]. On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic. President Trump has declared a national emergency. The Centers for Disease Control and Prevention ("CDC") have issued guidance related to the deadly effects of COVID-19 on certain high-risk patients of the population. The CDC identified the population most at risk of death from the disease to include adults of any age with underlying medical conditions, including people with diabetes and other chronic illnesses. For these individuals, the CDC warned to take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[8]

As of 5-18-20 there have been 1 positive case of coronavirus in FMC Carswell and 1 death from coronavirus in FMC Carswell. Notably, the "number of cases" is predicated on the policy of FMC Carswell which ONLY tests symptomatic individuals -- at most. *Cf. Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 **5 (ND OH 4-22-20); *Martinez-Brooks v. Easter*, No. 3:20-cv-00569; 2020 U.S. Dist. LEXIS 83300 * (D CT 5-12-20).

Moreover, a sentence reduction for Ms McClaflin is consistent with and supported by the factors in 18 U.S.C. § 3553(a), whose consideration is mandated by 18 U.S.C. § 3582(c)(1)(A) "to the extent they are applicable." Two of those factors now carry more weight than at the time

---

[6] See JOHNS HOPKINS Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html
[7] See JOHNS HOPKINS Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html

15

of sentencing: (1) "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); and

(2) "the need for the sentence imposed . . . to provide the defendant with . . . medical care . . . in

the most effective manner," 18 U.S.C. § 3553(a)(2)(D).[9] First, Ms McClaflin's vulnerability to

COVID-19 weigh in favor of reducing her sentence. Second, she is a non-violent offender with a

minimal "Pattern Score" which, by the BOP's own definition indicates she is NOT in need of

continued incarceration and should be released to be able to obtain medical care even if it is just

"social distancing" which is *NOT* even *alleged* by the strongest prison advocates as being

available in prison. *Id.* Any other course is simply playing Russian Roulette with Ms McClaflin's

life. She did NOT receive a sentence of "Russian Roulette" with her life.

Given (1) the highly infectious nature of COVID-19, (2) the limitations in a prison

environment (even a prison medical center) on practicing the hygienic and social distancing

techniques that the Center for Disease Control has put in place to prevent rapid transmission, and

(3) the fact that Ms McClaflin suffers from ailments that have already been identified as "high

risk," it is clear that Ms McClaflin's legitimate medical risk is a sufficiently extraordinary and

compelling basis for granting compassionate release. See Note 1(A), U.S.S.G. § 1B1.13

(expressly recognizing that "other reasons" may exist for granting compassionate release), see

Note 1(D), U.S.S.G. § 1B1.13 (recognizing that extraordinary and compelling reasons exists

"other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Ms

McClaflin's high susceptibility to COVID-19 falls within the purview of this catchall. See *Wilson

v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 (ND OH 4-22-20), affirmed,

---

[8]     See:     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html

[9] See *United States v. Kirk Brannan*, No. 4:15-CR-80-01 (SD TX 4-2-20) (ordering emergency release of vulnerable prisoner due to COVID-19 with a finding that these two sections of 18 U.S.C. § 3553(a) "now carry more weight than at the time of sentencing")

*Wilson v. Williams*, No. 20-3447; 2020 U.S. App. LEXIS 14291 * (6th Cir. 5-4-20); *Martinez-Brooks v. Easter*, No. 3:20-cv-00569; 2020 U.S. Dist. LEXIS 83300 * (D CT 5-12-20).

Based on the foregoing facts, continued incarceration of Ms McClaflin at FMC Carswell is subjecting her to denial of her Eighth Amendment constitutional right to be free of cruel and unusual punishment by deliberate indifference to her serious medical needs. *Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 (ND OH 4-22-20), affirmed, *Wilson v. Williams*, No. 20-3447; 2020 U.S. App. LEXIS 14291 * (6th Cir. 5-4-20); *Martinez-Brooks v. Easter*, No. 3:20-cv-00569; 2020 U.S. Dist. LEXIS 83300 * (D CT 5-12-20).

Based on the foregoing, a sentence reduction for Ms McClaflin is consistent with and supported by the factors in 18 U.S.C. § 3582(c)(1)(A)(i) and the Cares Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) as well as the Barr Memorandums and *Wilson v. Williams*, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 (ND OH 4-22-20), affirmed, *Wilson v. Williams*, No. 20-3447; 2020 U.S. App. LEXIS 14291 * (6th Cir. 5-4-20); *Martinez-Brooks v. Easter*, No. 3:20-cv-00569; 2020 U.S. Dist. LEXIS 83300 * (D CT 5-12-20).[10]

---

[10] Judges around the country have released defendants in light of the extraordinary risk posed by the COVD-19 pandemic. See, e.g., *United States v. Grobman*, No. 18-cr-20989 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Powell*, No. 1:94-cr- 316-ESH (D.D.C. Mar. 28, 2020) (granting motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic") (Nathan, J.); see also *United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (sua sponte

17

**2.)   Given The Life And Death Consequences To Karen Lynn McClaflin, This Court Can And Should Reach And Rule On The Merits Of Her Motion Without Requiring Further Exhaustion Of Administrative Remedies.**

It is well settled law that a Court can dispense with administrative remedies in appropriate cases and go directly to the merits. Indeed, courts throughout the country have waived the administrative exhaustion requirements under the First Step Act where circumstances warrant. See *Washington v. Bur. of Prisons*, No. 1:19-CV-01066, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (in addressing motion for recalculation of good time credit under the First Step Act, the court explained that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile."). Moreover, "[e]ven where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019). There are generally three bases for waiver of an exhaustion requirement. See *United States v. Perez*, No. 17cr513-3(AT), ECF No. 98 at 3-4 (S.D.N.Y. Apr. 1, 2020) (discussing exceptions to statutory exhaustion in context of motion for compassionate release during COVID-19 pandemic). "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Washington*, 925 F.3d at 118. "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile." *Id.* at 120. Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief," including situations where "the relief the agency might provide could,

---

inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Kirk Brannan*, No. 4:15-CR-80-01 (SD TX 4-2-20) (ordering emergency release of vulnerable prisoner due to COVID-19 with a finding that these two sections of 18 U.S.C. § 3553(a) "now carry more weight than at the time of sentencing"); *United States v. Colvin*, Case No. 3:19-cr-00179-JBA (D CT 4-2-20); *United States v. Resnick*, Case No. 1:12-cr-00152-CM (SD NY 4-2-20).

18

because of undue delay, become inadequate." *Id.* at 119-20. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." Id. at 119.[11]

In Ms McClaflin's case, as set forth above, she has filed 3 (three) BP-9 administrative remedy requests with the warden of the facility in which she is incarcerated. The dates of filing the first two of the requests are 11-18-19 and 1-27-20. The third request was filed shortly before the filing of this motion. The BP-10 request was denied on 3-12-20 as untimely. It was untimely because she was in quarantine when the second BP-9 was answered and so she was unable to file the BP-10 on time. (See attachments) The institution where Ms McClaflin is incarcerated has explicitly advised that she is NOT eligible for release under the CARES Act. As much as Ms McClaflin has tried to exhaust administrative remedies, she has been unable to because the BOP simply runs her around in a circle. (See attachments)

Based on the foregoing, given the life and death consequences to Karen Lynn McClaflin, this Court can and should reach and rule on the merits of her motion without requiring further exhaustion of Administrative Remedies.

---

[11] See also *United States v. Walker*, No. 3:10-cr- 00298-RRB-1, [Dkt. 110] (D. Or. Feb. 7, 2019) (finding that, although the defendant failed to exhaust administrative remedies, the Court had jurisdiction to order recalculation of defendant's good time Case 3:19-cr-00179-JBA Document 30 Filed 03/31/20 Page 6 of 8 7 credit under the First Step Act and to order defendant's release if his term of imprisonment had expired); see also *Gurzi v. Marques*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at *2 (D. Minn. Oct. 10, 2019) (despite prisoner's failure to exhaust administrative remedies, addressing the merits of prisoner's objections to his designation, in part under the First Step Act, as "the Court observes that it has the authority to proceed to the merits of the case rather than rely on a failure to exhaust when appropriate."); *United States v. Colvin*, Case No. 3:19-cr-00179-JBA (D CT 4-2-20); *United States v. Brannan*, Case No. 4:15-cr-00080 (SD TX 4-2-20) (verbal request to case manager constituted exhaustion).

19

## CONCLUSION

Based on the foregoing, a sentence reduction for Ms McClaflin is consistent with and supported by the factors in 18 U.S.C. § 3582(c)(1)(A)(i) and the CARES Act, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) and the Barr Memorandum of April 3, 2020.. *Id.* Ms McClaflin respectfully requests this Court to so **ORDER**.

Date: 6/01/20

Respectfully submitted,

Karen Lynn McClaflin
44166-013
P.O. Box 27137
Fort Worth, TX  76127

20

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
## AT DENVER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 1:17-cr-168-CMA-1 |
| | ) | Civil No. |
| Plaintiff-Respondent, | ) | HON. CHRISTINE M. ARGUELLO |
| | ) | MAG. |
| vs. | ) | |
| | ) | **CERTIFICATE OF FILING** |
| KAREN LYNN MCCLAFLIN, | ) | **AND SERVICE** |
| | ) | |
| Defendant-Movant. | ) | |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

Pursuant to the principles of *Houston v. Lack,* 487 U.S. 266, 276 (1988), Ms McClaflin

has this day filed with the Court and served counsel for the opposing party with the required

original and copies of the enclosed documents by depositing same in the prison legal mail

collection box, in sealed envelopes, first class postage affixed and addressed to: **Clerk, U.S.**

**District Court, 901--19th Street, Denver, CO 80294-3589** and to **United States Attorney,**

**1801 California St #1600, Denver, CO 80202.**

Signed under penalty of perjury under
28 U.S.C. § 1746 this ⟨1ST⟩ day
of ⟨JUNE⟩, 2020.

**Karen Lynn McClaflin**
44166-013
P.O. Box 27137
Fort Worth, TX 76127

21

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
## AT DENVER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 1:17-cr-168-CMA-1 |
| | ) | Civil No. |
| Plaintiff-Respondent, | ) | HON. CHRISTINE M. ARGUELLO |
| | ) | MAG. |
| vs. | ) | |
| | ) | |
| KAREN LYNN MCCLAFLIN, | ) | VERIFICATION OF EXHIBITS |
| | ) | |
| Defendant-Movant. | ) | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

COMES NOW DEFENDANT-MOVANT **Karen Lynn McClaflin** and deposes and states as follows:

    1.)    I am the Defendant-Movant in the above entitled case and the instant proceedings pursuant to 18 U.S.C. § 3582(c)(1).

    2.)    The attached documents are submitted as exhibits in support of my 18 U.S.C. § 3582(c)(1) motion. I have personal knowledge of the originals of the exhibits and state that the copies truly and accurately represent said originals.

    3.)    I have read the foregoing and state that it is true and correct.

Signed under penalty of perjury under 28 U.S.C. § 1746 this __1st__ day of __June__, 2020.

Karen Lynn McClaflin
Defendant-Movant
44166-013
P.O. Box 27137
Fort Worth, TX 76127

1

## ATTACHMENT TO BP-9

I am requesting compassionate release and/or transfer to home confinement pursuant to 28 U.S.C. § 2241 and 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 2201 and 2202 and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) as well as 18 U.S.C. § 3624(c)(2) (Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement) 18 U.S.C. § 3582(c)(1)(A)(i) and the *Cares Act*, Congressional Record Vol. 166, No. 59, Section 12003 (Senate - March 25, 2020) and the *Barr Memorandums of March 26, 2020 and April 3, 2020* and 18 U.S.C. § 3553(a) and for the following reasons:

I currently suffer from the following medical conditions which cause me to be especially vulnerable to the coronavirus in accordance with the Centers for Disease Control and Prevention (CDC) guidelines[1]:

> 1. Autoimmune disorder due to massive amounts of broad-spectrum antibiotics used to treat infections following 18 hip surgeries. (Documentation available through my medical records). I am exceptionally susceptible to any & all virus' to which I am exposed. I actually got an infection in my hip from a routine teeth cleaning even though I took 4 amoxicillin as recommended by my doctor.
> 2. I suffered through one episode of Clostridium difficile due to the antibiotic treatments. Clostridium difficile is a highly contagious, deadly condition if not immediately treated. See: https://www.mayoclinic.org/diseases-conditions/c-difficile/symptoms-causes/syc-20351691
> 3. Thyroid disease - have taken thyroid medications for 20+ years. Thyroid disease runs in my family.
> 4. Former smoker - lungs are borderline to needing oxygen during the day.
> 5. I have been recommended the use of a C-PAP at night, but have not gotten one here at Carswell yet.

These multiple and severe comorbidities increase my likelihood of death exponentially when I inevitably contract COVID-19 if I continue to be held at FMC Carswell.

I also suffer from the following medical conditions which were NOT foreseen by the Sentencing Court:

---

[1] Based on what we know now, those at high-risk for severe illness from COVID-19 are: People of all ages with underlying medical conditions, particularly if not well controlled, including: People 65 years and older; People with chronic lung disease or moderate to severe asthma; People who have serious heart conditions; People who are immunocompromised; Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; People with severe obesity (body mass index [BMI] of 40 or higher); People with diabetes; People with chronic kidney disease undergoing dialysis; People with liver disease. See: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

1

I was assigned to FMC Carswell as the Judge in my case, Hon. Christine Arguello, was under the impression that this facility was a medical facility and that my medical issues would be addressed here. such is not the case as Carswell has not passed their inspection for many years to receive accreditation as a Medical Facility. Carswell is a Nursing Facility, Behavioral Modification Unit & Ambulatory Care Unit. As such, I self-surrendered here on 6/11/20 with the expectation that I could receive appropriate medical care for my medical issues. I was originally sentenced to the AZ (Phoenix) Satellite Camp as I am a low-level offender. After meeting with the BOP Contractor, Dr. Santos - (Orthopedic Surgeon), it was determined that I should wait at least 6-12 months before considering any 'reimplantation' surgery. A 'Girdlestone Procedure' was performed in December, 2018. As that date approached, Dr. Santos on his second meeting with me expressed his concerns about his unfamiliarity with my condition as well as the Doctors at the Hospital where he worked. I asked Dr. Jowdy, (my BOP assigned physician), whether or not I should even contemplate having the surgery done while at Carswell and what he would do if he was me. He stated that under no circumstances would he have the surgery done here. He would go to The Hospital for Special Surgery in New York or the Mayo Clinic. He was so adamant about it that he looked it up on his computer while I was in his consultation room and had me scoot around to see the screen. He typed in the HSS in NY and we picked out 2 physicians that only specialized in hip replacements. *It is to be noted that my right leg is now over 6 inches shorter than my left leg.*

The foregoing extraordinary and compelling circumstances demonstrate deprivation by the Bureau of Prisons of my Eigth Amendment right to be free of cruel and unusual punishment by deliberate indifference to my serious medical needs.

My proposed release plans, including where I will reside, how I will support myself, and, information on where I will receive medical treatment and how I will pay for such treatment: are as follows:

I will be picked up at the prison by private vehicle and carried directly to my available Probation Approved housing at 15954 Jackson Creek Pkwy #B602, Monument, CO 80132. At this location I will have a private room and bath segregated from anyone else. I will contact the local Federal Probation Office at Colorado Springs to coordinate my supervision. I am disabled and will apply for supplemental Social Security but will still be able to assist the "receiver" in my underlying case to continue returning funds to the victims of the case. I will have medical care available thru my husband's insurance where he works.. Under these verifiable conditions, I will maximize public safety and present a vastly lower risk of contracting COVID-19 than if allowed to continue incarceration at FMC Carswell.

Date: 6/01/20

Karen Lynn McClaflin
44166-013
P.O. Box 27137
Fort Worth, TX 76127

2

REJECTION NOTICE -- ADMINISTRATIVE REMEDY

DATE: MARCH 16, 2020

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      SOUTH CENTRAL REGIONAL OFFICE

TO  : KAREN LYNN MCCLAFLIN, 44166-013
      CARSWELL FMC    UNT: UNIT 6 CC    QTR: G02-192L
      P.O. BOX 27066
      FORT WORTH, TX 76127

FOR THE REASONS LISTED BELOW, THIS REGIONAL APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID        : 1004424-R1    REGIONAL APPEAL
DATE RECEIVED    : MARCH 12, 2020
SUBJECT 1        : REDUCTION-IN-SENTENCE REQUEST
SUBJECT 2        :
INCIDENT RPT NO :

REJECT REASON 1 : YOUR APPEAL IS UNTIMELY. REGIONAL APPEALS (BP-10)
                  MUST BE RECEIVED WITHIN 20 DAYS OF THE WARDEN/CCM
                  RESPONSE OR RECEIPT OF THE DHO REPORT. THIS TIME
                  INCLUDES MAIL TIME.

REJECT REASON 2 : YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN
                  15 DAYS OF THE DATE OF THIS REJECTION NOTICE.

REJECT REASON 3 : SEE REMARKS.

REMARKS         : YOU HAD 20 DAYS FROM THE DAY YOU RECEIVED YOUR BP-9
                  RESPONSE 2-11-2020 TO APPEAL. PROVIDE STAFF DOCUMEN
                  TATION FOR REASON OF DELAY.



**For Institution
Delivery to Inmate**

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

| From: | MCCLAFLIN, KAREN L | 44166-013 | CC-5 | CARSWELL |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

Part A – REASONS FOR APPEAL

I AM SUBMITTING THIS APPEAL FOR RECONSIDERATION
BASED ON PROGRAM STATEMENT 5050.50 AMEND # 799

PLEASE SEE ATTACHED

3-9-20

DATE                           SIGNATURE OF REQUESTER

Part B – RESPONSE

RECEIVED

MAR 12 2020

DATE                           REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE        CASE NUMBER: 1009424-R1

Part C – RECEIPT

CASE NUMBER:

Return to:

LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

SUBJECT:

DATE                           SIGNATURE, RECIPIENT OF REGIONAL APPEAL

March 9, 2020

Bureau of Prisons
South Central Regional Office
344 Marine Forces Drive
Grand Prairie, TX 75051

To Whom it May Concern:

Pursuant to the attached denial letter of my request for Administrative Remedy # 1004424-F1, I am submitting this request for reconsideration.

As an inmate, I may request consideration for Reduction in Sentence or Compassionate Release when there are extraordinary or compelling circumstances which could not have been foreseen at the time of sentencing. At the time of my sentencing, I was not suffering from any surgical complications; however, no one could have foreseen the fact that the BOP would NOT be able to provide a physician with the necessary skill set and experience to perform the reimplantation surgery that I desperately require.

Although I may not meet ALL the criteria according to USC 18 3582(d)(1). Program Statement 5050.50 Amendment 799 clearly states that there may exist conditions that are in COMBINATION of those outlined within the Program Statement. (SEE ATTACHED)

Amendment 799 provides an option to reduce a sentence to qualify for the 60+ pilot program so that an inmate over 60 years of age can spend the remainder of their sentence on home confinement.

If an inmate doesn't qualify EXACTLY under a section of Program Statement 5050.50, it doesn't mean that they don't qualify for a COMBINATION of issues within any given section.

Dr. Jowdy, (my BOP assigned physician), as well as Dr. Miner, (my Orthopedic Specialist from Denver, CO), concur that due to the complexity of the Denver, CO surgery and the trauma suffered, I have ONE more opportunity for a successful surgery. reimplantation.

To-date, the costs of surgeries, prescriptions, rehab etc. is approximately $3M for 18 surgeries performed. Because I cannot bear any weight on my right leg, (due to the missing skeletal structure), I am confined to a wheelchair (or walker) 15-16 hours a day.

I am 61 years old and am suffering from a debilitative condition- (my right leg continues to atrophy due to the delay in surgery and is now over 6" shorter than my left leg), and am deeply concerned that I may not be able to get the critical surgery I need before the tendons & muscles in my right leg atrophy to the point where a reimplantation surgery will be less than successful.

Given the totality of circumstances, I kindly ask that you carefully review and reconsider my case.

Respectfully,

Karen McClanin
44166-013

Delivered to inmate
2-13-2020

KAREN LYNN MCCLAFLIN, 44166-013
CARSWELL FMC     UNT: UNIT 5 CC     QTR: G02-193L
P.O. BOX 27066
FORT WORTH,  TX 76127

**PART B – RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY # 1004424-F1**

| McClaflin, Karen | 44166-013 | CC5 |
|---|---|---|
| **INMATE NAME** | **REGISTER NUMBER** | **UNIT** |

This is in response to your Request for Administrative Remedy # 1004424-F1, received in the Warden's Office on January 28, 2020, wherein you requested reconsideration for Reduction In Sentence/ Compassionate Release based on Medical Circumstances – Debilitated Medical Condition.

An inmate may request consideration for Reduction In Sentence/Compassionate Release when there are particularly extraordinary or compelling circumstances which could not have been foreseen by the court at the time of sentencing. To meet criteria for Reduction In Sentence/Compassionate Release based on Medical Circumstances – Debilitated Medical Condition, one must be completely disabled, meaning the inmate cannot carry on any self-care and is confined to a bed or chair more than 50% of waking hours under the United States Code 18 3582(d)(1). According to your attending physician and your treating physical therapist, you do not meet these criteria as you are able to complete all self-care activities independently, which is well documented in your medical records.

In addition you suffered from your medical conditions at the time of sentencing, and your Presentence Investigation Report (PSR) mentions these medical conditions and required medical care at length.

In addition, per Program Statement 5050.50, *Reduction In Sentence/Compassionate Release*, additional factors should be considered when reviewing this type of request. Some of these factors include; length of sentence and amount of time served, supervised release violations, and criminal history. While you may have serious medical conditions, currently, you do not meet the medical criteria for Reduction In Sentence- Terminal Medical Condition. While you may have serious medical conditions, currently you do not meet the criteria for Reduction in Sentence-Debilitated Medical Condition.

Based on the above information, your Request for Administrative Remedy is denied.

If you are not satisfied with this decision, you may appeal to the Regional Director at: Bureau of Prisons, South Central Regional Office, 344 Marine Forces Drive, Grand Prairie, Texas 75051. Your appeal must be received in the South Central Regional Office within 20 days of the date of this response.

M. Carr, Warden                    2-11-2020
                                   Date

RECEIPT - ADMINISTRATIVE REMEDY


DATE: MARCH 26, 2020



FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CARSWELL FMC

TO  : KAREN LYNN MCCLAFLIN, 44166-013
      CARSWELL FMC    UNT: UNIT 5 CC    QTR: G02-193L



THIS ACKNOWLEDGES THE RECEIPT OF THE ADMINISTRATIVE REMEDY REQUEST
IDENTIFIED BELOW:

REMEDY ID        : 1004424-F1
DATE RECEIVED    : JANUARY 28, 2020
RESPONSE DUE     : FEBRUARY 17, 2020
SUBJECT 1        : REDUCTION-IN-SENTENCE REQUEST
SUBJECT 2        :

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

---

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: McCLAFLIN KAREN L. 44166-013 CC-5 CARSWELL FMC
LAST NAME, FIRST, MIDDLE INITIAL.    REG. NO.    UNIT    INSTITUTION

**Part A- INMATE REQUEST** ON 11/18/19 I SUBMITTED A REQUEST FOR CONSIDERATION FOR
COMPASSIONATE RELEASE TO WARDEN CARR. I RESPONDED TO A "CALL OUT"
APPOINTMENT TO SOCIAL WORKER WHEELER WHERE SHE PRESENTED ME
WITH A "DENIAL" LETTER DATED 12/13/19 SIGNED BY ACTING WARDEN POLLARD.
(THIS WAS A MERE FEW WEEKS PRIOR TO LEAVING CARSWELL). I'M NOT SURE
WHETHER WARDEN CARR EVER SAW MY REQUEST. THE DENIAL WAS BASED
ON THE PREMISE THAT I WAS ABLE TO COMPLETE ALL SELF CARE INDEPENDENTLY.
I QUESTION WHO MADE THIS ASSUMPTION AS TO MY EFFICIENCY IN PERFORMING
ADL's (ACTIVITIES OF DAILY LIVING) BECAUSE CARSWELL DOES NOT HAVE AN OCCUPATIONAL
THERAPIST SINCE MY SELF SCREENED ON 6/11/19.
I AM THEREFORE APPEALING THIS DENIAL AND RESPECTFULLY REQUEST
A RECONSIDERATION THROUGH THE ADMINISTRATIVE REMEDY PROGRAM.

1/27/20                                    _Karen L. McClaflin_
DATE                                        SIGNATURE OF REQUESTER

**Part B- RESPONSE**

JAN 29 2020

---
DATE                                        WARDEN OR REGIONAL DIRECTOR
If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

**ORIGINAL: RETURN TO INMATE**                CASE NUMBER: 1004424-F1

                                              CASE NUMBER:

**Part C- RECEIPT**

Return to: _____
              LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____          ⊛                    _____    BP-229(13)
DATE                                           RECIPIENT'S SIGNATURE (STAFF MEMBER)    APRIL 1982



**U. S. Department of Justice**

Federal Bureau of Prisons

Federal Medical Center, Carswell

---

*P.O. Box 27066, J Street, Bldg 3000*
*Fort Worth, Texas 76127*

December 13, 2019

MEMORANDUM FOR MCCLAFLIN, KAREN
Reg. No. 44166-013

FROM:        M. Carr, Warden  Acting Warden

SUBJECT:        Compassionate Release/Reduction In Sentence (RIS)

Consideration for your release, under the provisions of Title 18, United States Code, Section 3582 (c)(1)(A), and Bureau of Prisons' Program Statement 5050.50, has been given careful review, which included case summary information and length of time served. Based upon this information, your request for a Compassionate Release/Reduction In Sentence (RIS) has been denied.

Currently, you do not meet the criteria for a Reduction In Sentence based on medical circumstances – Debilitated Medical Condition. A review of your current medical status indicates that, although you may require a wheelchair at times for mobility, you are able to complete all self-care activities independently. After careful review of this information, consideration for Compassionate Release/RIS is denied. In compliance with Bureau of Prisons' Program Statement 5050.50, you may appeal this denial through the Administrative Remedy Program.

Medical staff will continue to monitor your conditions as clinically indicated. I suggest you continue to work with your unit team, your designated medical team, and your assigned social worker to address your needs, as they may arise.

TO: WARDEN MICHAEL CARR
FM: KAREN McCLAFLIN 44166-013
DT: 11/18/2019
RE: FORMAL CONSIDERATION FOR COMPASSIONATE RELEASE

Please accept this as my Formal Consideration for Compassionate Release and/or Reduction in Sentence (Ref: Program Statement 5050.5) as allowed by 18 U.S.C. 3582(c)(1)(A) and Amended by the First Step Act of 2018 as well as the 60-Year Old Pilot Program. Please reference US Sentencing Guideline Amendment 799 (A) (1v) and US v Cantu, No. 1:05-CR-458-1, 2019 U.S. Dist. LEXUS 100923 (S.D. Tex. June 17, 2019).

My request is based on extraordinary or compelling circumstances that I believe warrant consideration (Para: 571.61). These issues could not reasonably have been foreseen by the Court at the time of sentencing.

On June 21, 2017, I entered into a Plea Agreement with the Government containing one Count of Wire Fraud and one Count of Money Laundering. I was sentenced on May 10, 2018, at the age of 60. The Government suggested a sentence of 65 months, (due to super-cooperation), but the Judge imposed a sentence of 96 months.

During the period of time between the Plea Agreement and Sentencing, (approximately 11 months), I was released on a PR Bond, (with no stipulation of Home Confinement). Thirteen unsuccessful hip surgeries were performed, (between January, 2017, and May 10, 2018), due to repeated infections. I experienced pain and trauma as a result of the multiple failed surgeries and endured tremendous grief due to the deaths of both my mother and father, (to whom I was the Primary Caregiver), within six months of each other.

At the time of sentencing, my infections had temporarily abated, however, the 17th surgery, (called a Girdlestone), was performed in December, 2018 - followed by yet another infection at the site, necessitating an 18th surgery in March, 2019. This last surgery was performed just shy of 3 months prior to my self-surrender to Carswell FMC on June 11, 2019.

The Girdlestone procedure removed all hip replacement components. Because there is no longer a hip structure, my right leg is attached to my torso only by muscles and tendons. My condition is steadily declining as the leg is atrophying and my overall health has declined since arriving at Carswell, FMC. My weight hovers around 100 pounds because I am experiencing major issues with the diet provided by the BOP. Also, the Ensure Nutritional Supplements I was receiving upon my arrival at Carswell FMC have been discontinued.

It is the prognosis of my Orthopedic Specialist, (Dr. Miner) in Denver, Colorado along with my Infectious Disease Doctor, (Dr. Brookmeyer), that it would be best to allow the hip to heal for a period of 6-12 months from the date of the last surgery before reimplantation would be considered. Meanwhile, I am confined to a wheelchair (full time) because I am unable to bear any weight on my right leg whatsoever. I am a high fall risk due to this condition, and my femur has fractured to the point where metal super clamps have been installed to prevent further breakage of the bone. There is now over a 5" length leg discrepancy which may or may not ever be fully correctable with reimplantation; but the sooner the surgery is performed, the better, since almost a year has passed since the Girdlestone surgery. The length discrepancy will continue to increase the longer the surgery is delayed, and lessens the chance of a successful outcome.

My immune system is compromised due to the serious nature of my numerous surgeries as well as IV antibiotic treatment following each surgery. I have already experienced C-Diff (Colostrium Difficile Diarrhea) that is highly contagious & life-threatening and caught an infection in my eyes during my first few weeks at Carswell, FMC. Initially I was categorized as a Care Level 4 due to my multiple health issues and my overall frailty.

The opinion of my orthopedic specialist is that I have one more opportunity for a successful surgery reimplantation due to the trauma experienced and the complexity of reimplantation following a Girdlestone procedure. Since my arrival at Carswell, FMC, I met with Commander Stevens, (in the PT Department), and Dr. Sanchez, (an Orthopedic doctor contracted by the BOP), twice to discuss a forward plan regarding my hip. Dr. Sanchez recognized the complexity of the Girdlestone procedure and concurred that I needed to wait at least a year, (infection free), before contemplating reimplantation and that he was not overly familiar or experienced with the condition. PT also discharged me as there were no further treatments that could improve my situation. As there was nothing more that could be done for me, I was transferred to Unit CC-5 on October 9, 2019, as a Care Level 2. I understand that if I was able-bodied I would qualify for Camp Status, as my original designation was to the BOP Satellite Camp in Phoenix, Arizona.

I met with Dr. Jowdy, (my BOP designated Physician), on November 8, 2019, to discuss my healthcare situation. He stated that due to the complexity of the reimplantation he would NOT elect to have the surgery done while at Carswell, FMC. He said that I

should research Orthopedic Specialists in NEW YORK and the MAYO CLINIC for the best chance of finding a qualified & experienced surgeon.

I am, therefore, requesting that I be granted Compassionate Release/Reduction in Sentence, or Commutation to Home Confinement so that I may be allowed to procure my own orthopedic specialist, through my own health insurance before my condition deteriorates further.

The following Factors and Evaluation of Circumstances are:

The Company I founded and operated, (and where my charges originated), is being managed by a Court Appointed Receiver that I procured. During the period between the Plea Agreement and self-surrender, I cooperated fully with the Receiver, FBI, SEC and all Governmental Agencies involved in my case. I worked alongside a Forensic Accountant, (employed by the Receiver), on a regular basis (for 2 1/2 years), to reconstruct files allowing the Receiver to disburse funds to the victims.

The Probation Department previously visited and approved my designated release residence in December, 2017. It is the home that my husband and I have shared since 1997, and where he currently resides. It is my intent to file for Social Security Disability due to my debilitated condition upon release, therefore providing an income to address healthcare and any FRP.

Nature & Circumstances of the inmate's offense: 1 Count of Money Laundering & 1 Count of Wire Fraud
Criminal History: 1
Comments from Victims: Mixed, but predominantly favorable
Unresolved Detainers: None
Supervised Release Violations: None
Institutional Adjustment: Significant Depression and overall declining health
Disciplinary Infractions: None
Personal history derived from PSR: Excellent
Length of Sentence and amount of time served: 96 months/ 5 months
Inmate's Release plans (Employment, Medical & Financial): Husband employed full-time, Social Security Disability Income enabling me access to good health insurance. Able to address any FRP better from being released
Inmate's current age: 61
Inmate's age at the time of offense and sentencing: 58/60
Whether release would minimize the severity of the offense: No. There is no amount of prison time, (whether in a BOP Facility or Home Detention), that will ever lessen the remorse, guilt and responsibility I feel for what transpired. Release from Custody would better enable me to pay any FRP and receive Social Security benefits, (income), as well as health insurance.

I know that being released from incarceration @ Carswell, FMC would be in the best interest of all involved. Untreated, my health and the condition of my right leg will continue to decline. The ongoing costs born by the BOP for my medical care will continue to escalate, and payments toward any FRP would be further delayed. The average cost of each hip surgery ranges between $135K & $150K (just for the operating room). Additional costs for hospitalization, doctor fees, aftercare, Physical Therapy and medications exceed $25K per surgery. To-date, the cost of my 18 surgeries has exceeded $3 Million.

Dr. Jowdy made it clear that the BOP is not able to provide the caliber of Orthopedic Specialist required to perform the reimplantation of my hip. I am terrified by the thought that after 18 surgeries I could lose my leg or my life due to an inexperienced surgeon. I also know that there is no chance that I would ever reoffend. I am not a danger or threat to anyone.

In summation, my time in prison @ FMC Carswell has been the most difficult experience in my life. I need to be released as soon as possible so that I may pursue a specialist that will be able to perform my much needed surgery. Once that is completed, I will be able to concentrate my efforts to address any shortfalls to the victims that may exist. The efforts of the receiver have continued while I have been at Carswell FMC, but they would definitely be expedited if I could assist the Forensic Accountant as I did previous to my incarceration.

I will be happy to provide any and all documentation, (letters, medical records, etc), requested that support my claims. Thank you for your kind consideration of my request.

Sincerely,

Karen McClaflin
Karen McClaflin
44166-013

KAREN McCLAFLIN
44166-013
Federal Medical Center
CARSWELL
PO BOX 27137
FT. WORTH, TX 76127

CLERK, U.S. DISTRICT COURT
901-19th STREET
DENVER, CO 80294-3589






FMC Carswell
P.O. Box 27066
Fort Worth, TX 76127
Mailed _____ 6-2-97

The enclosed letter was processed through special
mailing procedures for forwarding to you. The letter
has neither been opened nor inspected. If the writer
raises a question or problem over which this facility
has jurisdiction, you may wish to return the material
for further information or clarification. (4)

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Thomas James Hammond (hammondlaw@solucian.com), Laura Beth Hurd
(caseview.ecf@usdoj.gov, charisha.cruz@usdoj.gov, jasmine.zachariah@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov,
laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, sheri.gidan@usdoj.gov,
tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecfcriminal@usdoj.gov,
usaco.ecffluatty@usdoj.gov, wayne.campbell@usdoj.gov), Pegeen Denise Rhyne
(caseview.ecf@usdoj.gov, dequesa.boucher@usdoj.gov, michaela.keiter@usdoj.gov,
pegeen.rhyne@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Ann Marie Taliaferro
(ann@brownbradshaw.com, frances@brownbradshaw.com, kristin@brownbradshaw.com,
levi@brownbradshaw.com), Judge Christine M. Arguello (arguello_chambers@cod.uscourts.gov)
--Non Case Participants: jkoza (justine_kozak@cod.uscourts.gov), npete
(nicole_peterson@cod.uscourts.gov), Probation-General (cod_efiling@cod.uscourts.gov),
USM-Criminal Division (gregorio.rivera@usdoj.gov, jason.brackett@usdoj.gov,
justin.kellogg@usdoj.gov, katrina.crouse@usdoj.gov, royce.namoca@usdoj.gov,
usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:7603485@cod.uscourts.gov
Subject:Activity in Case 1:17-cr-00168-CMA USA v. McClaflin Order
Content−Type: text/html
```

### U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 6/8/2020 at 7:58 AM MDT and filed on 6/8/2020

| | |
|---|---|
| **Case Name:** | USA v. McClaflin |
| **Case Number:** | 1:17−cr−00168−CMA |
| **Filer:** | |
| **Document Number:** | 119(No document attached) |

**Docket Text:**
 **ORDER: The Government and the Probation Office are DIRECTED to file a Response to [117] Defendants Motion on or before 6/15/2020. The Government's Response shall specifically address: what steps the warden at this facility is taking/has taken to protect especially vulnerable people like Defendant from the COVID−19 virus, what the status of Defendant's administrative request is, and whether the warden has put in place any process to expedite the determination of these types of compassionate release requests. Probation's Response shall specifically address: what steps would need to be taken by their office to put in place adequate supervision if the Court were to find that release is appropriate, what the time frame would be, and what particular risks if any the relief Defendant requests may create for the community. SO ORDERED by Judge Christine M. Arguello on 6/8/2020. Text Only Entry (cmasec)**

**1:17−cr−00168−CMA−1 Notice has been electronically mailed to:**

Thomas James Hammond     hammondlaw@solucian.com

Case No. 1:17-cr-00168-CMA    Document 138-1    filed 08/18/20    USDC Colorado    pg
Case 1:17-cr-168    NEF for Docket Entry 139    Filed 06/08/2020    Page 2 of 2
186 of 230

Pegeen Denise Rhyne    pegeen.rhyne@usdoj.gov, CaseView.ECF@usdoj.gov,
Dequesa.Boucher@usdoj.gov, USACO.ECFCriminal@usdoj.gov, michaela.keiter@usdoj.gov

Laura Beth Hurd    laura.hurd@usdoj.gov, CaseView.ECF@usdoj.gov, charisha.cruz@usdoj.gov,
jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, michelle.lockman@usdoj.gov, sheri.gidan@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov, usaco.ecfcriminal@usdoj.gov, usaco.ecffluatty@usdoj.gov,
wayne.campbell@usdoj.gov

Ann Marie Taliaferro    ann@brownbradshaw.com, frances@brownbradshaw.com,
kristin@brownbradshaw.com, levi@brownbradshaw.com

**1:17−cr−00168−CMA−1 Notice has been mailed by the filer to:**

Karen Lynn McClaflin(Terminated)
44166−013
CARSWELL
FEDERAL MEDICAL CENTER
Inmate Mail/Parcels
P.O. BOX 27137
FORT WORTH, TX 76127

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 17-cr-00168-CMA-1

UNITED STATES OF AMERICA,

     Plaintiff,

v.

KAREN LYNN McCLAFLIN,
     Defendants.

_____

## DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR
## COMPASSIONATE RELEASE OR HOME CONFINEMENT
_____

Defendant Karen McClaflin, through counsel, respectfully submits this Reply in Support of Motion for Compassionate Release or Home Confinement:

1.    <u>INTRODUCTION</u>:   On June 5, 2020, Defendant filed her Pro Se Motion for Compassionate Release or Home Confinement Per the Care and First Step Acts. [Doc.117].  This Court has previously observed that *pro se* pleadings should be reviewed liberally and held to a less stringent standard than those drafted by an attorney.  See e.g. *Hutchinson v. Milyard*, 2011 U.S. Dist. LEXIS 743 (2011).  On June 15, 2020, the Probation Office's Response [Doc.121] and the Government's Response to Defendant's Motion for Compassionate Release [Doc. 122] were filed.  Ms. McClaflin, through counsel, now submits this Reply.

2.    <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>:   The government first responds by claiming that Ms. McClaflin has failed to exhaust administrative

1

remedies. The government claims that "the defendant never submitted a new request for compassionate release to address her concerns regarding COVID-19." [Doc.122, p.3]. In fact, she has. The history of Ms. McClaflin's efforts to exhaust administrative remedies is detailed and documented in her *pro se* motion. Ms. McClaflin filed separate requests for an administrative remedy on November 18, 2019 and January 27, 2020 based on her medical condition. [Doc.117, pp.33, 35-36]. These requests for administrative remedy did not specifically cite the COVID-19 pandemic as grounds for relief. However, on June 1, 2020, Ms. Claflin submitted a third request for administrative remedy which specifically noted that she was at extraordinary risk to contract COVID-19 with potential catastrophic consequences. [Doc. 117, pp.25-26 (Attachment to BP-9)]. More than thirty (30) days have now passed since June 1, 2020 when Ms. McClaflin submitted her third request for administrative remedy.

18 U.S.C. §3582(c)(1)(A) provides that a motion for compassionate release can be filed after the lapse of 30 days from the date a request for administrative remedy is received by the warden of the defendant's facility. Ms. McClaflin is not certain of the date that her third request was received by the warden; however, she does know that the request was submitted on June 1, 2020. More than 30 days have passed since Ms. McClaflin requested an administrative remedy based on concerns about COVID-19. Accordingly, Ms. McClaflin's submits that her requests for administrative remedy are ripe for review by this Court.

Counsel is aware that this Court has consistently held that exhaustion is a jurisdictional requirement for the Court to entertain a request for compassionate release.

See e.g. *United States v. Soto*, 16-cr-238-CMA (April 15, 2020); *United States v. Riley*, 17-cr-134-CMA (April 17, 2020); *United States v. Ramirez-Argueta*, 14-cr-427-CMA (May 29, 2020); *United States v. Maynard*, 18-cr-395-CMA (May 15, 2020). In these cases the Court found a failure to exhaust based on (1) the record being "devoid" of any evidence of an attempt to comply with administrative exhaustion requirements (*Ramirez-Argueta*, *Soto*); (2) the defendant conceded a failure to exhaust (*Riley*); or (3) the defendant "provide(d) no direct evidence" of exhaustion (*Maynard*). Unlike these cases, Ms. McClaflin has provided direct evidence of exhaustion. [Doc. 117, pp.25-26 (Attachment to BP-9)].

      3.   <u>MS. McCLAFLIN'S MEDICAL CONDITION AND VULNERABILITY TO</u> <u>COVID-19</u>: Ms. McClaflin's medical records confirm that she is especially vulnerable to COVID-19. The Center for Disease Control and Prevention website states the following: "People of any age with the following conditions **are at increased risk** of severe illness from COVID-19: COPD (chronic obstructive pulmonary disease)." See Exhibit A, print-out from CDC website (emphasis in original on CDC website).[1] Ms. McClaflin has Chronic Obstructive Pulmonary Disease. [Doc. 122-3, pp.2, 26]. Whether or not, as the U.S. Attorney opines, Ms. McClaflin's COPD is related to her history of being a smoker is irrelevant. [Doc. 122, p.5]. What is relevant is that (1) COPD creates

---

[1] Full document available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html

an "increased risk of severe illness from COVID-19", and (2) Ms. McClaflin has COPD.

While the etiology of Ms. McClaflin's COPD diagnosis is not relevant, her history of smoking is. As recently as last week the CDC updated its list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 and noted that a history of smoking may create increased risk. See Exhibit B.[2]

The government argues that Ms. McClaflin's request for relief should be denied because, *inter alia*, the BOP medical records that the government attached to its Response do not note a diagnosis of autoimmune disorder. The extensive record that has previously been made in this case regarding Ms. McClaflin's medical condition should not be ignored. [Docs. 26, 36, 55, 65, 87, 93, 99, 107, 108, 109][3]. The record in this case is replete with documentation that Ms. McClaflin has a history of "chronic", "acute", "recurrent" infections. One medical report in the Court file describes Ms. McClaflin as "relatively frail and in a weakened state" and as being in a "physically deconditioned and weakened state." [Doc.36].

Further, a report relied on by the CDC when it updated the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 (Exhibit B, pp.2,5) states as follows: "Smoking . . . increase(s) risk and severity of

---

[2] From CDC website at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html.

[3] In addition to these court filings, on January 14, 2019 a hearing was held in this matter and the Court received testimony from two medical professionals. [Doc. 81]. The Court file does not include transcript of the hearing. Accordingly, counsel is unable to comment of the substance of the testimony; however, counsel suspects that Ms. McClaflin's long-standing heath issues were discussed.

pulmonary infections because of damage to upper airways and **a decrease in pulmonary immune function**."[4] The report further states, "our analysis confirms that smoking is a risk factor for progression of COVID-19, with smokers having 2.25 times the odds of severe COVID-19 outcomes that never smokers. . . . The finding that smoking is associated with COVID-19 progression is not surprising because of the **adverse effects of smoking on pulmonary immune function**."  In short, smoking causes immunodeficiency.  This is not a novel medical concept or a recent discovery, see *e.g.* Bauer, CMT, *et al*, The Influence of Cigarette Smoking on Viral Infections, available at https://doi.org/10.1378/chest.12-0930 ("cigarette smoke **profoundly** affects the immune system, compromising the host's ability to mount appropriate immune and inflammatory responses. . ."(emphasis added)).

It is also noteworthy that Ms. McClaflin's medical records document that she suffers from "Renal insufficiency" [Doc. 93, p.3] and that the CDC states that there is strong and consistent evidence that "chronic kidney disease" increases a person's risk of severe illness from COVID-19.  Exhibit B.

Unquestionably, Ms. McClaflin suffers from a medical condition(s) identified by the CDC as putting her at a higher risk of serious illness from COVID-19.  Recently, the Department of Justice has taken the position that inmates who suffer from a condition identified by the CDC as putting them at higher risk for severe illness from COVID-19 and

---

[4] Patanavanich, R and Glantz, S, Smoking is Associated with COVID-19 Progression: A Meta-Analysis, available at: https://www.medrxiv.org/content/10.1101/2020.04.13.20063669v1.

who are not expected to recover from that condition, present an "extraordinary and compelling reason" to be considered for compassionate release under U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I)—even if that condition in ordinary times would not meet the terms of the policy statement. *See, e.g.*, Letter Amending Government's Response, *United States v. Wise*, 1:18-cr-00072-ELH, ECF 185 (D. Md. May 18, 2020) ("consistent with current DOJ policy, the Government does not contest the Defendant's eligibility for being considered for compassionate release in this case because he suffers from a condition identified by the CDC as putting him at higher risk for severe illness."); *see also* Government's Response, *United States v. Feucht*, 0:11-cr-60025, ECF 51, p.5 (S.D. Fla. May, 26, 2020) ("The Government acknowledges that during the current COVID-19 pandemic, an inmate who presents one of the CDC risk factors, which include diabetes, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason that would allow compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release."); Government's Response to Defendant's Motion for Compassionate Release, *United States v. Moralez*, 1:13-cr-00073-SWS, ECF 50, p.3 (D. Wyo. May 27, 2020) ("The Department of Justice takes the position that the mere existence of COVID-19 is not sufficient to qualify an inmate for compassionate release. However, if an inmate has a chronic health condition that makes him particularly vulnerable to serious illness from COVID-19, as determined by the CDC, then the Department would deem he has satisfied the pertinent criteria in Application Note 1(A)(ii)(I).").

-6-

    4.    <u>MEASURES TAKEN BY THE BOP TO MITIGATE THE RISKS OF</u>

<u>COVID-19</u>:    The government claims that the BOP has taken appropriate measures to

mitigate the risks of COVID-19.  To support this assertion the government relies, *inter*

*alia*, on a Declaration from the Associate Warden at FMC Carswell, Raul Campos.

[Doc.122-4].  Several statements in Mr. Campos' Declaration are noteworthy.

    The Campos Declaration states, "As of today's date, there are currently no

inmates or staff with active COVID-19 at FMC Carswell."  [*Id.*, ¶28].  Having no evidence

to the contrary, the Defendant will accept that this statement was accurate when written;

however, it is no longer true.  According to the BOP's own website, as of this morning,

there are 24 confirmed active case of COVID-19 at FMC Carswell (23 inmates and 1

staff).  **This represents a 2,300% increase of confirmed active cases at FMC**

**Carswell in the past week.**  The percentage increase based on numbers from Mr.

Campos' Declaration is incalculable.  Further, because of the BOP's testing protocol,

little confidence can be placed in the BOP's reporting of confirmed active cases of

COVID-19 at FMC Carswell.  According to the BOP's procedures, "symptomatic

inmates" are tested for COVID-19.  See Exhibit C, p.2, BOP Implementing Modified

Operations.[5] The current best estimate from the CDC is that 35% of persons infected

with COVID-19 are asymptomatic with possible asymptomatic infections ranging from

---

    [5] BOP Modified Operations available at https://www.bop.gov/coronavirus/
covid19_status.jsp.

20% to 50%.  See Exhibit D, CDC COVID -19 Pandemic Planning Scenarios.[6]

Accordingly, because a high percentage of persons infected with COVID-19 are

asymptomatic but only symptomatic inmates are tested, the number of active cases

reported by FMC Carswell is of limited value.  In any event, the staggering increase of

confirmed COVID-19 infections at FMC-Carswell leaves no doubt that the BOP's efforts

to mitigate the risks of COVID-19 are largely ineffective.

Mr. Campos reports on two inmates at FMC Carswell who had COVID-19.

Regarding the first of those inmates Mr. Campos reports that "she was housed in

quarantine and isolation the entire time she was at FMC Carswell." [Doc.122-4, ¶28].

What Mr. Campos does not say it that this inmate's "entire time" at FMC Carswell was

extremely short because she died from COVID-19.  Commendably the government's

response does include this inconvenient fact that apparently slipped Mr. Campos' mind.

Mr. Campos also reports that "FMC Carswell has reviewed all of its Care Level 4

inmates for eligibility for priority consideration for home confinement under the CARES

Act and the Barr memoranda."  [Doc.122-4, ¶26].  Mr. Campos neglects to point out that

Ms. McClaflin was not included in this review.  Again, the government's response does

report that Ms. McClaflin was not included in this review but does so by suggesting that

she isn't really all that sick. [Doc. 122, p.7].

Mr. Campos also suggests that Ms. McClaflin will be safer at FMC Carswell,

---

[6] CDC report available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.  In this report the CDC also estimates that the infectiousness of asymptomatic individuals relative to symptomatic individual is 100%.

-8-

where one inmate has already died from COVID-19 and where there has been a

2,300% increase in confirmed cases in the last week, than she would be at home

serving her sentence in home confinement. [Doc.122-4, ¶6].  To be blunt, this

suggestion is preposterous and was rejected by Judge Raymond Jackson in the

Eastern District of Virginia:

> Despite the BOP's protection measures, individuals housed in
> prisons remain particularly vulnerable to infection.  Even in the best
> run prisons, officials might find it difficult if not impossible to follow
> the CDC's guidelines for preventing the spread of the virus among
> inmates and staff: practicing fastidious hygiene and keeping a
> distance of at least six feet from others. Thus, the Court need not
> wait until an outbreak occurs to determine whether to release
> Petitioner, especially whereas here, Petitioner suffers from
> underlying health conditions that may become fatal if she contracts
> COVID-19.

*Benn v. United States*, E.D.VA, Case No. 2:17-cr-30, ECF 122, PageID# 711 (internal

citations and quotations omitted).

     In Reply to the government's claim that the BOP has taken appropriate measures

to mitigate the risks of COVID-19, Ms. McClaflin invites the Court's attention to a letter

from Regina Warren, the President of AFGE Local 1006 to Senator John Cornyn,

attached hereto as Exhibit E.  According to Ms. Warren, and contrary to the assurances

from the BOP, in addressing COVID-19 "FMC Carswell knowingly and willingly misled

the public placing the staff, inmates, and community at risk to the most lethal pandemic

since 1920."

     5.    <u>The Legal Standard for Relief</u>:    Pursuant to the First Step Act, 18 U.S.C.

3582(c)(1)(A), a court may modify a term of imprisonment, "after considering the factors

set forth in section 3553(a) to the extent they are applicable," if (a) "extraordinary and

compelling reasons warrant" relief and (b) relief is "consistent with applicable policy statements issued by the Sentencing Commission."  The Sentencing Commission has provided an expansive definition of "extraordinary and compelling reasons" at U.S.S.G. §1B1.13, note 1.  The definition has three general categories of "extraordinary and compelling reasons" (medical condition, age and family circumstances) but also includes a "catch-all provision" that allows a finding of "extraordinary and compelling reasons" on other grounds.  The Sentencing Guidelines also provide that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing." *Id*, note 2.

Here, Ms. McClaflin has made a showing of extraordinary and compelling reasons to grant relief.  She has been diagnosed with an underlying medical condition (COPD) that increases her risk of severe illness from COVID-19.  Additionally, her history as a smoker, standing alone, not only increases her risk from COVID-19, but also, "decreases her pulmonary immune function."  "Renal insufficiency" further increases her risk.  On top of all this, the chronic issues surrounding Ms. McClaflin's hip replacement and resulting infections remain unresolved.  The fact that her hip replacement issues were known at time of sentencing does not preclude consideration of those facts in finding "extraordinary and compelling" reasons to grant relief.  In the age of COVID-19, it is "extraordinary and compelling" that Ms. McClaflin has COPD, renal insufficiency, is a smoker with the attendant consequences, has significant unresolved medical issues, and is housed in a facility where infections are increasing at an alarming rate and a fellow inmate has already died from COVID-19.  Further, Ms. McClaflin will not pose a danger to the safety of any other person or to the community and relief is consistent with applicable policy statement

issued by the Sentencing Commission.

The requested relief is consistent with Section 3553(a) factors. In considering Ms. McClaflin's motion the Court is directed to consider the sentencing factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. §3582(c)(1)(A). Ms. McClaflin will not attempt to relitigate the §3553(a) factors that were thoroughly discussed at the sentencing hearing; however, §3553(a) factors remain relevant and additional pertinent information has become available. As the Court is aware, Ms. McClaflin worked diligently to assist in locating assets that could be returned to the victims. Indeed, because of her cooperation and assistance, the government filed a motion requesting a variant sentence. [Doc.20]. We are happy to report that Ms. McClaflin's efforts have been successful. Attached hereto as Exhibit F, is a letter from James Barash who was appointed receiver by the El Paso County District Court to pursue assets that could be returned to victims. Mr. Barash reports that to date the Receiver has recovered over $9.2 million for the estate and has distributed over $5 million to secured claimants and over $1.6 million to unsecured claimants. Secured claimants have received a 100% return of principal. As the Court well knows, this sort of recovery for victims of white-collar crime is extraordinary. These recoveries are in no small measure the result of Ms. McClaflin's efforts. Mr. Barash reports that he continues to pursue assets that can be returned to the victims and that, if transferred to home confinement, Ms. McClaflin could assist in those efforts.

6.    Relief Requested:   Ms. McClaflin's request is that she be permitted to serve her sentence in home confinement. If sentenced to home confinement she would

(1) be relatively more safe from exposure to COVID-19 than she will be in the custody of the BOP; (2) be able to receive necessary medical care more effectively and efficiently (see §3553(a)(2)(D) ; and (3) be able to assist the court appointed Receiver in pursuing assets for the benefit of victims.

Despite Ms. McClaflin's wishes, this Court likely lacks the authority to order that she be transferred to home confinement. Pursuant to 18 U.S.C. §3586 and §3621(b), the BOP, and not this Court, has the authority to choose the place of defendant's incarceration. 18 U.S.C. 3621(b) provides that "[t]he Bureau of Prisons shall designate the place of the prisoner's imprisonment." "The term 'imprisonment' refers to any type of custody, including custody in a correctional facility or home confinement program." *Moresco v. United States*, 982 F.2d 529, [published in full-text format at 1992 U.S. App. LEXIS 32819, 1992 WL 372399 (10th Cir. 1992)). Thus, the decision as to defendant's placement rests with the Bureau of Prisons. The Court is without jurisdiction to order how defendant's sentence is to be administered. *Id; United States v. Samuels,* 2019 U.S. Dist. Lexis 144787 (W.D.Ok. 2019). Accordingly, defendant's understanding is that this Court does not have the authority to order that Ms. McClaflin's sentence be served in home confinement. That said, this Court does have the statutory authority to accomplish a similar result. 18 U.S.C. 3582(c) gives this Court the legal authority.

18 U.S.C. 3582(c), provides that this Court "may modify a term of imprisonment" and "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. 3563(b)(19) specifically authorizes home confinement as a condition of

-12-

probation. 18 U.S.C. 3583(d) gives the Court broad authority to impose conditions of

supervised release:

> The court may order, as a further condition of supervised release, to the extent that such condition—
>
> > **(1)** is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D) [18 USCS § 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D)];
> >
> > **(2)** involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D) [18 USCS § 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)]; and
> >
> > **(3)** is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a);
>
> any condition set forth as a discretionary condition of probation in section 3563(b) [18 USCS § 3563(b)] and any other condition it considers to be appropriate.

In addition to its authority to order home confinement as a condition, this Court has the

authority to order "any other condition it considers to be appropriate." Accordingly, the

Court could, if it considered it appropriate, place Ms. McClaflin on location monitoring.

Further, although it probably goes without saying, Ms. McClaflin would be under the

supervision of the Probation Office and this Court would retain the authority to place her

back in BOP custody should she violate any condition of probation or supervised

release.

      7.   <u>Conclusion</u>: Based on the foregoing, Defendant respectfully request that

this court find that "extraordinary and compelling reasons" exist to modify the sentence in

this case and order that:

    a. Her term of imprisonment be modified to time served with a term of

       supervised release, with conditions that the Court deems appropriate, but

       including, home confinement;

       OR,

    b. Her sentenced be modified to a term of probation, with conditions that

       the Court deems appropriate, but including, home confinement.

DATED:  July 3, 2020.    Respectfully submitted,

                          NATHAN D. CHAMBERS LLC
                          By:    s/Nathan D. Chambers
                          Nathan D. Chambers
                          303 16th Street, Suite 200
                          Denver, Colorado 80202
                          (303) 825-2222

CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2020, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.

By: ___s/Nathan D. Chambers_____
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
(303) 825-2222

 CDC Centers for Disease Control and Prevention

EXHIBIT A

# Coronavirus Disease 2019 (COVID-19)

# People of Any Age with Underlying Medical Conditions

Updated June 25, 2020                    Print Page

## Summary of Recent Changes

*Revisions were made on June 25, 2020 to reflect available data as of May 29, 2020. We are learning more about COVID-19 every day, and as new information becomes available, CDC will update the information below.*

People of any age with **certain underlying medical conditions** are at increased risk for severe illness from COVID-19:

People of any age with the following conditions **are at increased risk** of severe illness from COVID-19:

- Chronic kidney disease
- COPD (chronic obstructive pulmonary disease)
- Immunocompromised state (weakened immune system) from solid organ transplant
- Obesity (body mass index [BMI] of 30 or higher)
- Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies
- Sickle cell disease
- Type 2 diabetes mellitus

Children who are medically complex, who have neurologic, genetic, metabolic conditions, or who have congenital heart disease are at higher risk for severe illness from COVID-19 than other children.

COVID-19 is a new disease. Currently there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19. Based on what we know at this time, people with the following conditions **might be at an increased risk** for severe illness from COVID-19:

- Asthma (moderate-to-severe)
- Cerebrovascular disease (affects blood vessels and blood supply to the brain)
- Cystic fibrosis
- Hypertension or high blood pressure
- Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines
- Neurologic conditions, such as dementia
- Liver disease
- Pregnancy
- Pulmonary fibrosis (having damaged or scarred lung tissues)
- Smoking
- Thalassemia (a type of blood disorder)
- Type 1 diabetes mellitus

Want to see the evidence behind these lists?

The list of underlying conditions is meant to inform clinicians to help them provide the best care possible for patients,

Case No. 21-1366, Document 138-2, filed 08/03/20 UBBE Colorado pg 203 of 230

7/1/2020

Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 | CDC





# Coronavirus Disease 2019 (COVID-19)

# Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19

Updated June 25, 2020                    Print Page

Updates to the list of underlying medical conditions that put individuals at increased risk for severe illness from COVID-19 were based on published reports, articles in press, unreviewed pre-prints, and internal data available between December 1, 2019 and May 29, 2020. **This list is a living document that will be periodically updated by CDC, and it could rapidly change as the science evolves.** Severe illness from COVID-19 was defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death.

The level of evidence for each condition was determined by CDC reviewers based on available information about COVID-19. Conditions were added to the list (if not already on the previous underlying medical conditions list [originally released in March 2020]) if evidence for an association with severe illness from COVID-19 met any of the following criteria:

- **Strongest and most consistent evidence:** Defined as consistent evidence from multiple small studies or a strong association from a large study,

- **Mixed evidence:** Defined as multiple studies that reached different conclusions about risk associated with a condition, or

- **Limited evidence:** Defined as consistent evidence from a small number of studies. categorization for a condition's association with severe illness from COVID-19, the condition was added to the list (if not already on the previous underlying medical conditions list [originally released in March 2020]).

Qualifiers to previously listed conditions were added or removed if there was strong evidence to support that the condition be expanded. Conditions previously listed were to be removed if there was strong and consistent evidence demonstrating no association with severe outcomes. Based on this criterion, no conditions were removed from the previous underlying medical conditions list dated March 2020.

| Level of Evidence | Condition | Evidence of Impact on COVID-19 Severity | Notes |
|---|---|---|---|
| Strongest and Most Consistent Evidence | Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies | Cohort Study [1, 2] Meta Analyses [3, 4] Case Series [5] | On previous version of list as "Serious Heart Conditions" |
| | Chronic kidney disease | Case Series [6, 7, 8] Cohort Studies [9, 10, 11] | On previous version of list as "Chronic Kidney Disease Requiring Dialysis" |
| | COPD | Meta Analyses [4, 12] Case Series [13] Cohort Study [10] | On previous version of list |
| | Obesity (BMI≥ 30) | Cohort Studies [14, 15, 16, 17, 18] Cross-sectional [19] | On previous version of list as "Severe Obesity (BMI ≥40)" |
| | Sickle cell disease | Case Series [20, 21, 22, 23, 24] | On previous version of list |
| | Solid organ transplantation | Case Series [8, 25, 26, 27, 28, 29, 30] | New to updated list as of June 25, 2020 |
| | Type 2 diabetes mellitus | Case Series [7] Longitudinal Study [31] Cohort Study [32, 33] Meta Analysis [34] | On previous version of list |

7/1/2020

Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 | CDC

Case No. 1:21-cv-01708-WJM-MEH Document 38-28 filed 08/18/20 USDC Colorado pg 204 of 230

| Level of Evidence | Condition | Evidence of Impact on COVID-19 Severity | Notes |
|---|---|---|---|
| Mixed Evidence | Asthma | Cohort Study [**10**, 35, 36, 37]<br>Case Series [**13**] | On previous version of list |
| | Cerebrovascular disease | Meta Analysis [**38**, **39**, *40*, *41*]<br>Synthesis of Evidence [*42*]<br>Cohort Study [1, 2, **43**, **44**, **45**] | New to updated list as of June 25, 2020 |
| | Hypertension | Cohort Study [1, 2, **45**, 46, 47]<br>Systematic Review [**48**]<br>Meta Analyses [3, **4**, 49] | New to updated list as of June 25, 2020 |
| | Pregnancy | Systematic Review [**50**]<br>Case Control Study [**51**]<br>Case Series [**52**, 53, **54**, **55**]<br>Cohort Study [56, 57, 58] | |
| | Smoking | Meta Analyses [3, 59, 60, 61, **62**] | On previous version of list |
| | Use of corticosteroids or other immunosuppressive medications | Case Series [*63, 64, 65*]<br>Cohort Study [66, 67] | On previous version of list |
| Limited Evidence | Bone marrow transplantation | Review [68] | On previous version of list |
| | HIV | Case Series [**69**, 70] | On previous version of list |
| | Immune deficiencies | Case Series [**71**]<br>Systematic Review [**72**] | On previous version of list |
| | Inherited metabolic disorders | Cohort Study [43, *73*] | New to updated list as of June 25, 2020; specific to pediatric populations at this time |
| | Neurologic conditions | Cross-Sectional Study [74]<br>Cohort Study [37, **45**, 73] | New to updated list as of June 25, 2020; specific to pediatric populations at this time |
| | Other chronic lung diseases | Meta Analysis [**4**]<br>Case Series [**13**]<br>Cohort Study [**10**, 75] | On previous version of list |
| | Liver disease | Meta Analysis [76]<br>Cohort Study [77, 78]<br>Literature Review [**79**] | On previous version of list |
| | Type 1 diabetes mellitus | Case Series [**7**]<br>Cohort Study [**32**, **33**]<br>Meta Analysis [*34*] | On previous version of list |
| | Thalassemia | Case Series [80]<br>Cross-Sectional Study [81] | On previous version of list |

**Bold** citations indicate the reference is published
*Italicized* citations indicate the reference is not peer reviewed
Non-bold, non-italicized citations indicate the reference is in press

## References:

1. Chen, R., et al., *Risk Factors of Fatal Outcome in Hospitalized Subjects With Coronavirus Disease 2019 from a Nationwide Analysis in China.* CHEST.

2. Williamson, E., et al., *OpenSAFELY: factors associated with COVID-19-related hospital death in the linked electronic health records of 17 million adult NHS patients.* medRxiv, 2020: p. 2020.05.06.20092999.

3. Zheng, Z., et al., *Risk factors of critical & mortal COVID-19 cases: A systematic literature review and meta-analysis.* Journal of Infection, 2020.

7/1/2020

Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 | CDC

Case No. 2:37-cv-00665-GMN-CMB Document 18-28 Filed 08/03/20 Page 206 of 230

4. Yang, J., et al., *Prevalence of comorbidities and its effects in patients infected with SARS-CoV-2: a systematic review and meta-analysis.* International Journal of Infectious Diseases, 2020. **94**: p. 91-95.

5. Guo, T., et al., *Cardiovascular Implications of Fatal Outcomes of Patients With Coronavirus Disease 2019 (COVID-19).* JAMA Cardiology, 2020.

6. Garg, S., et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-NET, 14 States, March 1-30, 2020.* MMWR Morbidity Mortality Weekly Report, 2020. **69**(15): p. 458-464.

7. Richardson, S., et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area.* JAMA, 2020. **323**(20): p. 2052-2059.

8. Akalin, E., et al., *Covid-19 and Kidney Transplantation.* New England Journal of Medicine, 2020.

9. Myers, L.C., et al., *Characteristics of Hospitalized Adults With COVID-19 in an Integrated Health Care System in California.* JAMA, 2020. **323**(21): p. 2195-2198.

10. Gold, J.A.W., et al., *Characteristics and Clinical Outcomes of Adult Patients Hospitalized with COVID-19 – Georgia, March 2020.* MMWR Morbidity Mortality Weekly Report, , 2020. **69**(18): p. 545-550.

11. Hirsch, J.S., et al., *Acute kidney injury in patients hospitalized with COVID-19.* Kidney international, 2020: p. S0085-2538(20)30532-9.

12. Lippi, G. and B.M. Henry, *Chronic obstructive pulmonary disease is associated with severe coronavirus disease 2019 (COVID-19).* Respiratory medicine, 2020. **167**: p. 105941-105941.

13. CDC Covid-19 Response Team, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 – United States, February 12-March 28, 2020.* MMWR Morbidity Mortality Weekly Report, 2020. **69**(13): p. 382-386.

14. Lighter, J., et al., *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission.* Clinical Infectious Diseases, 2020.

15. Hur, K., et al., *Factors Associated With Intubation and Prolonged Intubation in Hospitalized Patients With COVID-19.* Otolaryngology–Head and Neck Surgery. **0**(0): p. 0194599820929640.

16. Simonnet, A., et al., *High Prevalence of Obesity in Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2) Requiring Invasive Mechanical Ventilation.* Obesity (Silver Spring), 2020.

17. Kalligeros, M., et al., *Association of Obesity with Disease Severity Among Patients with Coronavirus Disease 2019.* Obesity, 2020(n/a).

18. Palaiodimos, L., et al., *Severe obesity, increasing age and male sex are independently associated with worse in-hospital outcomes, and higher in-hospital mortality, in a cohort of patients with COVID-19 in the Bronx, New York.* Metabolism, 2020. **108**: p. 154262.

19. Petrilli, C.M., et al., *Factors associated with hospitalization and critical illness among 4,103 patients with COVID-19 disease in New York City.* medRxiv, 2020: p. 2020.04.08.20057794.

20. McCloskey, K.A., et al., *COVID-19 infection and sickle cell disease: a UK centre experience.* British Journal of Haematology.

21. Heilbronner, C., et al., *Patients with sickle cell disease and suspected COVID-19 in a paediatric intensive care unit.* British Journal of Haematology.

22. Nur, E., et al., *Vaso-occlusive crisis and acute chest syndrome in sickle cell disease due to 2019 novel coronavirus disease (COVID-19).* American Journal of Hematology, 2020. **95**(6): p. 725-726.

23. Hussain, F.A., et al., *COVID-19 infection in patients with sickle cell disease.* British Journal of Haematology, 2020. **189**(5): p. 851-852.

24. Panepinto et al., *Cases of COVID-19 among Persons with Sickle Cell Disease in the United States, March 20-May 21, 2020.* Personal Pre-Publication Correspondence with Authors 2020.

25. Ketcham, S.W., et al., *Coronavirus Disease-2019 in Heart Transplant Recipients in Southeastern Michigan: A Case Series.* Journal of Cardiac Failure, 2020.

26. Latif, F., et al., *Characteristics and Outcomes of Recipients of Heart Transplant With Coronavirus Disease 2019.* JAMA Cardiology, 2020.

27. Zhu, L., et al., *Successful recovery of COVID-19 pneumonia in a renal transplant recipient with long-term immunosuppression.* American Journal of Transplantation.

28. Fernández-Ruiz, M., et al., *COVID-19 in solid organ transplant recipients: A single-center case series from Spain.* American Journal of Transplantation.

7/1/2020     Case No. 1:1-cv-01055-CMA-Document-184:28-2-file-d-08/08/20 USDC-Colorado   pg

Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 | CDC

206 of 230

29. Travi, G., et al., *Clinical outcome in solid organ transplant recipients with COVID-19: A single-center experience.* American Journal of Transplantation, 2020.

30. Tschopp, J., et al., *First experience of SARS-CoV-2 infections in solid organ transplant recipients in the Swiss Transplant Cohort Study.* American Journal of Transplantation.

31. Zhu, L., et al., *Association of Blood Glucose Control and Outcomes in Patients with COVID-19 and Pre-existing Type 2 Diabetes.* Cell Metabolism, 2020. **31**(6): p. 1068-1077.e3.

32. Bode, B., et al., *Glycemic Characteristics and Clinical Outcomes of COVID-19 Patients Hospitalized in the United States.* Journal of Diabetes Science and Technology, 2020: p. 1932296820924469.

33. Chen, Y., et al., *Clinical Characteristics and Outcomes of Patients With Diabetes and COVID-19 in Association With Glucose-Lowering Medication.* Diabetes Care, 2020.

34. Fadini, G.P., et al., *Prevalence and impact of diabetes among people infected with SARS-CoV-2.* J Endocrinological Investigations, 2020. **43**(6): p. 867-869.

35. Mahdavinia, M., et al., *Asthma prolongs intubation in COVID-19.* The journal of allergy and clinical immunology. In practice, 2020: p. S2213-2198(20)30476-1.

36. Chao, J.Y., et al., *Clinical Characteristics and Outcomes of Hospitalized and Critically Ill Children and Adolescents with Coronavirus Disease 2019 (COVID-19) at a Tertiary Care Medical Center in New York City.* The Journal of Pediatrics, 2020.

37. DeBiasi, R.L., et al., *Severe COVID-19 in Children and Young Adults in the Washington, DC Metropolitan Region.* The Journal of Pediatrics, 2020.

38. Pranata, R., et al., *Impact of Cerebrovascular and Cardiovascular Diseases on Mortality and Severity of COVID-19 – Systematic Review, Meta-analysis, and Meta-regression.* Journal of stroke and cerebrovascular diseases : the official journal of National Stroke Association, 2020. **29**(8): p. 104949-104949.

39. Wang, B., et al., *Does comorbidity increase the risk of patients with COVID-19: evidence from meta-analysis.* Aging, 2020. **12**(7): p. 6049-6057.

40. Ssentongo, P., et al., *The association of cardiovascular disease and other pre-existing comorbidities with COVID-19 mortality: A systematic review and meta-analysis.* medRxiv, 2020: p. 2020.05.10.20097253.

41. Khan, M., et al., *Effects of underlying morbidities on the occurrence of deaths in COVID-19 patients: A systematic review and meta-analysis.* medRxiv, 2020: p. 2020.05.08.20095968.

42. Martins-Filho, P.R., C.S.S. Tavares, and V.S. Santos, *Factors associated with mortality in patients with COVID-19. A quantitative evidence synthesis of clinical and laboratory data.* European journal of internal medicine, 2020. **76**: p. 97-99.

43. Shi, S., et al., *Association of Cardiac Injury With Mortality in Hospitalized Patients With COVID-19 in Wuhan, China.* JAMA Cardiology, 2020.

44. Wang, L., et al., *Coronavirus disease 2019 in elderly patients: Characteristics and prognostic factors based on 4-week follow-up.* Journal of Infection, 2020. **80**(6): p. 639-645.

45. Killerby ME et al., *Characteristics Associated with Hospitalization Among Patients with COVID-19 — Metropolitan Atlanta, Georgia, March–April 2020.* MMWR Mobidity Mortality Weekly Report, 2020

46. Guan, W.J., et al., *Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis.* European Respiratory Journal, 2020. **55**(5).

47. Kim, L., et al., *Interim Analysis of Risk Factors for Severe Outcomes among a Cohort of Hospitalized Adults Identified through the U.S. Coronavirus Disease 2019 (COVID-19)-Associated Hospitalization Surveillance Network (COVID-NET).* medRxiv, 2020: p. 2020.05.18.20103390.

48. Pranata, R., et al., *Hypertension is associated with increased mortality and severity of disease in COVID-19 pneumonia: A systematic review, meta-analysis and meta-regression.* Journal of the Renin-Angiotensin-Aldosterone System, 2020. **21**(2): p. 1470320320926899.

49. Matsushita, K., et al., *The relationship of COVID-19 severity with cardiovascular disease and its traditional risk factors: A systematic review and meta-analysis.* medRxiv, 2020: p. 2020.04.05.20054155.

50. Yang, Z., et al., *Coronavirus disease 2019 (COVID-19) and pregnancy: a systematic review.* The Journal of Maternal-Fetal & Neonatal Medicine, 2020: p. 1-4.

51. Li, N., et al., *Maternal and neonatal outcomes of pregnant women with COVID-19 pneumonia: a case-control study.* Clinical Infectious Diseases, 2020.

52. Collin, J., et al., *Public Health Agency of Sweden's Brief Report: Pregnant and postpartum women with severe acute respiratory syndrome coronavirus 2 infection in intensive care in Sweden.* 2020. **99**(7): p. 819-822.

53. Yan, J., et al., *Coronavirus disease 2019 in pregnant women: a report based on 116 cases.* American Journal of Obstetrics and Gynecology, 2020.

and Gynecology, 2020.

54. Breslin, N., et al., *Coronavirus disease 2019 infection among asymptomatic and symptomatic pregnant women: two weeks of confirmed presentations to an affiliated pair of New York City hospitals.* American Journal of Obstetrics & Gynecology MFM, 2020. **2**(2, Supplement): p. 100118.

55. Chen, L., et al., *Clinical Characteristics of Pregnant Women with Covid-19 in Wuhan, China.* 2020. **382**(25): p. e100.

56. Pierce-Williams, R.A.M., et al., *Clinical course of severe and critical COVID-19 in hospitalized pregnancies: a US cohort study.* American Journal of Obstetrics & Gynecology MFM, 2020: p. 100134.

57. Savasi, V.M., et al., *Clinical Findings and Disease Severity in Hospitalized Pregnant Women With Coronavirus Disease 2019 (COVID-19).* Obstet Gynecol, 2020.

58. Ellington S, Strid P, Tong VT, et al. *Characteristics of Women of Reproductive Age with Laboratory-Confirmed SARS-CoV-2 Infection by Pregnancy Status — United States, January 22–June 7, 2020.* MMWR Morb Mortal Wkly Rep 2020;69:769–75.

59. Patanavanich, R. and S.A. Glantz, *Smoking Is Associated With COVID-19 Progression: A Meta-analysis.* Nicotine & Tobacco Research, 2020.

60. Guo, F.R., *Active smoking is associated with severity of coronavirus disease 2019 (COVID-19): An update of a meta-analysis.* Tobacco Induced Diseases, 2020. **18**: p. 37.

61. Zhao, Q., et al., *The impact of COPD and smoking history on the severity of COVID-19: A systemic review and meta-analysis.* Journal of Medical Virology, 2020.

62. Lippi, G. and B.M. Henry, *Active smoking is not associated with severity of coronavirus disease 2019 (COVID-19).* European Journal of Internal Medicine, 2020. **75**: p. 107-108.

63. Di Giorgio, A., et al., *Health status of patients with autoimmune liver disease during SARS-CoV-2 outbreak in northern Italy.* Journal of hepatology, 2020: p. S0168-8278(20)30300-7.

64. Marlais, M., et al., *The severity of COVID-19 in children on immunosuppressive medication.* The Lancet. Child & adolescent health, 2020: p. 10.1016/S2352-4642(20)30145-0.

65. Montero-Escribano, P., et al., *Anti-CD20 and COVID-19 in multiple sclerosis and related disorders: A case series of 60 patients from Madrid, Spain.* Multiple sclerosis and related disorders, 2020. **42**: p. 102185-102185.

66. Brenner, E.J., et al., *Corticosteroids, but not TNF Antagonists, are Associated with Adverse COVID-19 Outcomes in Patients With Inflammatory Bowel Diseases: Results from an International Registry.* Gastroenterology, 2020: p. 10.1053/j.gastro.2020.05.032.

67. Michelena, X., et al., *Incidence of COVID-19 in a cohort of adult and paediatric patients with rheumatic diseases treated with targeted biologic and synthetic disease-modifying anti-rheumatic drugs.* Seminars in arthritis and rheumatism, 2020. **50**(4): p. 564-570.

68. Ljungman, P., et al., *The challenge of COVID-19 and hematopoietic cell transplantation; EBMT recommendations for management of hematopoietic cell transplant recipients, their donors, and patients undergoing CAR T-cell therapy.* Bone Marrow Transplantation, 2020.

69. Härter, G., et al., *COVID-19 in people living with human immunodeficiency virus: a case series of 33 patients.* Infection, 2020: p. 1-6.

70. Altuntas Aydin, O., H. Kumbasar Karaosmanoglu, and K. Kart Yasar, *HIV/SARS-CoV-2 coinfected patients in Istanbul, Turkey.* Journal of Medical Virology, 2020.

71. Soresina, A., et al., *Two X-linked agammaglobulinemia patients develop pneumonia as COVID-19 manifestation but recover.* Pediatric Allergy and Immunology, 2020.

72. Gao, Y., et al., *Impacts of immunosuppression and immunodeficiency on COVID-19: A systematic review and meta-analysis.* The Journal of infection, 2020: p. S0163-4453(20)30294-2.

73. Parri, N., M. Lenge, and D. Buonsenso, *Children with Covid-19 in Pediatric Emergency Departments in Italy.* New England Journal of Medicine, 2020.

74. Shekerdemian, L.S., et al., *Characteristics and Outcomes of Children With Coronavirus Disease 2019 (COVID-19) Infection Admitted to US and Canadian Pediatric Intensive Care Units.* JAMA Pediatrics, 2020.

75. Cosgriff, R., et al., *A multinational report to characterise SARS-CoV-2 infection in people with cystic fibrosis.* Journal of Cystic Fibrosis, 2020.

76. Mantovani, A., G. Beatrice, and A. Dalbeni, *Coronavirus disease 2019 and prevalence of chronic liver disease: A meta-analysis.* 2020. **40**(6): p. 1316-1320.

77. Moon, A.M., et al., *High Mortality Rates for SARS-CoV-2 Infection in Patients with Pre-existing Chronic Liver Disease and Cirrhosis: Preliminary Results from an International Registry.* Journal of Hepatology, 2020.

78. Ji, D., et al., *Non-alcoholic fatty liver diseases in patients with COVID-19: A retrospective study.* J Hepatol, 2020.

7/1/2020    Case No... ACM Document 38-28 filed 08/08/20 USDC Colorado    pg
Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 | CDC
208 of 230

79. Garrido, I., R. Liberal, and G. Macedo, *Review article: COVID-19 and liver disease—what we know on 1st May 2020.* Alimentary Pharmacology & Therapeutics, 2020.

80. Motta, I., et al., *SARS-CoV-2 infection in beta thalassemia: Preliminary data from the Italian experience.* American Journal of Hematology, 2020.

81. Karimi, M., et al., *Prevalence and Mortality due to Outbreak of Novel Coronavirus Disease (COVID-19) in β-Thalassemias: The Nationwide Iranian Experience.*

Page last reviewed: June 25, 2020

## COVID-2019 Menu

 Coronavirus Home

 Your Health

 Community, Work & School

 Healthcare Workers

 Laboratories

 Health Departments

 Cases, Data & Surveillance

 More Resources

EXHIBIT C

Site Map    FOIA

Search bop.gov

| Home | About Us | Inmates | Locations | Careers | Business | Resources | Contact Us |

# BOP Implementing Modified Operations

In order to mitigate the spread of COVID-19, the BOP is operating under the following conditions:

---

**SOCIAL VISITS:** Social visits are suspended. Inmate telephone system minutes will be increased to 500 minutes per calendar month Bureau-wide.

**INMATE MOVEMENT (Updated):** As we previously described generally, inmate internal movement is suspended with limited exceptions. This suspension, however, does not mean the BOP has ceased all inmate movements because the federal judicial system as well as state courts continue to process criminal cases.

These movement exceptions may include, but are not limited to, transfers related to forensic studies, writs, Interstate Agreements on Detainers (IAD), medical or mental health treatment (including local medical trips), and RRC placements. **The BOP also needs to move inmates to better manage the detention bedspace as well as assure that administrative facilities do not become overcrowded beyond available resources.**

The BOP and the USMS are coordinating carefully to transport and transfer federal inmates into the Bureau's custody while taking proactive steps, including aggressive testing, to mitigate the transmission of COVID-19 into the federal prison environment. The Bureau is processing all newly-sentenced BOP inmates through one of three quarantine sites - - FCC Yazoo City, MS; FCC Victorville, CA; and FTC Oklahoma City, OK, or to a BOP detention center/jail unit. The BOP will test all inmates upon arrival at a BOP detention center/jail unit or at one of the three quarantine sites. All inmates will be tested again before movement to their designated BOP facility.

- Inmates being released to community custody are quarantined for 14 days prior to release. After that period: If the inmate has no symptoms and a temperature less than 100.4 degrees F, the inmate will be transferred;
- If the inmate has COVID-19 symptoms, or temperature greater than 100.4 degrees F, they will not be transferred and will instead be immediately placed in isolation.

**LEGAL VISITS:** Legal visits will be suspended for 30 days, at which time the suspension will be re-evaluated. Case-by-case approval at the local level and confidential legal calls will be allowed in order to ensure access to counsel. If approved for an in-person visit, the attorney will need to undergo screening using the same procedures as staff.

***Access to legal counsel remains a paramount requirement and will be accommodated to the maximum extent practicable.*** *Although legal visits are generally suspended for 30-days, case-by-case accommodation will be made at the local level. If approved for an in-person visit, the attorney will need to undergo advanced health screening, to include a temperature check.*

**OFFICIAL STAFF TRAVEL:** Official staff travel, with the exception of relocation travel, is suspended.

**TRAINING:** All staff training is suspended (to include conferences and meetings), with the exception of basic training for new staff.

**CONTRACTORS:** Contractors performing essential services or necessary maintenance on essential systems will undergo advanced health screening, to include a temperature check. All other contractor access is suspended. Contractors who require access will be screened using the same procedures as staff prior to entry.

Essential services include, for example, medical services, mental health services, religious services and critical infrastructure repairs.

A copy of the Visitor/Volunteer/Contractor COVID-19 Screening Tool will be required for all vistors, volunteers, and contractors. A copy will be provided by staff members at the lobby for all institutions.

**VOLUNTEERS:** Volunteer visits are suspended, unless approved by the Deputy Director of the BOP. Alternate means of communication will be considered for inmates who request to speak with a religious advisor. Volunteers who are approved for access will be screened using the same procedures as staff prior to entry.

A copy of the Visitor/Volunteer/Contractor COVID-19 Screening Tool will be required for all vistors, volunteers, and contractors. A copy will be provided by staff members at the lobby for all institutions.

**SCREENING OF STAFF:** Enhanced health screening of staff is being performed at all BOP locations. Such screening includes self-reporting and temperature checks.

**SCREENING OF INMATES:** The BOP will continue to screen inmates for COVID-19 following previously-indicated practices:

- All newly-arriving BOP inmates are processed through quarantine or jail/detention sites and screened for COVID-19 exposure risk factors and symptoms.
- Asymptomatic inmates with exposure risk factors are quarantined.
- Symptomatic inmates with exposure risk factors will be isolated and tested for COVID-19 per local health authority protocols.

**TOURS:** Tours are suspended. Any exceptions must be approved by the Deputy Director. If approved, participants will be screened using the same procedures as staff prior to entry.

**MODIFIED OPERATIONS:** BOP is implementing modified operations to maximize social distancing in our facilities, as much as practicable. To that end, inmates are limited in their movements to prevent congregate gathering and maximize social distancing. Essential inmate work details, such as Food Service, continue to operate with appropriate screening. Inmate movement in small numbers is authorized for the following purposes:

A. Commissary

B. Laundry

C. Showers three times each week

D. Telephone, to include legal calls, and access to TRULINCs

Note that inmate movement is still expected to allow, when necessary, for the provision of required mental health or medical care, including continued Sick Call. Select Unicor operations also continue.

**PRIVATE DETENTION CONTRACTORS:** This COVID-19 guidance is being shared with private prisons and RRCs for dissemination to staff and inmates in these facilities, so that similar protocols can be implemented.

< BOP's COVID-19 Main Page



Federal Bureau of Prisons    1930 · 2020    Protecting Society. Changing Lives.

| About Us | Inmates | Locations | Careers | Business | Resources | Resources For ... |
|---|---|---|---|---|---|---|
| About Our Agency | Find an Inmate | List of our Facilities | Life at the BOP | Acquisitions | Policy & Forms | Victims & Witnesses |
| About Our Facilities | First Step Act | Map of our Locations | Explore Opportunities | Solicitations & Awards | News Stories | Employees |
| Historical Information | Communications | Search for a Facility | Current Openings | Reentry Contracting | Press Releases | Federal Executions |
| Statistics | Custody & Care | | Application Process | | Publications | Former Inmates |
| | Visiting | | Our Hiring Process | | Research & Reports | Media Reps |
| | Voice a Concern | | | | | |

EXHIBIT D



## COVID-19 Pandemic Planning Scenarios

CDC and the Office of the Assistant Secretary for Preparedness and Response (ASPR) have developed five COVID-19 Pandemic Planning Scenarios that are designed to help inform decisions by modelers and public health officials who utilize mathematical modeling. The planning scenarios are being used by mathematical modelers throughout the Federal government.  Models developed using the data provided in the planning scenarios can help evaluate the potential effects of different community mitigation strategies (e.g., social distancing).  The planning scenarios may also be useful to hospital administrators in assessing resource needs and can be used in conjunction with the COVID-19 Surge Tool.

Each scenario is based on a set of numerical values for biological and epidemiological characteristics of COVID-19. These values—called *parameter values*—can be used to estimate the possible effects of COVID-19 in U.S. states and localities. The parameter values in each scenario will be updated and augmented over time, as we learn more about the epidemiology of COVID-19.

New data on COVID-19 is available daily; information about its biological and epidemiological characteristics remain limited, and uncertainty remains around nearly all parameter values.

The parameters in the scenarios:
- Are estimates intended to support public health preparedness and planning**.**
- Are **not** predictions of the expected effects of COVID-19.
- Do not reflect the impact of any behavioral changes, social distancing, or other interventions.

### The Five Scenarios

The five COVID-19 Pandemic Planning Scenarios (Box 1) represent a range of possible parameters for COVID-19 in the United States. All parameter values are based on current COVID-19 surveillance data and scientific knowledge.
- Scenarios 1 through 4 are based on parameter values that represent the lower and upper bounds of disease severity and viral transmissibility (moderate to very high).  The parameter values used in these scenarios are likely to change as we obtain additional data about the upper and lower bounds of disease severity and the transmissibility of SARS-CoV-2, the virus that causes COVID-19.
- Scenario 5 represents a current best estimate about viral transmission and disease severity in the United States, with the same caveat: that the parameter values will change as more data become available.

Parameter values that vary among the Pandemic Planning Scenarios are listed in Table 1, while parameter values common to all five scenarios are listed in Table 2.  Definitions of the parameters are provided below, and the source of each parameter value is indicated in the Tables.

### The Parameter Values:  Definitions

Parameter values that vary across the five COVID-19 Pandemic Planning Scenarios (Table 1) include measures of viral transmissibility, disease severity, and pre-symptomatic and asymptomatic disease transmission. Where sufficient data are available, age-stratified estimates are provided.

**Viral Transmissibility**

- **Basic reproduction number (R$_0$):**  The average number of people that one person with COVID-19 is likely to infect in a population without any immunity (from previous infection) or any interventions.  R$_0$ is an estimate of how transmissible a pathogen is in a population.

**Disease Severity**
- **Symptomatic Case Fatality Ratio:**  The number of symptomatic individuals who **die** of the disease among all individuals experiencing symptoms from the infection. This parameter is not necessarily equivalent to the number of reported deaths per reported cases, because many cases and deaths are never confirmed to be COVID-19, and there is a lag in time between when people are infected and when they die. This parameter reflects the existing standard of care and may be affected by the introduction of new therapeutics.
- **Symptomatic Case Hospitalization Ratio:**  The number of symptomatic individuals who **are hospitalized** from the disease among all individuals experiencing symptoms from the infection. This parameter is not necessarily equivalent to the number of reported hospitalizations per reported cases, because many cases and deaths are never confirmed to be COVID-19, and there is a lag in time between when people are infected and when they die. This parameter reflects the existing standard of care and may be affected by the introduction of new therapeutics.

**Pre-symptomatic and Asymptomatic Contribution to Disease Transmission**

A **pre-symptomatic case** of COVID-19 is an individual infected with SARS-CoV-2 who has not exhibited symptoms at the time of testing, but who later exhibits symptoms during the course of the infection.  An **asymptomatic case** is an individual infected with SARS-CoV-2 who does not exhibit symptoms during the course of infection.  Parameter values that measure the pre-symptomatic and asymptomatic contribution to disease transmission include:
- **Percentage of infections that are asymptomatic:**  The percentage of persons who are infected with SARS-CoV-2 but never show symptoms of disease. Asymptomatic cases are challenging to identify because individuals do not know they are infected unless they are tested, typically as a part of a scientific study.
- **Infectiousness of asymptomatic individuals relative to symptomatic individuals:**  The contribution to transmission of SARS-CoV-2 from asymptomatic individuals compared to the contribution to transmission of SARS-CoV-2 from symptomatic individuals.  A parameter value of 50% means that an asymptomatic individual is half as infectious as a symptomatic individual, while a parameter value of 100% means that an asymptomatic individual is just as likely to transmit infection as a symptomatic individual. This parameter is especially challenging to estimate because studies that repeatedly test asymptomatic individuals over time are limited.

Parameter values that do not vary across the five Pandemic Planning Scenarios (Table 2) include:
- **Level of pre-existing immunity to COVID-19 in the community:** The percentage of the U.S. population that had existing immunity to COVID-19 prior to the start of the pandemic beginning in 2019.
- **Percentage of transmission occurring prior to symptom onset:** The percentage of new cases of COVID-19 due to transmission from a person with COVID-19 who transmits infection to others before exhibiting symptoms.
- **Time from exposure to symptom onset:** The number of days between the time when a person has contact with an infected person that results in COVID-19 infection and the first appearance of symptoms.

2

212

- **Time between symptom onset in an individual and symptom onset of a second person infected by that individual:** The number of days between the time when a person becomes symptomatic and when the person who they infect becomes symptomatic.

Additional parameter values common to the five COVID-19 Pandemic Planning Scenarios include these seven measures of healthcare usage:
- **Mean number of days from symptom onset to seeking outpatient care**
- **Mean number of days from symptom onset to hospitalization**
- **Mean number of days of hospitalization**
- **Percentage of patients admitted to the ICU among those hospitalized**
- **Percentage of patients on mechanical ventilation among admitted to the ICU**
- **Mean number of days on mechanical ventilation**
- **Median number of days from symptom onset to death**

These healthcare-related parameters (Table 2) are included to assist assessment of resource needs as the pandemic progresses.

**************************

---

**Box 1 Description of the Five COVID-19 Pandemic Planning Scenarios**

For each Pandemic Planning Scenario:
- Parameters values for **viral transmissibility** include the Basic Reproduction Number ($R_0$)
- Parameters values for **disease severity** include Symptomatic Case Fatality Ratio and Symptomatic Case Hospitalization Ratio
- Parameter values for the **pre-symptomatic and asymptomatic contribution** to disease transmission include:
  - Percentage of transmission occurring prior to symptom onset (from pre-symptomatic individuals)
  - Percentage of infections that are asymptomatic
  - Infectiousness of asymptomatic individuals relative to symptomatic individuals

For Pandemic Scenarios 1-4:
- These Scenarios are based on parameter values that represent the lower and upper bounds of disease severity and viral transmissibility (moderate to very high). The parameter values used in these Scenarios are likely to change as we obtain additional data about the upper and lower bounds of disease severity and viral transmissibility of COVID-19.

For Pandemic Scenario 5:
- This Scenario represents a current best estimate about viral transmission and disease severity in the United States, with the same caveat: that the parameter values will change as more data become available.

---

**Scenario 1:**
- Lower-bound values for virus transmissibility and disease severity
- Lower percentage of transmission prior to onset of symptoms
- Lower percentage of infections that never have symptoms and lower contribution of those cases to transmission

---

3

**Scenario 2:**
- Lower-bound values for virus transmissibility and disease severity
- Higher percentage of transmission prior to onset of symptoms
- Higher percentage of infections that never have symptoms and higher contribution of those cases to transmission

**Scenario 3:**
- Upper-bound values for virus transmissibility and disease severity
- Lower percentage of transmission prior to onset of symptoms
- Lower percentage of infections that never have symptoms and lower contribution of those cases to transmission

**Scenario 4:**
- Upper-bound values for virus transmissibility and disease severity
- Higher percentage of transmission prior to onset of symptoms
- Higher percentage of infections that never have symptoms and higher contribution of those cases to transmission

**Scenario 5:**
- Parameter values for disease severity, viral transmissibility, and pre-symptomatic and asymptomatic disease transmission that represent the best estimate, based on the latest surveillance data and scientific knowledge.  Parameter values are based on data received by CDC prior to 4/29/2020.

**Table 1. Parameter Values that vary among the five COVID-19 Pandemic Planning Scenarios.** The scenarios are intended to advance public health preparedness and planning.  They are not predictions or estimates of the expected impact of COVID-19.  The parameter values in each scenario will be updated and augmented over time, as we learn more about the epidemiology of COVID-19.  Additional parameter values might be added in the future (e.g., population density, household transmission, and/or race and ethnicity).

Parameter values are based on data received by CDC prior to 4/29/2020

| Parameter | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 | Scenario 5: Current Best Estimate |
|---|---|---|---|---|---|
| $R_0$ Source: Preliminary COVID-19 estimates, ASPR and CDC | 2 | 2 | 3 | 3 | 2.5 |
| **Symptomatic Case Fatality Ratio, stratified by age** Source: Preliminary COVID-19 estimates, CDC | 0-49 years: 0.0002 50-64 years: 0.001 65+ years: 0.006 Overall: 0.002 | 0-49 years: 0.0002 50-64 years: 0.001 65+ years: 0.006 Overall: 0.002 | 0-49 years: 0.001 50-64 years: 0.006 65+ years: 0.032 Overall: 0.010 | 0-49 years: 0.001 50-64 years: 0.006 65+ years: 0.032 Overall: 0.010 | 0-49 years: 0.0005 50-64 years: 0.002 65+ years: 0.013 Overall: 0.004 |

4

| Symptomatic Case Hospitalization Ratio, stratified by age Source: Preliminary COVID-19 estimates, CDC | 0–49 years: 0.013 50–64 years: 0.036 65+ years: 0.052 Overall: 0.028 | 0–49 years: 0.013 50–64 years: 0.036 65+ years: 0.052 Overall: 0.028 | 0–49 years: 0.026 50–64 years: 0.057 65+ years: 0.10 Overall: 0.041 | 0–49 years: 0.026 50–64 years: 0.057 65+ years: 0.10 Overall: 0.041 | 0–49 years: 0.017 50–64 years: 0.045 65+ years: 0.074 Overall: 0.034 |
|---|---|---|---|---|---|
| Percent of infections that are asymptomatic Source: Preliminary COVID-19 estimates, ASPR and CDC | 20% | 50% | 20% | 50% | 35% |
| Infectiousness of asymptomatic individuals relative to symptomatic individuals Source: Assumption, ASPR and CDC | 50% | 100% | 50% | 100% | 100% |

**Table 2.  Parameter Values Common to the Five COVID-19 Pandemic Planning Scenarios**. The parameter values are likely to change as we obtain additional data about disease severity and viral transmissibility of COVID-19.

Parameter values are based on data received by CDC prior to 4/29/2020

| Pre-existing immunity Source: Assumption, ASPR and CDC | No pre-existing immunity before the pandemic began in 2019. It is assumed that all members of the U.S. population were susceptible to infection prior to the pandemic. |
|---|---|
| **Percentage of transmission occurring prior to symptom onset:** Source: Preliminary COVID-19 estimates, ASPR and CDC | 40% |
| **Time from exposure to symptom onset** Source: Pre-publication COVID-19 estimates* | ~6 days (mean) |
| **Time between symptom onset in an individual and symptom onset of a second person infected by that individual** Source: Pre-publication COVID-19 estimates | ~6 days (mean) |
| **Parameter Values Related to Healthcare Usage** | |

5

| | |
|---|---|
| **Time to seek care (outpatient)** Source: Survey of persons with Influenza like illness (ILI), CDC[†] | ≤2 days: 35% 3–7 days: 50% ≥8 days: 25% |
| **Mean number of days from symptom onset to hospitalization (standard deviation)** Source: Preliminary COVID-19 estimates, CDC[§] | 0-49 years: 6.9 (5.0) days 50-64 years: 7.2 (5.3) days ≥65 years: 6.2 (5.7) days |
| **Mean number of days of hospitalization among those not admitted to ICU (standard deviation)** [¶] Source: Preliminary COVID-19 estimates, CDC | 0-49 years: 3.9 (3.7) days 50-64 years: 4.9 (4.3) days ≥65 years: 6.3 (5.1) days |
| **Mean number of days of hospitalization among those admitted to ICU (standard deviation)** [¶] Source: Preliminary COVID-19 estimates, CDC | 0-49 years: 9.5 (7.2) days 50-64 years: 10.5 (7.0) days ≥65 years: 10.0 (6.8) days |
| **Percent admitted to ICU among those hospitalized** Source: Preliminary COVID-19 estimates, CDC | 0-49 years: 21.9% 50-64 years: 29.2% ≥65 years: 26.8% |
| **Percent on mechanical ventilation among those in ICU** Source: Preliminary COVID-19 estimates, CDC | 0-49 years: 72.1% 50-64 years: 77.6% ≥65 years: 75.5% |
| **Mean number of days of mechanical ventilation (standard deviation)** Source: Preliminary COVID-19 estimates, CDC | Overall: 5.5 (5.3) days |
| **Mean number of days from symptom onset to death (standard deviation)** Source: Preliminary COVID-19 estimates, CDC[§] | 0-49 years: 14.9 (7.7) days 50-64 years: 15.3 (8.1) days ≥65 years: 12.9 (7.6) days |
| **Mean number of days from death to reporting (standard deviation)** Source: Preliminary COVID-19 estimates, CDC[**] | 0-49 years: 7.1 (7.7) days 50-64 years: 7.2 (7.7) days ≥65 years: 6.6 (7.3) days |

*Khalili, M., Karamouzian, M., Nasiri, N., Javadi, S., Mirzazadeh, A., & Sharifi, H. (2020). Epidemiological Characteristics of COVID-19: A Systemic Review and Meta-Analysis. *medRxiv*.

6

† Biggerstaff, M., Jhung, M. A., Reed, C., Fry, A. M., Balluz, L., & Finelli, L. (2014). Influenza-like illness, the time to seek healthcare, and influenza antiviral receipt during the 2010–2011 influenza season—United States. *The Journal of infectious diseases*, *210*(4), 535-544.

§ Estimates only include onset dates between March 1, 2020 – March 31, 2020 to ensure cases have had sufficient time to observe the outcome (hospital admission or death).

¶ Estimates only include hospital admission dates between March 1, 2020 – March 31, 2020 to ensure cases have had sufficient time to observe the outcome (hospital discharge or death).

** Estimates only include death dates between March 1, 2020 – March 31, 2020 to ensure sufficient time for reporting





7

EXHIBIT E

# AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
## COUNCIL OF PRISON LOCALS - 33
## FMC CARSWELL LOCAL 1006
### Regina Warren, President



Date: April 7, 2020

The Honorable John Cornyn

Senior Unit States Senator of Texas

5001 Spring Valley Road

Suite 1125 East

Dallas TX. 75244

Dear Senator Cornyn,

A.F.G.E. Local 1006, is the sole and exclusive representative of the bargaining unit staff at FMC Carswell, in accordance with the Master Agreement Article 6 **Section o.** Any employee covered by this Agreement may, without fear of penalty or reprisal, exercise their rights under the Whistleblower Protection Act, which includes the right to disclose gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. This act is codified in 5 USC, Section 1213. As the President of Local 1006, I am exercising this right.

Now that FMC Carswell has had its first positive case of COVID19 there is a growing concern amongst staff in regard to health and safety amongst staff, the public, as well as the inmates. According to the Master Agreement Article 27 Health and Safety Section **a.** There are essentially two (2) distinct areas of concern

1

regarding the safety and health of employees in the Federal Bureau of Prisons:
1. The first, which affects the safety and well-being of employees, involves the inherent hazards of a correctional environment; and
2. The second, which affects the safety and health of employees, involves the inherent hazards associated with the normal industrial operations found throughout the Federal Bureau of Prisons.
With respect to the first, the Employer agrees to lower those inherent hazards to the lowest possible level, without relinquishing its rights under 5 USC 7106. The Union recognizes that by the very nature of the duties associated with supervising and controlling inmates, these hazards can never be completely eliminated.
With respect to the second, the Employer agrees to furnish to employees places and conditions of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical harm, in accordance with all applicable federal laws, standards, codes, regulations, and executive orders

On March 31, 2020, the Bureau of Prison issued a public statement informing the public the following "for a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior." On the same day, a Memorandum for all CEO was sent from the Correctional Programs Division and Health Services Vision out of Central office directing the CEO's the following: "Effective Wednesday, April 1, 2020, the Bureau will enact a fourteen-day (140 nationwide actions to minimize movement to decrease the spread of the virus". The Agency issued a nationwide (public statement) meant to assure the public that the agency was taking every necessary precaution to protect the staff, inmates, and public from the further spreading of the global pandemic.

The Union believes the Agency was providing a false perception to the American people by stating all institutions will lockdown while sending internal memorandum suggesting CEO's enact minimize movement.

The agency knowing misleads the American public particularly at FMC Carswell.

All Warden's has the vicarious responsibility to carry out the Bureau of Prisons' mission and provide public safety. According to the CDC individuals with underlying health issues are highly susceptible to contracting this virus. With FMC Carswell being the only female medical facility this institution would experience a catastrophic catastrophe by not taking extraordinary measures in this extraordinary situation.

[ 2 ]

There has not been any guidance given to all staff as far as processes and procedures in maintaining health and safety. The last guidance given to all staff within the institution was on April 1, 2020, with an attached modified operation schedule. Because we work in a line of work of confine space and close quarters there is no such thing of social distancing which makes it imperative to communicate with all staff in what PPE is available, the process of getting them, and when/how to use them. In correctional facility we are subject to work in various units at various times each area has had different procedures that have caused staff and inmates to be at risk.

As of now, FMC Carswell has not issued a complete lockdown we are still operating on a modified operation. In "THE CReW" weekly updates the Warden informed staff of the changes that have been implemented thus far. The Executive Assistant D. Lux, Camp administrator stated the Camp inmates will be restricted to their rooms the majority of the day. Inmates were still allowed to move around the compound for various reasons to include pill line, commissary, TV rooms, and food service. After Phase V was enacted Camp inmates were seen playing volleyball on the compound as well as congregating in small confine TV rooms.
Also, the Newsletter indicated Foodservice will do a partial satellite feeding system. Meaning some of the inmates will be fed on the unit while others would be allowed to do grab and go feeding. Grab and go feeding consist of calling each unit one at of time to go to the foodservice area to pick up their food.

Saturday, April 4, 2020, we received the results of our first positive case. The Agency was aware of this inmate being a suspected symptomatic case on Saturday, March 28th when she went out to the local hospital. She was sent back to the institution to be placed in isolation. The inmate symptoms progress which caused her to go back to the hospital for admission on Tuesday, March 31st. Wednesday staff who had direct contact with this inmate began having concerns and started emailing and calling the Agency on guidance regarding the suspected symptomatic case who has now been admitted to the hospital. The response the Agency was given to the staff was to continue to come to work because she has not tested positive as of yet. There were a total number of 6 officers and 1 Nurse who treated this inmate during that time and they continued to come to work daily until the inmate test result came back positive on April 4th. Since then all staff mentioned has been sent home to self-quarantine with the exception of the nurse. According to the CDC guidelines, those staff should have self-quarantine at the time they were exposed the first time with the symptomatic inmate.

As of today, Carswell has isolated 7 inmates, 3 of the inmates worked on a sanitarian detail which allowed them excess to numerous areas throughout the

institution to clean. The sanitarian workers lived in a unit that houses over 300 inmates. Because of the potential exposure that unit is the only unit that has been completely locked down.

In closing, the fact that a lockdown has not accrued and as a result seven inmates have been placed in isolation awaiting test results due to symptoms after phase V was enacted. The agencies cavalier approach led to these presumptive cases by refusing to practice social distancing as recommended by the CDC.

Sadly, FMC Carswell knowingly and willingly misled the public placing the staff, inmates, and community at risk to the most lethal pandemic since 1920.

As the representative of more than 400 correctional workers, we are requesting your assistance in this matter.

Regina Warren, President AFGE Local 1006

4

EXHIBIT F

# James Robert Barash
## Receiver for HomeSource Partners, Inc.

403 South Tejon Street          Telephone (719) 578-1335
Colorado Springs, CO 80903

June 30, 2020

Mr. Nathan Chambers, Esq.
303 16th Street, Suite 200
Denver, CO 80202

**KAREN McCLAFLIN**

Good afternoon Mr. Chambers;

     I am following up on Friday's telephone conversation in my capacity as Court Appointed Receiver for Karen McClaflin, HomeSource Partners, Inc., and various related entities.

     My appointment in this case was the result of a unique series of events. Typically, a Receiver is sought by a Bank or group of creditors. In this case, it was Karen McClaflin herself who sought appointment of a Receiver explaining that she knew she did wrong and wanted to do everything in her power to recover as much as possible for the victims. This was strange as it is virtually never the "crook" seeking appointment of a Receiver.

     Before I accepted the appointment, I insisted on meeting with Karen to make clear to her that my role was to maximize the return to the creditors and protect the estate. I told Karen, that if she was truthful and helped me in obtaining funds for the victims, that I would make her assistance known to the Court; and conversely that if she told me one lie, that too would be made known to the Court, and she would regret having me appointed as the Receiver. Karen understood and assured me that she would only tell me the truth. She kept her word.

     Over the year plus that Karen worked with me, my accountant, the IRS accountant, and the FBI and SEC investigators, she never lied or shaded the truth. The information she gave us always checked out 100%, and much of the information was very damning of Karen. I was surprised at how forthright she was.

     The victims in the Ponzi scheme were provided with Deeds of Trust, and were told that they were in "first" positions on identified properties. Unbeknownst to the victims most of the Deeds of Trust were either recorded in second or third, etc. positions, or were unrecorded altogether. For the most part the victims were relatively unsophisticated, and none of them had obtained title insurance.

A local Bank managed dozens of self-directed IRA's that had invested in HomeSource. (It hadn't gotten title insurance either). The Bank, was first to recognize the scam before the other victims realized what was happening. The Bank confronted Karen secured its claims with new loan agreements, security documents, and additional deeds of trust on Karen's marital properties, cross collateralizing everything in one package. The Bank attempted to improve it's position ahead of the other victims.

Had Receiver not successfully challenged the Bank's preferential transfers, the Bank, and another hard money lender would have gotten all the fictional interest promised by HomeSource in addition to attorney's fees and costs in the foreclosures, consuming the entire corpus of the estate.

Karen's application for appointment of a Receiver was strenuously resisted by the Bank which had begun foreclosure proceedings prior to the Motion to Appoint a Receiver. Receiver's first action was a motion to stay the Bank's foreclosure proceedings. Ultimately, after more than a year of intense litigation, the Bank settled with Receiver and gave up it's fictional interest, attorneys fees, foreclosure fees, etc. that it had attempted to secure with it's "preferential" paperwork.

Karen traced transactions spanning a decade through countless banker boxes of records, years of bank statements from different entities, hundreds of real estate closing statements, some of which were correct, and others fictional, etc. She worked with Receiver's accountant, the IRS accountant, and representatives of the FBI and SEC. Without Karen's help we would not have been able to defeat the Banks foreclosure actions, nor would we have recovered any money for the unsecured victims.

To date Receiver has recovered **$9,234,320 for the estate**. It has distributed **$5,042,085 to 34 Secured claimants**; and an additional **$1,682,929 to 78 Unsecured claimants**. This represents 100% return of principal to Secured claimants and thus far 17% of principal to the Unsecured claimants.

Receiver expects to recover additional funds which should materially increase the Unsecured payout. A primary source of those funds is expected from Karen's interest in her marital properties. Karen and James Strange's marriage is dissolved, but the Court has not yet ruled on the property division between them. Karen's share of the marital properties belongs to the Receivership.

Receiver believes that he has reached a satisfactory agreement in principal with Mr. Strange as to which properties will come to the Receivership, subject to the Agreement being written up, signed and approved by the Court. Receiver believes that should happen in the next month or so, and then Receiver will have five more properties to sell.

In addition to her help on the financial tracing and history, Karen is very experienced in marketing real estate in this market. Receiver believes that if Karen is

granted a compassionate release she will continue to help Receiver in maximizing the return on the remaining properties. One, of these properties is a large, undeveloped single-family site, adjacent to a developed area of high-end homes. Karen and her ex-husband, who is an architect, have worked on prospective home designs that could be constructed on this site, and have also explored how to get utilities to this site which is not served by any municipal water and sewer provider.

Karen McClaflin knows more about the properties than Receiver does, and her local knowledge can be very helpful in marketing the properties. She is also acquainted with the tenants, who we may be able to sell to and Karen can also assist fix up and possibly sitting in properties for open houses, etc.

I would welcome Karen's assistance with this final phase of wrapping up the receivership. Upon completion, I expect a further distribution to the unsecured's. This is extremely heartwarming to me, as so many of them believed that they had lost everything.

After the initial distributions, I received many calls from victims profusely thanking me for my teams efforts and expressing their gratitude. I hope that the Court recognizes the additional incremental value that Karen's efforts have brought to recoveries thus far and that she is able to help in this final phase. I'm certain that we will recover more with Karen's help than without it.

Let me know if there is anything further I can help you with on this matter.

Very truly yours,

James Robert Barash
Receiver for HomeSource Partners, Inc

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 1:17-cr-00168-CMA

UNITED STATES OF AMERICA,

     Plaintiff,

v.

KAREN LYNN MCCLAFLIN,

     Defendant.

---

## ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

---

This matter is before the Court on Defendant Karen McClaflin's Motion for Compassionate Release. (Doc. # 117.) The Probation Office and the Government filed Responses (Doc. ## 121, 122) to the Motion on June 15, 2020, and Ms. McClaflin filed a Reply (Doc. # 128) on July 3, 2020. For the following reasons, the Court denies the Motion.

## I.     BACKGROUND

On June 21, 2017, Ms. McClaflin pled guilty to two counts stemming from her operation of a residential Ponzi scheme which defrauded investors of more than $14.5 million. At sentencing, this Court calculated the advisory sentencing guidelines at 135 to 168 months' imprisonment, applied a 6-level enhancement for substantial financial hardship to more than twenty-five victims, and ultimately determined that a downward variant sentence of 96 months was appropriate.

Notably, Ms. McClaflin has served only 13 months—or 14%—of her sentence. *See* (Doc. # 111) (Ms. McClaflin was required to report to FMC Carswell on June 11, 2019). Her current projected release date is April 3, 2026. (Doc. # 121 at 1.) In the instant Motion, Ms. McClaflin asserts that her underlying medical conditions and her risk of contracting the COVID-19 virus warrant her release from prison pursuant to 18 U.S.C. § 3582(c)(1)(A).

## II. **LEGAL STANDARD**

18 U.S.C. § 3582(c)(1)(A) allows a court to reduce a defendant's sentence where "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). In doing so, the Court must also consider "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." *Id.* § 3582(c)(1)(A). "Application of the § 3553(a) factors requires an assessment of whether the relevant factors 'outweigh the "extraordinary and compelling reasons" warranting compassionate release . . . [and] whether compassionate release would undermine the goals of the original sentence.'" *United States v. Batista*, No. 19 Cr. 2 (JFK), 2020 WL 3249233, at *2 (S.D.N.Y. June 16, 2020) (quoting *United States v. Daugerdas*, No. 09 Cr. 581 (WHP), 2020 WL 2097653, at *4 (S.D.N.Y. May 1, 2020)).

The relevant policy statement issued by the U.S. Sentencing Commission pertaining to compassionate release is found in § 1B1.13 of the Sentencing Guidelines. Application Note 1 to § 1B1.13 describes four potentially extraordinary and compelling reasons for compassionate release: (1) the defendant has a terminal medical condition

or a serious health condition that substantially diminishes his ability to provide self-care; (2) the defendant is at least 65 years old and has served 75% of his sentence; (3) family circumstances; and (4) an extraordinary and compelling reason other than or in combination with one of the above. U.S. Sentencing Guidelines Manual § 1B1.13(1)(A) & cmt. n.1(A)–(D) (U.S. Sentencing Comm'n 2018). The defendant, however, must not be "a danger to the safety of any other person or to the community," *id.* § 1B1.13(2), and "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason," 28 U.S.C. § 994(t); *see also* U.S.S.G. § 1B1.13 cmt. n.3.

### III.    <u>ANALYSIS</u>

Assuming, *arguendo*, that Ms. McClaflin's health issues and the COVID-19 pandemic constituted "extraordinary and compelling reasons" to reduce her sentence, application of the § 3553(a) sentencing factors outweighs any such reduction. Specifically, allowing Ms. McClaflin's to serve merely **14%** of a sentence that already constitutes a substantial downward variance from the applicable guideline range would not "reflect the seriousness of the offense, . . . promote respect for the law, [or] provide just punishment for the offense . . . ." 18 U.S.C. § 3553(a)(2)(A).

In reaching this conclusion, the Court is persuaded by the analysis of the Southern District of New York in its decision in *United States v. Israel*, No. 05 CR 1039 (CM), 2019 WL 6702522 (S.D.N.Y. Dec. 9, 2019). In that case, the court denied a white-collar defendant's motion for compassionate release, "notwithstanding his compromised medical condition or the undoubted fact that he could receive better medical care in the private sector." *Id.* at *9.

3

Like Ms. McClaflin, the defendant in *Israel* operated a Ponzi scheme that
defrauded millions of dollars from innocent investors. He was sentenced to 20 years
imprisonment and served 11 years—or **55%**—of his sentence when he requested
compassionate release based on his deteriorating health. *Id.* at *1. The court reasoned
that, even though the defendant presented a low risk of recidivism,

> cutting [his] sentence **in half**—which is what he requests—would
> undermine the goals of sentencing set forth at . . . § 3553(a). In particular,
> reducing [his] sentence would not reflect the seriousness of his crimes,
> provide just punishment, or promote respect for the law."
>
> * * *
>
> Adjusting Israel's sentence downward on "compassionate" grounds, despite
> the seriousness of his crime and the amount of his fraud . . . does nothing
> to promote respect for the law. It simply reinforces the belief that there is
> one law for the white-collar criminal and another law altogether for the
> ghetto dweller or the drug dealer.

*Id.* at *9, 10 (emphasis added).

The Southern District's reasoning applies with additional force in this case, as the
accommodation Ms. McClaflin requests would constitute a reduction in her sentence by
over **85%**. Such a reduction would not only fail to promote respect for the law—it would
make a mockery of it.

## IV.  **CONCLUSION**

Based on the foregoing, Defendant Karen McClaflin's Motion for Compassionate
Relief (Doc. # 117) is DENIED.

DATED: July 20, 2020              BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 17-cr-00168-CMA-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KAREN LYNN McCLAFLIN,
    Defendants.

_____

## NOTICE OF APPEAL
_____

Notice is hereby given that Karen Lynn McClaflin, defendant in the above captioned case, appeals to the Tenth Circuit Court of Appeals from the Order Denying Motion For Compassionate Release entered on July 20, 2020 as Docket No. 129.

DATED:   July 24, 2020.              Respectfully submitted,


                    NATHAN D. CHAMBERS LLC
                    By:    s/Nathan D. Chambers
                    Nathan D. Chambers
                    303 16th Street, Suite 200
                    Denver, Colorado  80202
                    (303) 825-2222

1

CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2020, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.

By: ___s/Nathan D. Chambers_____
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
(303) 825-2222